**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CORA E. BENNETT, individually and On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>SPRINT NEXTEL CORPORATION, GARY D. FORSEE, PAUL N. SALEH And QILLIAM G. ARENDT, )<br><br>Defendants. ) | Case No. 09-CV-2122 EFM/KMH |

**CONSOLIDATED COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**INTRODUCTION AND OVERVIEW**

1.      Lead Plaintiffs PACE Industry Union-Management Pension Fund, Skandia Life Insurance Company and the West Virginia Investment Management Board (collectively, "Plaintiffs"), on behalf of themselves and all other persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon the investigation of Plaintiffs' counsel, which included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Sprint Nextel Corporation ("Sprint" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews of former Sprint officers and employees, and media reports about the Company.  Plaintiffs further believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

2.     This is a class action for violations of the federal securities laws on behalf of all purchasers or acquirers of Sprint securities between October 26, 2006 and February 27, 2008, inclusive (the "Class Period"), against Sprint, Gary D. Forsee, the Company's former Chief Executive Officer ("CEO") and Chairman, Paul N. Saleh, the Company's former Chief Financial Officer ("CFO"), and William G. Arendt, Sprint's former Senior Vice President and Controller. Plaintiffs' claims arise from allegations of securities fraud in violation of §10(b) of the Securities Exchange Act of 1934 ("1934 Act") and control-person claims under §20(a) of the 1934 Act.

3.     During the Class Period, defendants issued a series of false and misleading statements touting Sprint's tightened credit standards, decreasing reliance on subprime subscribers, improved wireless subscriber metrics, and the integration of Sprint and Nextel Communications ("Nextel") and the Company's goodwill assets associated with Nextel.  Defendants' misstatements and omissions obfuscated growing problems with Sprint's subscriber base and integration efforts while artificially inflating the price of the Company's publicly traded securities.  Ultimately, when the truth emerged following defendants Forsee and Saleh's termination, Sprint's stock price plummeted and the Company's shareholders suffered billions of dollars in damages.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b), 78t(a) and 78t-1) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC.  Jurisdiction is conferred by §27 of the 1934 Act (15 U.S.C. §78aa).  Venue is proper pursuant to §27 of the 1934 Act.  Sprint's headquarters are located at 6200 Sprint Parkway, Overland Park, Kansas and many of the acts and transactions constituting the violations of the securities laws alleged herein occurred in this District.

5.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Lead Plaintiffs**

6.     On June 5, 2009, the Court appointed PACE Industry Union-Management Pension Fund, Skandia Life Insurance Company and the West Virginia Investment Management Board as Lead Plaintiffs to represent the proposed class of Sprint shareholders.

(a)     PACE Industry Union-Management Pension Fund is a multi-employer pension fund headquartered in Nashville, Tennessee.  The PACE Fund is a Taft-Hartley trust fund, jointly administered by a board of trustees of both labor and management representatives.  During the Class Period, the PACE Fund purchased and held shares of Sprint common stock as detailed in the Fund's certification filed with the Court in support of its motion to be appointed Lead Plaintiff. As a result of the defendants' conduct detailed herein, the PACE Fund suffered damages in connection with its purchases of Sprint securities.

(b)     The Skandia Life Insurance Company is Sweden's largest life insurance company and provides a range of financial and insurance services.  Skandia is headquartered in Stockholm, Sweden.  During the Class Period, Skandia purchased and held shares of Sprint common stock as detailed in the Fund's certification filed with the Court in support of its motion to be appointed Lead Plaintiff.  As a result of the defendants' conduct detailed herein, Skandia suffered damages in connection with its purchases of Sprint securities.

(c)     The West Virginia Investment Management Board is the principal investment management organization for the State of West Virginia.  Headquartered in Charleston, West Virginia, the West Virginia Investment Management Board is responsible for the investment of all of

the State's defined benefit retirement plans, the Workers' Compensation and Pneumoconiosis plans, general revenue, special revenue, municipal bond moneys, certain local government moneys, state bond proceeds, and miscellaneous other long-term assets.  During the Class Period, West Virginia purchased and held shares of Sprint common stock as detailed in the Investment Management Board's certification filed with the Court in support of its motion to be appointed Lead Plaintiff.  As a result of the defendants' conduct detailed herein, West Virginia suffered damages in connection with its purchases of Sprint securities.

**Defendants**

7.     Defendant Sprint is a wireless (cellular) and wireline communications services company with its headquarters located at 6200 Sprint Parkway, Overland Park, Kansas.  At all relevant times, Sprint's common stock traded under the symbol "S" on the New York Stock Exchange ("NYSE"), which is an efficient market.  As of February 21, 2008, there were over 2.7 billion shares of Sprint's common stock outstanding.

8.     Defendant Gary D. Forsee served as President and CEO and a director of Sprint from March 2003, and Chairman of the Board from December 2006, until his termination on October 8, 2007.  In August 2006, immediately before the start of the Class Period, Forsee consolidated his power at Sprint, forcing out the Company's Chief Operating Officer ("COO"), Len Lauer, and assuming all of the COO's day-to-day operating responsibilities.

(a)     During the Class Period, Forsee was responsible for the issuance of false and misleading statements about Sprint and failed to disclose the true facts about Sprint's subprime wireless customer base and resulting subscriber addition rate, churn (the percentage of existing subscribers who have cancelled service) or average revenues per user ("ARPU"), the integration of Sprint and Nextel, including Sprint's code division multiple access network ("CDMA") and Nextel's integrated digital enhanced network ("iDEN"), or the Company's financial results.  *See* ¶¶23-28, 34-

38, 42-43, 48-49, 52-54, 56, 59-63.   In addition to issuing false and misleading statements throughout the Class Period, Forsee repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of Sprint, and failed to do so.

(b)      As CEO and Chairman, Forsee was responsible for directing Sprint's financial and business affairs.   Specifically, during conference calls with analysts and investors, Forsee repeatedly held himself out as knowledgeable about Sprint's wireless subscriber base, including the credit standards applied to new and existing subprime customers, the integration of Sprint and Nextel and the Company's financial results.   Moreover, in conjunction with each of Sprint's Class Period financial reports publicly filed with the SEC through 2Q 2007, Forsee assured investors that he, together with defendant Saleh, was personally "responsible for establishing and maintaining disclosure controls and . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Sprint], including its consolidated subsidiaries, is made known to us by others within those entities."   At no time during, or after, the Class Period did Forsee or Saleh assert that they were not aware of material aspects of Sprint's core business operations, including the wireless subscriber credit standards or the integration of the Sprint and Nextel networks.

9.      Defendant Paul N. Saleh served as CFO of Sprint from the time of the merger with Nextel in August 2005 until his forced resignation on January 25, 2008.   Previously, Saleh served as CFO of Nextel from 2001 until August 2005.   Saleh briefly assumed the role of Acting CEO of Sprint upon Forsee's termination until he was removed from the position on December 18, 2007.

(a)      During the Class Period, Saleh was responsible for the issuance of false and misleading statements about Sprint and failed to disclose the true facts about Sprint's subprime wireless customer base and resulting subscriber addition rate, churn or ARPU, the integration of

Sprint and Nextel, including the CDMA and iDEN networks, or the Company's financial results. *See* ¶¶23-25, 27, 30-31, 34-45, 48-49, 52-53, 55, 59-62, 67-70.  In addition to issuing false and misleading statements throughout the Class Period, Saleh repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of Sprint, and failed to do so.

(b)     As CFO and, briefly, CEO, Saleh was, with Forsee, responsible for directing Sprint's financial and business affairs.  Specifically, during conference calls with analysts and investors, Saleh repeatedly held himself out as knowledgeable about Sprint's wireless subscriber base, including the credit standards applied to new and existing subprime customers, the integration of Sprint and Nextel, the rebanding of portions of the iDEN network, and the Company's financial results.  Moreover, in conjunction with each of Sprint's Class Period financial reports publicly filed with the SEC, Saleh assured investors that he, together with defendant Forsee, was personally "responsible for establishing and maintaining disclosure controls and . . . [d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Sprint], including its consolidated subsidiaries, is made known to us by others within those entities."  At no time during, or after, the Class Period did Saleh assert that he was not aware of material aspects of Sprint's core business operations, including the customer credit standards or the integration of Sprint and Nextel.

10.     Defendant William G. Arendt served as Senior Vice President and Controller of Sprint at all times during the Class Period.  Arendt assumed the role of Acting CFO of Sprint upon Saleh's forced resignation at the end of the Class Period.  During the Class Period, Arendt signed each of the Company's false financial statements and had direct and supervisory involvement in Sprint's day-to-day operations.

11.     Defendants Forsee, Saleh, and Arendt, because of their positions with the Company, possessed the power and authority to control the contents of Sprint's quarterly and annual reports, press releases, and presentations to securities analysts, money and portfolio managers and individual and institutional investors.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.

## BACKGROUND TO THE SPRINT SECURITIES FRAUD

12.     Sprint was founded in 1898 in Abilene, Kansas as the Brown Telephone Company, a manual switchboard operation that linked homes to Western Union or the town hall.  Sprint steadily grew from a landline telephone company operating as a competitor to the Bell System, and by 2004 was generating the majority of its revenue through wireless communications services.

13.     In 2003, defendant Forsee left BellSouth and took over the top job at Sprint, after Sprint's top two executives had been forced out over their use of personal tax shelters.  Forsee had been vice chairman of BellSouth and heir apparent to its CEO, and his defection resulted in a tremendous conflict between Sprint and BellSouth.  Ultimately, to resolve litigation with BellSouth over Forsee's abrupt departure, Sprint had to bar Forsee from participating in any merger and acquisition discussions for one year.  The timing proved difficult, as Forsee and Sprint were forced to sit on the sidelines during a period of substantial and lucrative consolidation in the telecommunications industry.

14.     At the same time, Sprint was trailing a distant third to AT&T (then doing business as Cingular) and Verizon and had never turned a profit from the wireless services business.  Facing complaints that Sprint could not compete with AT&T and Verizon in the wireless market, and unable to drive subscriber growth organically, Forsee desperately began to search for acquisition targets that could help Sprint keep up with the scale of its rivals.  Forsee and Sprint, however, had already missed out on the wireless acquisition spree.  As rumors circulated that Sprint would have to sell itself or its wireless business, Forsee latched on to the idea of merging with Nextel, then the country's fifth largest wireless carrier.

15.     Nextel was less than twenty years old, but had carved out a substantial niche market with its push-to-talk, walkie talkie features.  Beloved by corporations, small businesses, and government entities, the push-to-talk cellular phones had a devoted following and generated some of the highest ARPU in the industry.  Nextel, however, had oversold its iDEN network and, while facing capacity problems, was also being forced by the Federal Communications Commission ("FCC") to reband the network's 800 MHz spectrum to prevent interference with police and fire communications.[1]  As a result, Nextel's network needed a substantial infusion of capital to sustain operations, let alone upgrade the iDEN network and add new subscribers.

---

[1]     Following September 11, 2001, government public safety officials had been complaining about static from cell phones that would disrupt emergency radio communications running on the 800 MHz spectrum band.  Nextel's telecommunication systems had been linked to these problems affecting public safety communications and, in August 2004, Nextel reached an agreement with the FCC to "reband" or relocate its 800 MHz spectrum – where the Nextel iDEN network operated – to reduce this interference.  The solution called for Nextel to pay to move its service and public-safety agencies to separate channels, and in return, the FCC would give Nextel an additional 10 MHz of spectrum.  At the time Sprint acquired Nextel and inherited the task of reshuffling the iDEN's network's 800 MHz spectrum, defendants stated that the project would cost $2.8 billion and be completed by the end of June 2008.

16.     Despite the problems with Nextel's iDEN network and the resulting capacity constraints, Forsee was determined to expand Sprint's wireless subscriber base.  A deal was announced in December 2004.  Labeled a "merger of equals," on August 12, 2005 Sprint completed the purchase of Nextel for $37.8 billion, $15.6 billion of which was allocated to goodwill – the amount of the purchase price that exceeded the fair value of Nextel's assets.  Forsee became CEO and President of the combined company, and Nextel's CFO, Saleh, became CFO, while Nextel's former CEO, Tim Donahue, became Chairman.

17.     Justifying the massive purchase price, defendants boasted that the integration of Sprint and Nextel would create $14.5 billion in synergies – from improved customer retention, co-location of cell sites, and network operating costs, among other components – as the Company consolidated the two wireless networks and business operations.

18.     *The Washington Post* quoted Forsee discussing the acquisition in an October 27, 2005 article titled "Sprint Nextel Post Higher Profit," stating it was on course to realize the $14.5 billion in merger synergies – a statement which defendants would repeat throughout the Class Period:

> The company repeated its forecast that it will achieve $14.5 billion in savings from the merger through 2008.
>
> Sprint Nextel chief executive Gary D. Forsee was upbeat in a presentation to analysts, saying, "***We are significantly ahead of schedule on all merger initiatives and the results we are producing***."

19.     Despite the rosy scenarios proffered by Forsee, problems emerged soon after Sprint's acquisition of Nextel was consummated.  Cultural differences rapidly divided legacy Sprint and Nextel personnel – the former considered to be too rigid and slow and the latter perceived as undisciplined – and technological differences all but eliminated any chance of consolidating the iDEN and CDMA networks.  The Nextel name, and the push-to-talk technology, effectively disappeared from Sprint's marketing, while Sprint's reputation for awful customer service began to

affect legacy Nextel customers.  As a result, going into 2006, Sprint was unable to match the subscriber or revenue growth reported by AT&T or Verizon.  Forsee had solidified Sprint's spot as the third largest wireless provider, but the Company was increasingly falling further behind its rivals.

20.     In an attempt to calm investors and in response to pressure to make a change in the wake of the Company's weak performance, Forsee fired Sprint's COO, Len Lauer, and took over his operational duties, which included the oversight of merger integration, and improvement of subscriber growth and customer retention.  According to Ric Prentiss, an analyst at Raymond James, "[s]ome investors were hoping for a change in management.  Someone had to fall on the sword."  One of Lauer's chief responsibilities had been to drive the integration of Nextel since the 2005 acquisition and both analysts and investors had criticized the slow pace of that consolidation.

21.     Two months later, on October 10, 2006, amid rumors of personal and professional tension with Forsee, Sprint's executive chairman and Nextel's former CEO Donahue stepped down from the Company – more than a year ahead of his scheduled retirement.  On December 12, 2006, Sprint announced that Forsee had stepped in as Chairman, further consolidating his power.

22.     In the wake of the Nextel acquisition, which was increasingly being perceived as a disaster, significant losses to the quality and quantity of the Company's subscriber base and fearing that they would be next to follow in Lauer and Donahue's footsteps, defendants Forsee and Saleh began their campaign to portray the customer losses as a temporary phenomenon, inflate the Company's financial results and create the impression that Sprint was realizing significant synergies from the consolidation with Nextel, attracting an ever increasing customer base of a higher credit quality and driving Sprint in a competitive direction.  Defendants were successful in creating that impression; however, it was both illusory and, ultimately, temporary.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS**

23.     The Class Period commences on October 26, 2006.  On that date, defendants issued a press release over the *Business Wire* in which they reported the Company's financial results for 3Q 2006.  Defendants' press release stated in part:

> ***Total wireless net subscriber additions were 233,000 for the quarter due to growth in CDMA post-paid subscribers***, a gain in Boost pre-paid service subscribers and renewed growth in wholesale subscribers, offset by a decline in iDEN post-paid subscribers.  At the end of the quarter, Sprint Nextel's total base was 51.9 million subscribers.

> \*          \*          \*

> "In the third quarter, ***our margins benefited from merger synergies and the scale provided by acquisitions***," said Sprint Nextel President and Chief Executive Officer Gary Forsee.  "Our profitability in the quarter is encouraging and demonstrates the potential of an asset mix that now is predominantly wireless. ***In the third quarter we took some actions to improve the quality of the customers coming into our business, and this is constraining our near-term growth***.  At the same time, we have taken a number of actions we believe will improve our top-line growth performance over time.

> \*          \*          \*

> Discussion of the following Wireless results is on a pro forma basis.

> Total operating revenues increased 12% compared to the year-ago period.  Service revenues increased 14% due to a larger subscriber base, offset by lower average revenue per user (ARPU).  After adjusting for Nextel Partners and all affiliate acquisitions, pro forma year-over-year net operating revenue growth would have been approximately 4%.

> Adjusted OIBDA Margin improved to 38.4% compared to 37.6% in the second quarter and 36.5% a year ago.  The margin gain is due to a growing customer base and operating cost efficiencies which offset lower average customer revenues.

> In the quarter, the company reported a ***total net subscriber gain of 233,000***.  Total net additions include a loss of 188,000 post-paid subscribers, a gain of 216,000 Boost subscribers, a gain of 177,000 Wholesale subscribers, and a gain of 28,000 net subscribers from affiliates.  The company also acquired 458,000 post-paid customers though the purchase of UbiquiTel.

> Total retail gross additions were approximately 3.8 million compared to 3.5 million a year ago on a pro forma basis and 3.8 million in the second quarter.

*Post-paid churn in the quarter was 2.4%*.  Churn increased from 2.1% in the second quarter, mainly due to seasonally higher CDMA network involuntary churn, higher iDEN network voluntary churn, and higher-than-expected Nextel Partners churn.  Boost churn was 6.8% in the quarter versus 6.0% in the second quarter.  The increase is due to increased competition.

*Direct post-paid ARPU was approximately $61*, a decline of 5.5% year-over-year and 1% sequentially.  After adjusting for the effects of affiliate acquisitions, the decline was 4% from a year ago and 1% sequentially.  Strong growth in data services partially mitigated lower contributions from voice revenues.  Data revenues contributed approximately $7.75 to direct post-paid ARPU, up from $7.25 in the second quarter.  CDMA post-paid data ARPU exceeded $10 in the quarter.  Boost ARPU was approximately $32.50 in the quarter.

24.     On October 26, 2006, defendants hosted a conference call with investors and analysts to discuss Sprint's 3Q 2006 financial results and the Company's business and operations.  The call repeated and addressed information previously made public in defendants' October 26, 2006 press release, including Sprint's reported income, earnings per share ("EPS"), net subscriber additions, churn rate, and ARPU.  Defendants Forsee and Saleh led the call and addressed analysts' and investors' questions and concerns about Sprint's business.

(a)     During his opening statement, Forsee declared that "we have crossed the one-year anniversary of our merger.  We have accomplished a lot in a relatively short period of time . . . delivering as many of our integration goals, including areas such as retail store rationalization, *systems consolidation, network integration*, and producing positive results around margin expansion, solid free cash flow and strong data growth, wireless and wireline."  Forsee continued, "our technology plan of record, as announced at the time of the [Nextel] merger, is *on track, if not ahead of the plans* that . . . we envisioned at that time. . . .  Additionally, we will continue to invest in our iDEN network."  Addressing Sprint's credit standards, Forsee claimed: "*We tightened credit, as we outlined in the second quarter, to improve our customer mix*."  Forsee continued, "*[w]e've implemented a number of programs to improve our involuntary churn overtime, and these include tightening overall credit across both platforms, and we have done specific credit tightening on*

*iDEN capacity-constrained markets*."   Commenting on the CDMA network, Forsee stated that "CDMA has been experiencing stable sales performance . . . . *The quality of our CDMA gross adds is also very promising*, with the absolute volume of prime gross adds at the highest point in seven quarters in the third quarter."

      (b)      During his opening statement, Saleh reiterated that, "[o]ur margins also reflect the benefit of *accelerated merger synergies*. . . .  Overall, the Company is *on track to realize the $14.5 billion of NPV merger synergies*."  Saleh continued: "We're realizing significant synergies from our merger and acquisitions."   Addressing credit standards, Saleh stated that, "we are implementing several actions to improve the quality of our customers that we're acquiring, including *further credit tightening*.  These actions will likely constrain gross add and net adds in the near term."

      (c)      Included in the PowerPoint presentation used by Forsee and Saleh were slides identifying credit tightening as one of Sprint's "Key 3Q Actions" and "[p]olicy changes that will improve involuntary churn[:] *Overall credit tightening*[;] Specific credit tightening in iDEN capacity constrained markets."  Defendants' slide on subscriber additions provided "CDMA[:]  Gross adds stable" and for iDEN "[d]eclining subscribers driven by credit tightening & higher churn."

      (d)      In response to a question about Sprint's declining market share, Forsee asserted: "*The credit tightening that's occurred across both platforms, and then even more significantly in some of the iDEN markets that perhaps were constrained on capacity is a function of, again, managing capacity*, as we continue to make investments in that platform, and as we work our way through rebanding . . . .  So that is in the mix of, quote, managing growth but managing the right growth.  And we believe that, with the handset lineup that we're introducing, and with the focus that we're putting particularly on third party channels, which in the past have been very

focused on prime and very focused on prime business iDEN, so all of that suggests that we are, again, very clearly focused and resolved on improving our customer mix."

(e)     In response to a separate question about churn and whether investors could expect Sprint's churn rate to improve in 2007, Forsee stated: "Yes, we have internal targets, including where we want churn to go in 2007.  And I think by our tone and by the actions that you heard us describe, you know, the headline ought to be, we want to get our churn to competitive levels, and that implies to Cingular and Verizon, in that direction anyway, with initiatives that we have for 2006, 2007.  I think, you know, we can't sit here and call today at a level of precision, except that obviously it's implied in our forecast and our guidance how all of those pieces land in terms of the mix.  But we know *we have seen that effect on the CDMA platform, and we will see the effects of the credit tightening and the moving out, if you will, as we've already seen in iDEN over the last couple quarters of the lower value ASL customers that we won't have in our base going forward*, based on the acquisition strategy.  *So that process has been under way for now a couple of quarters on the iDEN platform, and for CDMA implemented credit tightening in October, again, to take out that lower value set of customers that were high churn, high cost* and be sure we're attracting with our acquisition strategies a different mix going forward."

(f)     Saleh responded to a question about Sprint's reported ARPU, stating that "our focus on prime customers is directed at people who would have, as you well know, very low churn, but [at] times lower ARPU."

(g)     Responding to numerous questions about the integration of Nextel, the iDEN network and Sprint's purported tightening of credit standards, Forsee and Saleh also made the following comments:

- "we're going to continue to invest in the iDEN platform for coverage and capacity";

- "[A] number of actions . . . have been put in place and credit tightening is one of those actions. . . . So *the iDEN credit tightening occurred very significantly. And then across both platforms on the first of October we took additional credit tightening action*";

- "we're constraining our growth near term because our focus is on improving the customer mix and the quality of the customer that we are acquiring"; and

- "we do want to regain traction on the iDEN growth side, but we want to do that by very specific targeting at the right kind of customers, and we think the plans we have in place are beginning to do that."

25.     Later that same day, in an October 26, 2006, *Dow Jones* news release titled "Sprint CFO: Seasonal Weakness May Pressure Rev," defendants Forsee and Saleh were quoted discussing Sprint's improving customer base and merger synergies:

> The Reston, Va., company expects to post operating revenue of $41 billion to $41.5 billion for the year and adjusted operating income before depreciation and amortization of $12.6 billion to $12.9 billion.
>
> In addition, *Sprint's focus on tightening its credit policy and improving its customer mix* likely will constrain subscriber growth in the near term, Saleh said Thursday during a conference call to discuss the company's third-quarter results.
>
> "*We want to improve the mix of customers*," Chief Executive Gary Forsee said. "That's a reflection of where we think value gets created long term. We've stated clearly we're not satisfied with the performance."
>
> *                *                *
>
> *Saleh added the company is on track, if not ahead, on realizing the $14.5 billion in merger cost savings from the integration of the Sprint and Nextel businesses*.

26.     In an October 26, 2006, *Business News* article titled "Sprint Nextel reports 3Q income down 52 percent; Nextel business struggles" defendants' purported credit improvement efforts were discussed:

> Sprint's chief executive, Gary Forsee, said the company is working hard to not only attract more customers but make sure those customers are willing to spend more on Internet, music downloads and other lucrative data services.

- 15 -

Those efforts include swanky new phones, new advertising featuring "Office Space" actor Ron Livingston and *new credit requirements aimed at weeding out low-margin customers* who tend to hopscotch between providers.

"We . . . have been openly and transparently (communicating) that our operating results are not what we or you expected but we know very specifically the actions and focus required to improve our results," Forsee told analysts during a conference call.

The turnaround won't come quickly, however. Paul Saleh, Sprint's chief financial officer, told analysts he expects subscriber growth to remain flat during the fourth quarter and into 2007.

"*We're constraining growth near-term because we're improving the quality of the customer base*," he said.

27.     On November 9, 2006, defendants filed Sprint's quarterly report with the SEC on Form 10-Q for 3Q 2006.  The Company's Form 10-Q was signed by defendant Arendt, certified by defendants Forsee and Saleh, and reported Sprint's financial results for 3Q 2006 as previously provided in defendants' October 26, 2006 press release.

28.     Together with the 3Q 2006 Form 10-Q, defendants Forsee and Saleh assured investors that they personally "carried out an evaluation of the effectiveness of the design and operation of [Sprint's] disclosure controls and procedures" and based on this evaluation "concluded that the design and operation of the disclosure controls and procedures were effective as of September 30, 2006."  Forsee and Saleh also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [3Q 2006 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

29.     On December 4, 2006, *USA Today* published an article titled "Can new Sprint rise above its hang-ups?; CEO stakes his reputation on $35 billion Nextel merger," in which defendant Forsee discussed Sprint's push to improve customer quality and improve operations:

> Eager to attract new customers, Sprint signed up a lot of deadbeats. The crush of bad accounts helped drive down the average revenue per subscriber. They also soaked up network capacity, in some cases crowding off paying customers.
>
> To remedy the problem, ***Forsee has lately been pushing Sprint to dump customers who aren't paying their bills*** (called "involuntary churn" in the industry). The housecleaning was a major factor in Sprint's sky-high churn rates, which are expected to improve as it signs up new, credit-worthy (paying) customers.
>
> *         *         *
>
> Forsee in August fired a shot across the bow of his own ship: He canned his chief operating officer, Len Lauer, and took over day-to-day operations. Says Forsee: "***I'm where the buck stops***."
>
> Forsee declines to discuss the events that led up to Lauer's removal. But he says it was necessary to refocus Sprint and "change the pace" of progress. "It was my decision."
>
> Lauer's abrupt removal led to some speculation that Forsee's job was on the line. Asked if this is true, Forsee pushes back, ever so slightly: "No one will ever put more pressure (on me) to make sure we deliver than I do."
>
> Tim Donahue, Nextel's former chief and Sprint's current chairman, says the board is "100% supportive" of Forsee. But he also says there is a limit to its patience.
>
> "From my perspective as chairman, Gary has the complete support of the board at this point in time," says Donahue, who is stepping down at the end of the year. "But who knows over time? This team has to execute."
>
> You won't get disagreement from Forsee. A 30-year telecommunications veteran, Forsee has staked his reputation and that of his company on his belief that the $35 billon gamble known as Sprint Nextel can change the world of wireless. Now, it's showtime.

30.     On December 5, 2006, defendant Saleh addressed investors and analysts in a conference call during the Credit Suisse Media & Telecom Week.

(a)      In his opening statement, Saleh stated that Sprint was "increasing [the] percentage of prime customers" and "***[w]e have tightened credit starting in the third quarter, and we've tightened again in the beginning of the fourth quarter*** . . . . Now, the implications of these areas of focus are going to be first, an improving mix of prime customers.  And that is something that we started to see in the third quarter, and we're going to see a greater percentage of our gross add coming from prime customers."  Saleh continued, commenting "[w]e are managing also the shift that is coming from sub-prime to prime customers in our base" and "[w]e will have a softer post-paid gross add due to the credit tightening that I mentioned earlier. We'll see some profit on – pressure on profitability – as a result of some of these actions.  And the lower post-paid churn is our objective for the long run.  We expect to have churn that is really pretty much in line with some of our key competitors."  Addressing the Nextel integration efforts, Saleh stated, "we already have the, a combined, an integrated billing platform.  All of the iDEN customers are already on it; all the new CDMA customers are already being, the new customers are being put on that new billing platform, and we are migrating month after month all the customers that we had that were CDMA customers. We expect to have this combined, the billing platform completed by the second half of the year, probably second to third quarter of next year."

(b)      In response to questions regarding Sprint's subscriber base and churn, Saleh made the following statements:

- "[O]n the gross add side we have, we've experienced a bit more pressure as a result of our objective to focus more on the prime customer.  So ***we have tightened credit across the board, and that's one of the reasons why our gross adds have come down***.  As the distribution channel refocused their attention to attracting more prime customers, so you have that kind of lag effect"; and

- "[W]e have the added challenge again of moving the base to becoming more prime, and second of all trying to really sort through getting some of the customer base, some of the sub-prime off of our network.  And so the combination of these things take a little while, but I would say I believe on the churn side we should see

significant improvement starting in the second half, and probably beginning maybe in the second quarter of next year."

31.     The next day, on December 6, 2006, defendant Saleh addressed investors and analysts in a conference call during the UBS 34th Annual Global Media Conference.  In his opening statement, Saleh stated that Sprint was "*ahead on the synergy*" with Nextel and that "we will in '07 particularly start to benefit from the integrated billing platform which is way underway."  In response to a question about subscriber growth, Saleh stated:

> All right.  If I look at what we have done, in the fourth quarter *we have tightened credit further*.  And this is, as you well know, the fourth quarter is less of a business gross add story as typically it is a consumer driven season.  And we did it because our objective is to attract very valuable customers and to reduce the churn that we have experienced from sub prime customers.  So we would expect everything else being equal to have potentially more headwinds on the gross add level because we're constraining growth.
>
> *         *         *
>
> I think at this stage we know that the constraint that we're putting on the credit tightening will just really constrain some of the gross add that we have in the fourth quarter.  And the churn we said will remain flat, we do next to get to go up but remain flat, relatively flat for the fourth quarter.  And as a result of that we expect actually the churn as we move into 2007 to start to improve in the first quarter of next year and continue to drop more significantly as we go through the year as a result of all the investments that I have mentioned.

32.     Defendants' statements during October, November, and December 2006 (¶¶23-28, 30-31) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     Defendants had not "tightened credit" or "tightened credit further" during 4Q 2006 but had, as later admitted, actually reversed the credit standards implemented earlier in 2006 and increased the credit extended to boost subscriber numbers, reduce churn, and inflate ARPU through the addition of subprime customers on both the iDEN and CDMA networks.  As a result, the

reported net subscriber gain was driven by subprime customers and was not constrained by any credit policy;

(b)     Sprint's reported CDMA subscriber "additions," in particular the post-paid subscriber additions, and the purported "solid demand" for CDMA services were the result of reducing the Company's credit standards to encourage the addition and temporary retention of subprime customers and the Company encouraging sales personnel to poach legacy Nextel iDEN customers – merely converting current iDEN subscribers to the CDMA network, not adding new subscribers.  Former Sprint sales personnel who were with the Company during the Class Period have confirmed that they were encouraged to and were able to hit their "new add targets" and bonus targets by simply "porting" legacy Nextel iDEN customers over to the CDMA network.  As a result, the reported growth in CDMA subscribers was illusory;

(c)     Sprint's reported numbers for total wireless subscribers and post-paid customers for 3Q 2006 were also inflated, and reported churn was reduced by defendants' practice of "hot-lining" customers that should have been reported as deactivated.  According to former Sprint employees, including a Senior Manager of Marketing who was with the Company through much of the Class Period and personally involved in the hot-lining process, Sprint was not "shedding" or "weed[ing] out low-quality customers through tougher credit requirements," but was, in fact, keeping subscribers who had failed to make payments on Sprint's billing system and identifying them as active subscribers for several months, even though their services had been cancelled due to lack of payment.  This had the effect of increasing the Company's total subscriber numbers and reducing reported churn.  Sprint's customer retention rates only improved as a result of lowering credit standards and "hot-lining" subprime subscribers who were not making payments;

(d)      Sprint's iDEN subscriber losses were not due to "credit tightening," but were the result of porting iDEN subscribers over to the CDMA network to create the appearance that the CDMA network was thriving, as well as the iDEN network's over-capacity in large, urban markets and declining quality, as defendants failed to upgrade or even maintain the network.  As a result, there was no basis to expect that the iDEN subscriber losses would stabilize;

(e)      Sprint's reported churn percentage, particularly for the CDMA network, was reduced by the addition of subprime customers, increasing the total number of subscribers, and using the lower credit standards and "hot-lining" to keep subprime customers listed as active subscribers;

(f)      The decline in Sprint's ARPU was moderated by the undisclosed addition of subprime customers who, while far less likely to pay their bills, tended to have a higher ARPU than prime customers;

(g)      As of the end of 3Q 2006, defendants were not "ahead on synergy," "on track, if not ahead of plans," or "on track to realize the $14.5 billion of NPV merger synergies," and had not delivered on the systems consolidation or network integration goals.  In fact, while a substantial portion of the purported merger synergies were premised on consolidating network facilities and collocating the iDEN and CDMA networks, it was later admitted that less than 10% of network sites had actually been collocated, the vast majority of which were newly built sites, and incompatibility issues prevented any progress on consolidating the two networks.  As of 3Q 2006, and throughout the Class Period, Sprint had failed to integrate the primary network infrastructure, including the network switches, base stations, operation maintenance centers, base station controllers, or home location registers.  Moreover, Sprint was not benefitting from any improvement in customer retention.  As a result, Sprint was not "on course" or "ahead of plans" to achieve any material merger synergies; and

(h)     Sprint was significantly behind and over budget in the efforts to comply with the FCC's requirement that the Company reband the iDEN 800 MHz spectrum to prevent interference with public-safety communications.  As of 3Q 2006, Sprint had completed less than 30% of the necessary rebanding work and would not be able to complete the process on time or within the original budget.

33.     On October 26, 2006, in response to defendants' statements, Sprint's stock price rose above $19 per share.  Defendants' statements during October, November, and December 2006, which were false and misleading when made, continued to have a direct effect on Sprint's stock price which traded at artificially inflated levels throughout the period.

34.     On January 8, 2007, defendants issued a press release over the *Business Wire* titled "Sprint Nextel Provides Update on Financial Outlook and Operating Performance," in which defendant Forsee discussed Sprint's merger synergies and credit improvement campaign:

> In the quarter, total post-paid gross additions were approximately 2.64 million.  As expected, ***credit tightening*** actions initiated in the second half of the year impacted fourth-quarter customer growth.  These actions improved the credit mix of acquisitions in the quarter. . . .

> "Sprint Nextel ended 2006 in a solid financial position," said Gary D. Forsee, the company's chairman and chief executive officer.  "We expect our full-year projected financial results will be in line with our prior guidance, and ***we remain on or ahead of plan in integrating our pre-merger operations, systems and product and service line up***.

> "While it was a challenging year, we initiated actions to improve our operating performance and enter 2007 with signs of progress underway," said Forsee. "***There was solid demand for CDMA voice and data services in the fourth quarter***, and we had a strong performance in our Mobile Virtual Network Operator (MVNO) channels. We are also pleased with the early customer acceptance of our enhanced device portfolio.

> \*       \*       \*

Over the course of the year we expect to resume growth of the post-paid customer base and stabilize these revenues, improve post-paid churn to below two percent and achieve increasing merger synergies.  We expect these actions to support a return to

mid-single digit revenue growth and mid-to-high teen adjusted OIBDA growth in 2008, prior to dilutive impacts from the 4G initiative."

*     *     *

Sprint Nextel expects to incur a total of approximately $700 million in merger integration and severance costs in 2007 with the bulk of these costs coming in the first half of the year. ***The company remains on course to achieve the $14.5 billion of net present value of merger synergies***.

35.     On January 8, 2007, following the release of Sprint's financial outlook update, defendants Forsee and Saleh hosted a conference call with investors and analysts. The call repeated and addressed information previously made public in defendants' January 8, 2007 press release. During the call, defendants made the following statements regarding Sprint's subscriber base and churn:

- "CDMA churn improved sequentially and core iDEN churn was flat . . . .  As expected, ***gross adds in the quarter were impacted by credit-tightening actions*** undertaken in the second half of the year";

- "***We've also raised the credit quality of our customer base by further tightening credit*** . . . .  This action, while producing long-term benefits, has resulted in near-term post-pay subscriber losses"; and

- "The credit tightening had the cause and effect that we had anticipated in terms of slowing down subscriber growth."

36.     On January 15, 2007, *RCR Wireless News*, in an article titled "iDEN losses take down Sprint Nextel; Carrier hopes job cuts, lower churn help financials," reported:

Sprint Nextel Corp.'s loss of postpaid iDEN customers accelerated during the fourth quarter, and investors jumped ship late last week after the company announced weak customer metrics. The carrier tried to temper fears with a flurry of other announcements promising revamped price plans, initial markets for its WiMAX network and 5,000 job cuts as it tries to turn things around.

Sprint Nextel said it would meet its financial guidance for 2006, but projected that network and business investments would likely affect its financial performance this year. However, company executives said that the carrier will be able to get its churn rate below 2 percent in 2007 and will begin to see positive numbers for its postpaid customer base-which has seen growth on the CDMA side, but which has been offset by the losses of valuable iDEN postpaid customers.

The company reported 742,000 net customer additions during the fourth quarter. That number reflected a loss of 306,000 postpaid subscribers for the period, widening from a third-quarter postpaid customer loss of 188,000 subscribers.  The company said its fourth-quarter postpaid performance was due to "solid gains in CDMA subscribers, offset by a decline in the iDEN base."  The carrier cited similar issues in the third quarter.

CFO Paul Saleh told analysts in a conference call that the first quarter was expected to be the last quarter of overall postpaid losses, and then numbers would start to improve.

"There was solid demand for CDMA voice and data services in the fourth quarter, and we had a strong performance in our mobile virtual network operator channels," said Gary Forsee, Sprint Nextel's chairman and CEO.  "As we indicated last year, issues related to the iDEN platform resulted in decreased demand for iDEN services and increased churn.  We expect the widespread introduction of our first combined CDMA/iDEN phones and improvements in iDEN network performance to benefit push-to-talk subscriber trends," he added.

37.    On February 28, 2007, defendants issued a press release over the *Business Wire* in which they reported the Company's financial results for 4Q and FY 2006.  Sprint announced "[w]ireless customer additions of 742,000 raises year-end total to 53.1 million; wireless service revenues and profits increase at double-digit rate" and stated in part:

For the quarter, diluted earnings per share (EPS) from continuing operations were 9 cents, compared to break-even in the fourth quarter of 2005.  Adjusted EPS before Amortization was 29 cents in the most recent quarter, compared to 23 cents in the fourth quarter of 2005, an increase of 26%.  The growth in earnings is due to higher contributions in both the Wireless and Long Distance segments.

For the full year, EPS from continuing operations was 34 cents compared to 40 cents for 2005.  Full-year 2006 Adjusted EPS before Amortization was $1.18, compared to pro forma Adjusted EPS before Amortization of $1.05 for the full year 2005, a 12% increase.

Consolidated net operating revenues in the fourth quarter of 2006 were $10.4 billion, an increase of 7% compared to $9.8 billion in the fourth quarter of 2005.  For the full year, total consolidated revenue of $41.0 billion increased 43% on a reported basis and 7% compared to pro forma 2005.

Consolidated adjusted OIBDA in the most recent quarter was $3.2 billion, an increase of 13% compared to the year-ago period.  Full-year consolidated adjusted OIBDA was $12.7 billion, an increase of 12% compared to pro forma 2005 full year adjusted OIBDA of $11.3 billion.  Consolidated adjusted OIBDA margin was 32.9%

- 24 -

in the fourth quarter of 2006 versus 31.2% in the year-ago period and 33.6% for the full year, compared to 32.2% for pro forma 2005.

*     *     *

- Customer retention rates improved sequentially.

- The credit mix of new subscribers was enhanced, but gross post-paid customer acquisitions declined.

- The postpaid Average Revenue Per User (ARPU) rate of decline again moderated.

38.     On February 28, 2007, defendants hosted a conference call with investors and analysts to discuss Sprint's 4Q and FY 2006 financial results and the Company's business and operations.  The call repeated and addressed information previously made public in defendants' February 28, 2007 press release, including Sprint's reported income, EPS, net subscriber additions, churn rate and ARPU.  Defendants Forsee and Saleh led the call and addressed analysts' and investors' questions and concerns about Sprint's business.

(a)     During his opening statement, Forsee declared: "In the fourth quarter we experienced a decline in our gross adds, *which was entirely attributable to lower subprime additions following credit tightening actions*" and "we had a modest sequential improvement in churn despite very high deactivations in the form of Nextel Partners base and we are tracking with our plans in the first quarter."  Forsee also declared that "*[w]e have temporarily slowed our top line growth to ensure that we improve the mix of our customer base* and these facts will negatively impact our margins in 2007 as we've indicated to you. . . .  In 2006 we continued to grow our overall subscriber base and we improved the quality of our post-paid customer base as a result."  Regarding churn, Forsee claimed that "on fourth quarter post-paid churn declined to 2.3% from 2.4% in the third quarter.  This decline was primarily driven by lower CDMA churn."  Regarding ARPU, Forsee stated that "in the fourth quarter our post-paid ARPU was slightly over $60, a 1% sequential decline.

ARPU decline moderated on a year-over-year basis to approximately 4.6%, in line with our expectations."

(b)     During his opening statement, Saleh boasted that Sprint had "met our full-year guidance for revenue and adjusted OIBDA" as a result of "significant merger synergies."  With regard to Sprint's subscriber results, Saleh stated, "we expect to report a similar number of post-paid subscriber losses in the first quarter of 2007 and post-paid net adds are expected to be positive in the second quarter and ramp up for the remainder of the year as our sale initiatives begin to take root and we make additional progress on customer retention."

(c)     Responding to questions regarding Sprint's subscriber base and credit standards, Forsee and Saleh also made the following comments:

- "CDMA is doing as well as it's ever done and that's witnessed by voluntary churn";

- "[W]e have been really pretty tight on our credit.  And as a result of that, we've seen our subprime growth that'd drop by about 35% as a result of the actions that we have taken"; and

- "[W]e like those early results that that change in customer mix will provide over time.  And obviously we're taking the short-term hit in growth, taking the short-term hit in top line performance, but that is, again, an equation that we're willing to undertake as we, again, set ourselves up for long-term shareholder gains here."

39.     Following defendants' conference call, *Reuters* issued an article on February 28, 2007, titled "Sprint Posts Higher Profit, Sees Subscriber Growth."  The article provided, in pertinent part, the following:

Sprint Nextel Corp. posted a higher quarterly profit on Wednesday and its shares rose 6 percent after the company reassured investors by repeating its forecast for a turnaround in subscriber losses.

The No. 3 U.S. wireless service provider has been losing customers in recent quarters, so investors were relieved that it reiterated its forecast for a net gain in postpaid customers, who pay monthly bills, in the second quarter.

*       *       *

- 26 -

Sprint had said in January that it added a net 742,000 customers in the fourth quarter, including 876,000 wholesale customer additions and net losses of 306,000 postpaid subscribers.  It ended 2006 with 53.1 million customers.

40.     On February 28, 2007, *Dow Jones Factiva* ran a story titled "Sprint 4Q Net Up; Posts High-Margin Customer Drop," which reported, in part:

> Looking ahead, Chief Financial Officer Paul Saleh said he expects similar results in the first quarter, but added that growth in post-paid subscribers should return in the second quarter and ramp up throughout the year.  ***Sprint expects to reduce its rate of monthly customer defections, which stood at 2.3% in the fourth quarter, to less than 2% by the end of the year.  The company's focus on shedding customers with higher credit risk has contributed to high customer turnover in recent months, but the strategy will lead to a more loyal customer base over time, Saleh said***.

41.     On February 28, 2007, *AFX International Focus* published an article titled "Sprint Nextel's 4Q revenue, profit rise."  The article reported that Sprint "***is attempting to weed out low-quality customers through tougher credit requirements***.  Chief Financial Officer Paul Saleh said that would continue to hamstring growth in the first quarter, but that he expected post-paid customer numbers to begin rising in the second quarter."

42.     On March 1, 2007, defendants filed Sprint's annual report with the SEC on Form 10-K for 4Q 2006 and fiscal year 2006.  The Company's Form 10-K was signed by defendants Forsee, Saleh and Arendt, certified by defendants Forsee and Saleh and reported Sprint's financial results for 4Q 2006 and fiscal year 2006 as previously provided in defendants' February 28, 2007 press release.  In the Form 10-K, defendants stated that they "***tightened [Sprint's] credit policies for new subscribers of both CDMA and iDEN services***" and "[w]e also are adjusting our credit policies in certain markets, which may adversely impact our ability to add lower credit quality subscribers."

43.     Together with the 2006 Form 10-K, defendants Forsee and Saleh assured investors that they personally "carried out an evaluation of the effectiveness of the design and operation of [Sprint's] disclosure controls and procedures" and based on this evaluation "concluded that the

design and operation of the disclosure controls and procedures were effective as of December 31, 2006." Forsee and Saleh also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [2006 Form 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

44.     On March 5, 2007, defendant Saleh addressed investors and analysts at the Raymond James Institutional Investors Conference. In his opening remarks, Saleh discussed Sprint's subscribers and churn:

> Revenues were up 7%, our OIBDA was up about 12% and we are starting to see the benefits of the actions that we took last year; they are starting to pay off. If you look at our churn on a sequential basis it improved in the fourth quarter. Our prime mix is also improving; in fact, this last quarter 60% of our gross add came in from prime customers.
>
> And *the actions that we took on the credit side are really also bearing fruit and if you look back at this past quarter we saw a 35% decline in our gross add coming from the sub prime market*. If I look also at our network, *our network is improving significantly*. On the iDEN side we mentioned during our call that the network is getting back historic best performance in all the markets. And actually we are beginning to see some customers coming back, win back from customers who may have left us this past year. So that is a very good sign.
>
> *       *       *
>
> And finally we expect greater cost efficiencies coming out of the business on even though this past year *we achieved over $1 billion of synergy as a result of the merger, we expect an incremental billion dollars of initiative, $1 billion of cost reduction benefits in 2007 as a result of a number of initiatives that we have shared with you previously*.

Defendant Saleh also addressed the iDEN 800 MHz rebanding efforts and confirmed that "we still expect to complete the rebranding and at this stage within the $2.8 billion umbrella that we have shared with you before."

45.     On March 29, 2007, defendant Saleh addressed investors and analysts in a conference call during the Banc of America Media, Telecommunications & Entertainment Conference.  In his opening statement, Saleh stated that "***we're continuing to see a significant improvement in the mix coming from prime customers and a lesser reliance on the subprime market***."  In response to a question about subscriber growth, Saleh stated:

> Well, on the iDEN side, some of the losses of customers that we have encountered had to do with number one Nextel partners being significantly – having significantly higher churn than prior to the merger.  If you will recall, they had a churn of about 1.4 or so before the merger.  They are right are over 4% dollars at the end of last year. So we had losses there.
>
> That contributed among other things to the fact that they had attracted subprime customers and been much more relaxed on the credit standards.  And so, as we continue to tighten the credit in the partners markets, I think we are seeing some of that flow through a negative add.

46.     Defendants' statements during January, February and March 2007 (¶¶34-45) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶95-120, rather than appropriately accounting for the known impairments to the acquired Nextel and Nextel Partners assets, defendants failed to comply with GAAP and appropriately value the goodwill associated with those acquisitions;

(b)     As a result of defendants' GAAP violations, Sprint's assets and reported net income and EPS for 4Q and FY 2006 were materially overstated.  As detailed in ¶¶95-120, had defendants complied with GAAP and appropriately valued the impaired goodwill associated with the Nextel and Nextel Partners acquisitions, Sprint would have had to report a loss of $12.2 billion in 4Q

2006 and a loss of $11.2 billion for FY 2006, as opposed to reporting income of $261 million and $1.3 billion for 4Q and FY 2006 respectively.  In addition, the Company's reported EPS would have been reduced by $4.20 per share;

(c)     Defendants had not "raised the credit quality of [Sprint's] customer base by further tightening credit," "improve[d] the mix of [Sprint's] customer base" or "been really pretty tight on . . . credit" but had, as later admitted, lowered credit standards and increased the credit extended to boost subscriber numbers, reduce churn and inflate ARPU through the addition of subprime customers on both the iDEN and CDMA networks.  As a result, the 4Q 2006 decline in gross subscriber additions was not "entirely attributable to lower subprime additions following credit tightening actions," but was due to long-term and unresolved issues related to poor network quality and customer service;

(d)     Sprint's reported CDMA subscriber "additions," in particular the post-paid subscriber additions, and the purported "solid demand" for CDMA services were the result of reducing the Company's credit standards to encourage the addition and temporary retention of subprime customers and encouraging the Company's sales personnel to poach legacy Nextel iDEN customers – merely converting current iDEN subscribers to the CDMA network, not adding new subscribers.  Former Sprint sales personnel who were with the Company during the Class Period have confirmed that they were encouraged to and were able to hit their "new add targets" and bonus targets by simply "porting" legacy Nextel iDEN customers over to the CDMA network.  As a result, there was no sustainable growth in CDMA subscribers;

(e)     Defendants also encouraged Sprint's sales staff to take advantage of the loosened credit standards and concentrate on signing new subprime subscribers.  According to former Sprint employees, including multiple former National Account Managers who were with

Sprint throughout the Class Period, by the beginning of 2007 and immediately after defendants lowered Sprint's credit standards, Sprint's internal sales goals had been altered to focus entirely on adding subscribers, regardless of revenue they generated.  While previously, account managers and sales staff had a revenue-based goal, to encourage the addition of prime customers, the new "unit" or "activation" goals rewarded sales staff for signing up as many subscribers as possible, regardless of their credit status or likelihood of generating future revenue;

(f)     Sprint's reported total wireless subscribers and post-paid customers for 4Q 2006 was also inflated and reported churn was reduced by defendants' practice of "hot-lining" customers that should have been reported as deactivated.  According to former Sprint employees, including a Senior Manager of Marketing who was with the Company through much of the Class Period and personally involved in the hot-lining process, Sprint was not "shedding" or "weed[ing] out low-quality customers through tougher credit requirements," but was, in fact, keeping subscribers who had failed to make payments on Sprint's billing system and identifying them as active subscribers for several months, even though their services had been cancelled due to lack of payment.  This had the effect of increasing the Company's total subscriber numbers and reducing reported churn.  Sprint's customer retention rates only improved as a result of lowering credit standards and "hot-lining" subprime subscribers who were not making payments;

(g)     Sprint's iDEN subscriber losses were not due to "credit tightening," but were the result of porting iDEN subscribers over to the CDMA network to create the appearance that the CDMA network was thriving, as well as the iDEN network's over-capacity in large, urban markets and declining quality, as defendants failed to upgrade or even maintain the network.  As a result, there was no basis to expect that the iDEN subscriber losses would stabilize;

(h)     Sprint's reported churn percentage, particularly for the CDMA network, was reduced by the addition of subprime customers, increasing the total number of subscribers, and using the lower credit standards and "hot-lining" to keep subprime customers listed as active subscribers;

(i)     The prior decline in Sprint's ARPU moderated only as a result of the undisclosed addition of subprime customers who, while far less likely to pay their bills, tended to have a higher ARPU than prime customers;

(j)     As of the end of 4Q 2006, defendants were not "on or ahead of plan in integrating [Sprint and Nextel's] pre-merger operations, systems and product and service line up" and were not "on course to achieve $14.5 billion of net present value of merger synergies."  In fact, while a substantial portion of the purported merger synergies were premised on consolidating network facilities and collocating the iDEN and CDMA networks, it was later admitted that less than 10% of network sites had actually been collocated, the vast majority of which were newly built sites, and incompatibility issues prevented any progress on consolidating the two networks.  As of 4Q 2006, and throughout the Class Period, Sprint had failed to integrate the primary network infrastructure, including the network switches, base stations, operation maintenance centers, base station controllers or home location registers.  Moreover, Sprint was not benefitting from any improvement in customer retention.  As a result, Sprint was not "on or ahead of plan" to achieve any material merger synergies;

(k)     Sprint was significantly behind and over budget in the efforts to comply with the FCC's rebanding efforts.  As of 4Q 2006, Sprint had completed less than 30% of the necessary rebanding work and would not be able to complete the process on time or within the original budget; and

(l)     The certifications that Forsee and Saleh signed together with Sprint's 4Q and FY 2006 Form 10-K (¶43) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶95-120, false and misleading when made.

47.     Defendants' statements during January, February and March 2007, which were false and misleading when made, had a direct effect on Sprint's stock price, which continued to trade at artificially inflated levels.   For example, on February 28, 2007, in response to defendants' statements, Sprint's stock price increased nearly 5%.

48.     On May 2, 2007, defendants issued a news release over the *Business Wire* in which they reported the Company's financial results for 1Q 2007.  Sprint's press release touted "[n]et subscriber additions of nearly 600,000 increase base to more than 53.6 million" and stated in part:

> Sprint Nextel Corp. (NYSE: S) today reported first quarter 2007 financial results.  In the quarter, ***the company added nearly 600,000 net new subscribers***, expanded network coverage and capabilities and significantly increased investments in business operations. . . .
>
> In the first quarter of 2007, ***diluted earnings per share (EPS) from continuing operations were a loss of 7 cents***, compared to income of 5 cents in the first quarter of 2006.  Adjusted EPS before Amortization was 18 cents compared to 26 cents in the year-ago period.  The lower earnings in the quarter are due to reduced contributions from operations and lower non-operating income, partially offset by fewer common shares outstanding.
>
> Consolidated net operating revenues of $10.1 billion in the first quarter were modestly above revenues in the year-ago period.  Reflecting increased operating expenses, consolidated adjusted OIBDA of $2.6 billion declined 12% from the first quarter of 2006.  First quarter capital expenditures were $1.6 billion and free cash flow was approximately $500 million.
>
> "Our plans in 2007 call for a substantial increase in the funding of business operations to build long term growth and profitability," said Gary Forsee, Sprint Nextel chairman and CEO. "We established a quick ramp on these investments in the first quarter to accelerate our progress.  These increased commitments, along with notably higher device subsidies to drive acquisition and retention, impacted our profitability in the quarter.  However, we are seeing some positive tradeoffs in the form of enhanced competitiveness.  Examples include:
>
> •     Double-digit annual growth in prime credit post-paid acquisitions;

• Continuing improvements in the customer experience;

• ***Good progress in integrating our disparate network users*** through new PowerSource devices and transitioning to a single billing and service delivery platform;

\* \* \*

"In the quarter, ***we had solid performance in our CDMA post-paid business, including sequential growth in both gross and net additions and improved customer churn***," said Forsee. "We also achieved a stronger Boost Mobile customer gain, continued growth in MVNO channels and good velocity with PowerSource sales. Together, these four lines of business generated 1.3 million net additions during the first quarter. However, these gains were partially offset by a decline in the iDEN post-paid subscriber base reflecting prior network constraints, which have since been largely mitigated.

Overall ***post-paid subscriber retention rates again trended slightly positive in the quarter, and reported net add performance was ahead of expectations***.

\* \* \*

The following is a discussion of our Wireless results.

Subscribers

• In the quarter, Wireless added nearly 600,000 subscribers and ended the quarter with a total subscriber base of 53.6 million, a 10 percent increase from the year-ago period.

\* \* \*

Churn

• Post-paid churn for the quarter was 2.3%, compared to a little over 2.3% in the fourth quarter 2006 and 2.1% in the year-ago first quarter. In the quarter, CDMA churn improved sequentially and year-over-year. The iDEN post-paid churn rate increased in the quarter, although total deactivations were modestly lower sequentially. Churn within the former Nextel Partners base improved from the fourth quarter but remained significantly above core iDEN levels.

\* \* \*

Revenues/ARPU

\* \* \*

- Post-paid ARPU in the quarter was a little more than $59, a decline of slightly less than 5% from the year-ago period and a decline of a little under 2% sequentially.

49. On May 2, 2007, defendants hosted a conference call with investors and analysts to discuss Sprint's 1Q 2007 financial results and the Company's business and operations. The call repeated and addressed information previously made public in defendants' May 2, 2007 press release, including Sprint's reported income, EPS, net subscriber additions, churn rate, and ARPU. Defendants Forsee and Saleh led the call and addressed analysts' and investors' questions and concerns about Sprint's business. During his opening remarks, Forsee stated that "[i]n addition to market share growth in the quarter we also improved the quality of our customer acquisitions . . . post-paid gross additions included a 14% annual increase in prime credit subscribers." Saleh commented that "[t]otal wireless subscribers on our network increased 10% year-over-year and 1% sequentially" and "we are delivering good subscriber growth and relatively stable ARPU's for the CDMA base." Saleh attempted to downplay declines in iDEN subscribers and stated that "impacting first quarter results are the operational investments which we described earlier this year designed to improve our competitive position, lower post-paid subscriber churn, and solidify long term profitability."

(a) In response to questions about subscriber rates, churn, and Sprint's credit standards, Forsee responded that "we were able to maintain gross add momentum in the quarter and effect churn modestly in the quarter and that obviously sets up a more significant improvement in churn in the second quarter."

(b) In response to a question on Sprint's ARPU, Forsee stated:

Maybe one other comment on kind of ARPU trend kind of digging a little bit deeper. **_We've made a conscious effort in the past year or so to improve the mix of customers including tightening credit._** And as we do that, then in some cases ASL or spending limit customers that may have had higher ARPU have churned off

involuntarily, and in some cases those are replaced with family plans or lower ARPU.

So part of this is under the overall banner of improving our customer mix and when you do that, there's some slight impact, as we've been describing here, on voice ARPU within the CDMA platform.  But having said that, we are on plan, if not slightly ahead of plan of what we had intended to do as a result of those consequences.

(c)     Finally, in response to questions about the integration of the Nextel systems and the benefits of that integration, Saleh commented that "the synergies and cost savings that I just outlined in my remarks should also contribute to adjusted OIBDA improving from the run rate that we saw in the first quarter and get us to the 11 to $11.5 billion for the full year."

50.     On May 2, 2007, *Dow Jones Newswires* issued a news report titled "Sprint Swings to 1Q Loss."  The article discussed defendants' purported credit tightening campaign and stated in part:

Sprint has tried to tighten its credit policy in recent months to weed out customers who aren't likely to stay loyal to the service.  The carrier said it did see an improvement in its customer mix, attracting more people with "prime" credit, who are less likely to cancel service.

\*       \*       \*

Chief Executive Gary Forsee said network performance is improving as the company adds new cell towers to handle call traffic and makes other investments.  "We believe our wireless network performance has come a long way in a very short period of time," Forsee said.

Forsee expects the company to return to positive growth in post-pay subscribers in the second quarter.

51.     A May 3, 2007, *The Kansas City Star* article titled "Investors forgiving of Sprint shortfall; They look past a $211 million first-quarter loss to drive up shares, as Forsee promises improved performance" quoted defendant Forsee as stating "[w]e continue to make the necessary adjustments" and reported on Sprint's business results:

Sprint Nextel Corp. Chief Executive Officer Gary Forsee on Wednesday persuaded Wall Street to look past a $211 million loss toward a promised turnaround for the nation's third-largest wireless carrier.

Despite the loss and fresh evidence of Sprint's difficulties since its merger with Nextel Communications Inc., investors responded to the company's first-quarter financial report by driving Sprint shares more than 3 percent higher.

Forsee told investment analysts the company had a clear strategy for future growth and investors would soon see improved performance.

*       *       *

Sprint executives reaffirmed previous projections for profits and sales in 2007. The company said it has bought back $1.9 billion of its stock and remained committed to completing the total of $6 billion in buybacks authorized by the Sprint board.

52.     On May 9, 2007, defendants filed Sprint's quarterly report with the SEC on Form 10-Q for 1Q 2007. The Company's Form 10-Q was signed by defendant Arendt, certified by defendants Forsee and Saleh, and reported Sprint's financial results for 1Q 2007 as previously provided in defendants' May 2, 2007 press release.

53.     Together with the 1Q 2007 Form 10-Q, defendants Forsee and Saleh assured investors that they personally "carried out an evaluation of the effectiveness of the design and operation of [Sprint's] disclosure controls and procedures" and based on this evaluation "concluded that the design and operation of the disclosure controls and procedures were effective as of March 31, 2007." Forsee and Saleh also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [1Q 2007 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

54.     On May 16, 2007, defendant Forsee addressed investors and analysts in a conference call during the Morgan Stanley 12th Annual Communications Conference.  In his opening statement, Forsee focused on the integration of the Sprint and Nextel systems and stated that "the good news there is we're well over halfway with converting customers to the common billing platform, and well down the path of ensuring that, in the call centers and the retail stores, we'll be on a common platform."  Later, in response to a question on the integration of the CDMA and iDEN networks, Forsee said "*that transition mark was first identified with bringing together everything from cell sites, where we, again, could take advantage of the two platforms*."  With regard to Sprint's customers and credit standards, Forsee claimed that "we wanted to be sure that we focused on metrics that we knew if we hit those marks, that would be clear signs of progress. And those include ARPU stabilization. It includes hitting churn performance metrics that we've been very clear about, particularly in the second quarter. And returning to post-paid positive net adds. . . .  And along the way, *we've been very focused on improving the quality of the customers coming on the network. And we tightened up credit metrics in order to ensure that prime quality customers that we're bringing on the network are disproportionate historically to sub-prime*."  In response to questions about subscriber additions and churn, Forsee further provided that "[i]f you go back to actions that we took, really, coming out of the second quarter – again, many of you are aware of these points – but *we went in and tightened credit very substantially on the iDEN platform*.  We needed to do that because of the service performance and network performance . . . .  Mid-'06.  So going back to second quarter last year, we had to take aggressive actions to curtail growth.  So that set in motion a dynamic of churning off sub-prime customers that, again, we weren't replacing with enough prime or sub-prime at that point in time because of this network dynamic.  *We also tightened credit across the CDMA platform, because we had a resolve that we wanted a better mix of customers*."  Forsee

later concluded, "*[we] bit the bullet on tightening credit to bring a better quality of customer on*, and now we are working our way back to a different set of data points."

55.     On May 30, 2007, defendant Saleh addressed investors and analysts in a conference call during the Lehman Brothers Worldwide Wireless & Wireline Conference.  In his opening statement, Saleh stated that "[t]he first point is that we are focusing on enhancing our return on invested capital. And obviously, we're doing it in two ways.  One is to improve our returns.  And that's going to come as a result of the focus on subscriber growth.  Both the growth adds and the quality of our churn, making sure that we have revenue per subscriber that's growing, and an operating cost efficiency. . . .  [W]e've seen some proactive subscriber-retention efforts in the 1st quarter that are paying off. And we are improving the credit mix, and attracting a greater percentage of our adds that are coming from client subscribers."  In response to the integration of the iDEN and CDMA networks and Sprint's margins, Saleh further provided that "*[w]e have all the infrastructure today in place*.  We have over 50% of our customers on one billing platform."

56.     On June 11, 2007, defendant Forsee addressed investors and analysts in a conference call during the Bear Stearns 18th Annual Technology, Communications & Internet Conference.  In response to a question regarding Nextel's subscribers and churn, Forsee stated:

> We've staked out a couple of pretty significant metrics for 2007, and we tried to pace that first quarter, second quarter from the progress report so investors could see our return on the investment that we said overtly we were going to make in January. And frankly, it really goes back to the second quarter last year, where we had to take some very significant actions on the IDEN network to tighten, using credit to tighten the in flow of customers on the networks, preserve capacity, and so forth, at that time.
>
> So we had an incredible focus on churn and that really was derived from both network performance as well as the quality of the customers coming on with key platforms, CDMA and IDEN.  As you recall, *last year we generally tightened credit across both platforms, but very significantly, to the tune of over 50% tightened credit in kind of the top 25 or 26 markets* that were most impacted by the IDEN quality issues.

So if you think about that, what that means to the types of customers, prime, sub prime, coming onto the network all in the category of post pay net adds, *we really choked off growth during the second half of last year and that obviously had an impact on churn, which increased across both platforms as we made that pivot, if you will, and expected fully as we got into this year that quarter by quarter we would see improvement*.

57.     Defendants' statements during May and June 2007 (¶¶48-49, 52-56) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶95-120, rather than appropriately accounting for the known impairments to the acquired Nextel and Nextel Partners assets, defendants failed to comply with GAAP and appropriately value the goodwill associated with those acquisitions;

(b)     As a result of defendants' GAAP violations, Sprint's assets and reported net income and EPS for 1Q 2007 was materially overstated.  As detailed in ¶¶95-120, had defendants complied with GAAP and appropriately valued the impaired goodwill associated with the Nextel and Nextel Partners acquisitions during 1Q 2007, Sprint would have had to report a loss of $12.7 billion in 1Q 2007, as opposed to a loss of $211 million and the Company's reported EPS would have been reduced by $4.31 per share;

(c)     Defendants had not "tightened up credit metrics," "tightened credit very substantially," or "bit the bullet on tightening credit to bring a better quality of customer on" during late 2006 or 1Q 2007 but had, as later admitted, lowered credit standards and increased the credit extended to boost subscriber numbers, reduce churn and inflate ARPU through the addition of subprime customers on both the iDEN and CDMA networks;

(d)     Sprint's reported CDMA subscriber "additions," in particular the post-paid subscriber additions, and the purported "solid performance" in its CDMA post-paid business was the result of reducing the Company's credit standards to encourage the addition and temporary retention

of subprime customers and the Company encouraging sales personnel to poach legacy Nextel iDEN customers – merely converting current iDEN subscribers to the CDMA network, not adding new subscribers.  Former Sprint sales personnel who were with the Company during the Class Period have confirmed that they were encouraged to and were able to hit their "new add targets" and bonus targets by simply "porting" legacy Nextel iDEN customers over to the CDMA network.  As a result, there was no sustainable growth in CDMA subscribers;

(e)     Defendants also encouraged Sprint's sales staff to take advantage of the loosened credit standards and concentrate on signing new subprime subscribers.  According to former Sprint employees, including multiple former National Account Managers who were with Sprint throughout the Class Period, by the beginning of 2007 and immediately after defendants lowered Sprint's credit standards, Sprint's internal sales goals had been altered to focus entirely on adding subscribers, regardless of the revenue they generated.  While previously, account managers and sales staff had a revenue-based goal, to encourage the addition of prime customers, the new "unit" or "activation" goals rewarded sales staff for signing up as many subscribers as possible, regardless of their credit status or likelihood of generating future revenue;

(f)     Sprint's reported total wireless subscribers and post-paid customers for 1Q 2007 was also inflated and reported churn was reduced by defendants' practice of "hot-lining" customers that should have been reported as deactivated.  According to former Sprint employees, including a Senior Manager of Marketing who was with the Company through much of the Class Period and personally involved in the hot-lining process, Sprint was not "choking off growth" or "weed[ing] out customers" but was, in fact, keeping subscribers who had failed to make payments on Sprint's billing system and identifying them as active subscribers for several months, even though their services had been cancelled due to lack of payments.  This had the effect of increasing the

Company's total subscriber numbers and reducing reported churn. Sprint's customer retention rates only improved as a result of lowering credit standards and "hot-lining" subprime subscribers who were not making payments;

(g)     Sprint's iDEN subscriber losses were not due to "credit tightening," but were the result of porting iDEN subscribers over to the CDMA network to create the appearance that the CDMA network was thriving, as well as the iDEN network's over-capacity in large, urban markets and declining quality, as defendants failed to upgrade or even maintain the network. As a result, there was no basis to expect that the iDEN subscriber losses would stabilize;

(h)     Sprint's reported churn percentage, particularly the reported CDMA churn, was not impacted by the purported tightening of credit standards, and was, in fact, improved as a result of the addition of subprime customers, increasing the total number of subscribers, and using the lower credit standards and "hot-lining" to keep subprime customers listed as active subscribers;

(i)     The prior decline in Sprint's ARPU moderated only as a result of the undisclosed addition of subprime customers who, while far less likely to pay their bills, tended to have a higher ARPU than prime customers;

(j)     As of the end of 1Q 2007, Sprint did not "have all the infrastructure in place" for integrating the CDMA and iDEN networks. In fact, while a substantial portion of the purported merger synergies were premised on consolidating network facilities and collocating the iDEN and CDMA networks, it was later admitted that less than 10% of network sites had actually been collocated, the vast majority of which were newly built sites, and incompatibility issues prevented any progress on consolidating the two networks. As of 1Q 2007, and throughout the Class Period, Sprint had failed to integrate the primary network infrastructure, including the network switches, base stations, operation maintenance centers, base station controllers or home location registers.

Moreover, Sprint was not benefitting from any improvement in customer retention.  As a result, Sprint was not on course to achieve any material merger synergies;

(k)     Sprint was significantly behind and over budget in the efforts to comply with the FCC's rebanding efforts.  As of 1Q 2007, Sprint had completed less than 30% of the necessary rebanding work and would not be able to complete the process on time or within the original budget; and

(l)     The certifications that Forsee and Saleh signed together with Sprint's 1Q 2007 Form 10-Q (¶53) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶95-120, false and misleading when made.

58.     On May 2, 2007, in response to defendants' statements, Sprint's stock price closed up 3.3% at $20.59 per share, and defendants' statements during May and June 2007, which were false and misleading when made, continued to have a direct effect on Sprint's stock price, which traded at artificially inflated levels.

59.     On August 8, 2007, defendants issued a press release over the *Business Wire* in which they reported the Company's financial results for 2Q 2007 and touted that Sprint's "***[s]ubscriber base increases by nearly 400,000***, to 54 million; ***lower churn contributes to positive post-paid net additions***."  Defendants' press release stated in part:

> RESTON, Va. – (BUSINESS WIRE) – Aug. 8, 2007 – Sprint Nextel Corp. (NYSE: S) today reported second quarter 2007 financial results. I n the quarter, the company reported a ***strong sequential improvement in post-paid net additions and profitability***. . . .
>
> In the second quarter of 2007, ***diluted earnings per share (EPS) from continuing operations was 1 cent***, compared to 10 cents in the second quarter of 2006, and a loss of 7 cents per share in the first quarter of 2007.  Adjusted EPS before Amortization was 25 cents, compared to 32 cents in the year-ago period and 18 cents in the first quarter of 2007. . . .
>
> Consolidated net operating revenues of $10.2 billion in the second quarter were 2% above the year-ago period and increased 1% sequentially.  Consolidated

adjusted OIBDA of $2.9 billion declined 10% from the second quarter of 2006 but increased 12% sequentially. Second quarter capital expenditures were $1.7 billion and free cash flow was $183 million.

**_Post-paid net additions increased more than 235,000 from the first quarter_** and were a positive 16,000 for the quarter. In the quarter, Sprint Nextel experienced strong post-paid demand on the CDMA platform. These gains were offset by lower demand for iDEN post-paid services.

*        *        *

The following is a discussion of our Wireless results.

Subscribers

•        In the quarter, Wireless added nearly 400,000 subscribers and ended the period with a total subscriber base of 54 million, a 5 percent increase from a year ago.

•        Post-paid subscribers increased by 16,000, reflecting a gain in CDMA subscribers, offset by a decline in iDEN subscribers.

*        *        *

Churn

•        Post-paid churn for the quarter was a little more than 2.0%, compared to 2.3% in the first quarter 2007 and a little more than 2.1% in the year-ago second quarter. The company deferred the previously planned second quarter implementation of certain changes to its churn calculations until the beginning of the third quarter. These changes would have reduced second quarter reported churn by approximately 10 basis points. In the quarter, voluntary churn improved sequentially on both network platforms and involuntary churn was also lower, partially due to seasonal factors.

*        *        *

Revenues/ARPU

*        *        *

•        Post-paid ARPU in the quarter was a little more than $60, an annual decline of slightly more than 2%. This is an improvement from the 5% annual rate of decline in the first quarter. CDMA ARPU increased from the year-ago period while iDEN ARPU declined. Post-paid ARPU increased 1% sequentially, partially due to seasonality. On a sequential basis, CDMA ARPU increased while iDEN ARPU was flat.

- 44 -

60.     On August 8, 2007, defendants hosted a conference call with investors and analysts to discuss Sprint's 2Q 2007 financial results and the Company's business and operations.  The call repeated and addressed information previously made public in defendants' August 8, 2007 press release, including Sprint's reported income, EPS, net subscriber additions, churn rate and ARPU. Defendants Forsee and Saleh led the call and addressed analysts' and investors' questions and concerns about Sprint's business.

(a)     In his opening remarks, Forsee stated that "[a]lthough we had modestly lower gross additions, lower customer churn drove a sequential improvement of more than 235,000 net post-paid additions. Post-paid churn improved 30 basis points from first-quarter levels as we achieved lower voluntary and involuntary churn rates in both CDMA and iDEN."  Forsee also boasted that "[o]ur ARPU increased sequentially to industry leading levels [and] we made solid progress on our margins."  Saleh continued, asserting that "in the second quarter, iDEN churn reversed course from the trend we had experienced over the past several quarters. On the CDMA platform, churn has been ramping down for some time."  And, that "increases in our post-paid ARPU were the largest driver of the increase from quarter to quarter."

(b)     During the conference call, a Morgan Stanley analyst inquired: "[Y]ou talked about credit controls in terms of your gross add base.  How is the sub-prime within your post-paid base and is that trending the way you want it to, given some of the macro factors?"  In response, Saleh stated: "*As far as the quality of the subscriber base, we're really actually pleased with the mix that we're getting from prime customers. It's very consistent with what we have seen in the first quarter and significantly better than last year's mix of customer. And I think it's also reflected in the fact that our churn has improved. And if you look at our bad debt experience*

*you'll see that actually on a sequential basis that also has come down*.  So we're very pleased with the – our overall positioning right now in the marketplace."

61.     On August 9, 2007, defendants filed Sprint's quarterly report with the SEC on Form 10-Q for 2Q 2007.  The Company's Form 10-Q was signed by defendant Arendt, certified by defendants Forsee and Saleh, and reported Sprint's financial results for 2Q 2007 as previously provided in defendants' August 8, 2007 press release.

62.     Together with the 2Q 2007 Form 10-Q, defendants Forsee and Saleh assured investors that they personally "carried out an evaluation of the effectiveness of the design and operation of [Sprint's] disclosure controls and procedures" and based on this evaluation "concluded that the design and operation of the disclosure controls and procedures were effective as of June 30, 2007."  Forsee and Saleh also signed certifications filed with the Form 10-Q stating that they had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [2Q 2007 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

63.     On September 19, 2007, defendant Forsee addressed investors and analysts in a conference call during the Goldman Sachs Communacopia XVI Conference.  In his opening statement, Forsee made the following statements about the integration of the Sprint and Nextel systems:  "Fourth point I would make is around core operations. And we identified a number of areas this year that would the investments that we would be mak[ing] in cooperation, at the same

time identify that we were still in transition. We still had work to do with our systems integration, still had work to do to bring the two platforms together. And, again, I'm pleased to report to you that our view is that *we're about 80% through that transition*." With regard to Sprint's subscriber base and churn, Forsee commented that "getting back to positive postpay net adds and churn improvement. Those were critical measures of progress and I think the underpinning that was identified with the investments in the report I just gave you would suggest that that underpinning is in place and will give us a solid foundation to reach a point where we can have continuous momentum and continuous improvements in the quarters ahead." In response to analysts' and investors' questions, Forsee responded: "I think over the past two years, we have been very transparent and open in our communication" and "as we look at our mix, we've been able to keep our mix of prime, sub-prime, holding *as we tightened credit last year and we wanted to keep that mix very strong*. To some degree, to the detriment of seeing less sub-prime coming in to the gross add base as a result that we think on balance the right decision for us and *obviously saw the churn improvement sequentially as a result of those actions*."

64. Defendants' statements in August and September 2007 (¶¶59-63) were false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) As detailed in ¶¶95-120, rather than appropriately accounting for the known impairments to the acquired Nextel and Nextel Partners assets, defendants failed to comply with GAAP and appropriately value the goodwill associated with those acquisitions;

(b) As a result of defendants' GAAP violations, Sprint's assets and reported net income and EPS for 2Q 2007 was materially overstated. As detailed in ¶¶95-120, had defendants complied with GAAP and appropriately valued the impaired goodwill associated with the Nextel and

Nextel Partners acquisitions during 2Q 2007, Sprint would have had to report a loss of $12.5 billion in 2Q 2007, as opposed to reporting income of $19 million and the Company's reported EPS would have been reduced from $0.01 to a loss of $4.29 per share;

(c)     Defendants had not "tightened credit," but had, as later admitted, lowered credit standards and increased the credit extended to boost subscriber numbers, reduce churn and inflate ARPU through the addition of subprime customers on both the iDEN and CDMA networks;

(d)     Sprint's reported CDMA subscriber "additions," in particular the post-paid subscriber additions, and the purported demand for CDMA services were the result of reducing the Company's credit standards to encourage the addition and temporary retention of subprime customers and the Company encouraging sales personnel to poach legacy Nextel iDEN customers – merely converting current iDEN subscribers to the CDMA network, not adding new subscribers. Former Sprint sales personnel who were with the Company during the Class Period have confirmed that they were encouraged to and were able to hit their "new add targets" and bonus targets by simply "porting" legacy Nextel iDEN customers over to the CDMA network. As a result, there was no sustainable growth in CDMA subscribers;

(e)     Defendants also encouraged Sprint's sales staff to take advantage of the loosened credit standards and concentrate on signing new subprime subscribers. According to former Sprint employees, including multiple former National Account Managers who were with Sprint throughout the Class Period, by the beginning of 2007 and immediately after defendants lowered Sprint's credit standards, Sprint's internal sales goals had been altered to focus entirely on adding subscribers, regardless of revenue they generated. While previously, account managers and sales staff had a revenue-based goal, to encourage the addition of prime customers, the new "unit" or

"activation" goals rewarded sales staff for signing up as many subscribers as possible, regardless of their credit status or likelihood of generating future revenue;

(f)     Sprint's reported total subscribers and post-paid additions for 2Q 2007 were also inflated and reported churn was reduced by defendants' practice of "hot-lining" customers that should have been reported as deactivated.  According to former Sprint employees, including a Senior Manager of Marketing who was with the Company through much of the Class Period and personally involved in the hot-lining process, Sprint had not been weeding out low-quality customers through tougher credit requirements, but was, in fact, keeping subscribers who had failed to make payments on Sprint's billing system and identifying them as active subscribers for several months, even though their services had been cancelled due to lack of payment.  This had the effect of increasing the Company's total subscriber numbers and reducing reported churn.  Sprint's customer retention rates only improved as a result of lowering credit standards and "hot-lining" subprime subscribers who were not making payments;

(g)     Sprint's iDEN subscriber losses were not due to "credit tightening," but were the result of porting iDEN subscribers over to the CDMA network to create the appearance that the CDMA network was thriving, as well as the iDEN network's over-capacity in large, urban markets and declining quality, as defendants failed to upgrade or even maintain the network.  As a result, there was no basis to expect that the iDEN subscriber losses would stabilize;

(h)     Sprint's reported churn percentage, particularly for the CDMA network, was reduced by the addition of subprime customers, increasing the total number of subscribers, and using the lower credit standards and "hot-lining" to keep subprime customers listed as active subscribers, not as a result of any credit tightening;

       (i)     Sprint's "industry leading" ARPU was the result of the undisclosed addition of subprime customers who, while far less likely to pay their bills, tended to have a higher ARPU than prime customers;

       (j)     As of the end of 2Q 2007, Sprint was not "80% through" the integration of the Sprint and Nextel systems.  In fact, while a substantial portion of the purported merger synergies were premised on consolidating network facilities and collocating the iDEN and CDMA networks, it was later admitted that less than 10% of network sites had actually been collocated, the vast majority of which were newly built sites, and incompatibility issues prevented any progress on consolidating the two networks.  As of 2Q 2007, and throughout the Class Period, Sprint had failed to integrate the primary network infrastructure, including the network switches, base stations, operation maintenance centers, base station controllers or home location registers.  Moreover, Sprint was not benefitting from any improvements in customer retention.  As a result, Sprint was not on course to achieve any material merger synergies;

       (k)     Sprint was significantly behind and over budget in the efforts to comply with the FCC's rebanding efforts.  As of 2Q 2007, Sprint had completed less than 30% of the necessary rebanding work and would not be able to complete the process on time or within the original budget; and

       (l)     The certifications that Forsee and Saleh signed together with Sprint's 2Q 2007 Form 10-Q (¶62) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶95-120, false and misleading when made.

      65.     Defendants' statements during August and September 2007, which were false and misleading when made, had a direct effect on Sprint's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels.

66.     On Friday, October 5, 2007, less than a month after his comments at the Goldman

Sach's conference and eight weeks after the filing of Sprint's 2Q 2007 Form 10-Q, *The Wall Street*

*Journal* reported that Sprint's Board of Directors was seeking to terminate and replace Forsee as

CEO and Chairman of the Company.  By Monday, October 8, 2007, Forsee had been forced to

announce his resignation as both CEO and Chairman, effective immediately. Defendant Saleh

became Acting CEO as the Board of Directors searched for a new CEO. At the same time, it was

disclosed that Sprint expected to report a net loss of approximately 337,000 post-paid subscribers in

3Q 2007 and that revenue and OIBDA for FY 2007 would be slightly below previous guidance. In

response to these disclosures, Sprint's stock price dropped $0.51 per share, to $18.47, on October 8,

2007, and continued to drop to below $17 per share in the following trading days.

67.     On November 1, 2007, Sprint issued a press release over the *Business Wire*, which

reported the Company's financial results for 3Q 2007.  The press release stated in part:

> RESTON, Va. – (BUSINESS WIRE) – Nov. 1, 2007 – Sprint Nextel Corp. (NYSE: S) today reported third quarter 2007 financial results.  Consolidated net operating revenues in the quarter were $10 billion compared to $10.5 billion in the year-ago third quarter. ***Net income in the quarter was $64 million or 2 cents diluted earnings per share***, which compares to $279 million or 9 cents diluted earnings per share (EPS) in the year-ago period.  Adjusted EPS before Amortization, which removes the effects of special items and merger-related amortization costs, was 23 cents in the quarter compared to 32 cents in this quarter of 2006.  The decline in earnings is due to a lower contribution from Wireless, partially offset by an improved contribution from Wireline.
>
> The company reported a ***net decline of 60,000 total wireless subscribers*** in the third quarter.  Overall subscriber results include growth from CDMA post-paid, Boost Unlimited, wholesale and affiliate channels.  These gains were offset by declines from iDEN post-paid and traditional Boost pre-paid product lines.  In the quarter, ***post-paid churn was 2.3%*** on seasonally higher involuntary deactivations and competitive market conditions.  The ***Wireless post-paid ARPU of a little more than $59*** in the quarter continues to be supported by data growth, offset by lower voice contributions.
>
> *                *                *
>
> The following is a discussion of Wireless results:

Subscribers

- Wireless ended the period with nearly 54 million total subscribers, compared to 51.9 million subscribers at the end of the third quarter of 2006. The growth is due to gains in pre-paid and wholesale offset by a decline in post-paid.

\*       \*       \*

Churn

- Post-paid churn for the quarter was 2.3% compared to 2.0% in the second quarter and 2.4% in the year-ago period. In the third quarter, the sequential increase in overall churn was driven equally by higher voluntary and involuntary deactivations, primarily on the CDMA platform. The CDMA post-paid churn rate remained below iDEN churn in the quarter.

\*       \*       \*

Revenues/ARPU

\*       \*       \*

- Post-paid ARPU of a little more than $59 in the quarter declined 3% year-over-year and a little under 2% sequentially. The company reported modest annual growth in CDMA ARPU that was offset by a decline in iDEN. Sequentially, ARPU declined on both platforms, mainly due to lower average pricing plans. In the quarter, post-paid ARPU for CDMA and iDEN subscribers were substantially similar.

68.     On November 1, 2007, new Acting CEO Saleh, together with other Sprint executives, hosted a conference call with investors and analysts to discuss Sprint's 3Q 2007 financial results and the Company's business and operations. The call repeated and addressed information previously made public in Sprint's November 1, 2007 press release, including the Company's reported income, EPS, net subscriber additions, churn rate and ARPU. Saleh led the call and addressed analysts' and investors' questions and concerns about Sprint's business.

(a)     Concerning the integration of the Sprint and Nextel systems, Saleh said "[n]ow the key take away here is that ***the most pressing care issues are now behind us***."

- 52 -

(b)      Commenting on the drop in iDEN subscribers, Saleh continued:  "[T]he greatest impact to our iDEN subscriber numbers originates with the actions we took to address network quality and capacity issues associated with our rebanding efforts during the summer of 2006.  Put simply, we curtailed acquisition on iDEN for several quarters while we worked through the challenges.  This was accomplished through tightening credits . . . ."  In response to questions about Sprint's subscriber base and credit standards, Saleh and his Sprint colleagues made the following statements:

- "The customers we have are more valuable customers and therefore working on retaining them should benefit our top line and revenue and profitability";

- "[A] majority of gross adds are now in prime.  We have tightened credit very recently"; and

- "Of course based on the credit policy that we employ, *we have very tight controls that we can apply to the base and the recent decisions as Paul just described had an effect on moderating our sub prime additions*.  If it's necessary to do more, we're prepared and we have the tools to control that."

(c)      During the conference call, a Merrill Lynch analyst asked Saleh: "Last year you had disclosed evaluating indicators of impairment for goodwill and intangible assets relating to iDEN.  What factors do you evaluate and . . . [w]hat could cause a change in the assessment this year?"  Saleh responded: "I think we will look at the cash flow test and we will look at the future of the business and the plan and that would be what . . . is going to be the basis for our analysis if there is any impairment of any of the assets that we have."

69.      On November 9, 2007, defendants filed Sprint's quarterly report with the SEC on Form 10-Q for 3Q 2007.  The Company's Form 10-Q was signed by defendant Arendt, certified by defendant Saleh and reported Sprint's financial results for 3Q 2007 as previously provided in defendants' November 1, 2007 press release.

70.     Together with the 3Q 2007 Form 10-Q, defendant Saleh assured investors that he personally "carried out an evaluation of the effectiveness of the design and operation of [Sprint's] disclosure controls and procedures" and based on this evaluation "concluded that the design and operation of the disclosure controls and procedures were effective as of September 30, 2007." Saleh also signed a certification filed with the Form 10-Q stating that he had personally reviewed the Company's Form 10-Q and that the public filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this [3Q 2007 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

71.     On December 18, 2007, the Company announced that the Board of Directors had named Daniel R. Hesse, as president and chief executive officer of the Company, effective immediately.  Hesse was previously the chairman, president and CEO of Embarq Corporation, a Sprint spin-off.

72.     Following Forsee's termination, the remaining defendants' statements in November 2007 (¶¶67-70) were false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     As detailed in ¶¶95-120, rather than appropriately accounting for the known impairments to the acquired Nextel and Nextel Partners assets, defendants failed to comply with GAAP and appropriately value the goodwill associated with those acquisitions;

(b)     As a result of defendants' GAAP violations, Sprint's assets and reported net income and EPS for 3Q 2007 was materially overstated.  As detailed in ¶¶95-120, had defendants

complied with GAAP and appropriately valued the impaired goodwill associated with the Nextel and Nextel Partners acquisitions during 3Q 2007, Sprint would have had to report a loss of $12.4 billion in 3Q 2007, as opposed to reporting income of $64 million and the Company's reported EPS would have been reduced from $0.02 to a loss of $4.36 per share;

(c)     Defendants had not "tightened credit" but had, as later admitted, lowered credit standards and increased the credit extended to boost subscriber numbers, reduce churn and inflate ARPU through the addition of subprime customers on both the iDEN and CDMA networks;

(d)     Sprint's reported CDMA subscriber "additions," in particular the post-paid subscriber additions, and the purported demand for CDMA services were the result of reducing the Company's credit standards to encourage the addition and temporary retention of subprime customers and the Company encouraging sales personnel to poach legacy Nextel iDEN customers – merely converting current iDEN subscribers to the CDMA network, not adding new subscribers. Former Sprint sales personnel who were with the Company during the Class Period have confirmed that they were encouraged to and were able to hit their "new add targets" and bonus targets by simply "porting" legacy Nextel iDEN customers over to the CDMA network.  As a result, there was no sustainable growth in CDMA subscribers;

(e)     Defendants also encouraged Sprint's sales staff to take advantage of the loosened credit standards and concentrate on signing new subprime subscribers.  According to former Sprint employees, including multiple former National Account Managers who were with Sprint throughout the Class Period, by the beginning of 2007 and immediately after defendants lowered Sprint's credit standards, Sprint's internal sales goals had been altered to focus entirely on adding subscribers, regardless of revenue they generated.  While previously, account managers and sales staff had a revenue-based goal, to encourage the addition of prime customers, the new "unit" or

"activation" goals rewarded sales staff for signing up as many subscribers as possible, regardless of their credit status or likelihood of generating future revenue;

(f)     Sprint's reported decline in total subscribers for 3Q 2007 was mitigated and reported churn was reduced by defendants' practice of "hot-lining" customers that should have been reported as deactivated.  According to former Sprint employees, including a Senior Manager of Marketing who was with the Company through much of the Class Period and personally involved in the hot-lining process, Sprint had not been "weeding" out low-quality customers through tougher credit requirements, but was, in fact, keeping subscribers who had failed to make payments on Sprint's billing system and identifying them as active subscribers for several months, even though their services had been cancelled due to lack of payment.  This had the effect of increasing the Company's total subscriber numbers and reducing reported churn.  Sprint's customer retention rates only improved as a result of lowering credit standards and "hot-lining" subprime subscribers who were not making payments;

(g)     Sprint's iDEN subscriber losses were not due to "tightening credits," but were the result of porting iDEN subscribers over to the CDMA network to create the appearance that the CDMA network was thriving, as well as the iDEN network's over-capacity in large, urban markets and declining quality, as defendants failed to upgrade or even maintain the network.  As a result, there was no basis to expect that the iDEN subscriber losses would stabilize;

(h)     Sprint's reported churn percentage, particularly for the CDMA network, was reduced by the addition of subprime customers, increasing the total number of subscribers, and using the lower credit standards and "hot-lining" to keep subprime customers listed as active subscribers;

(i)      The decline in Sprint's ARPU was moderated as a result of the undisclosed addition of subprime customers who, while far less likely to pay their bills, tended to have a higher ARPU than prime customers;

(j)      As of the end of 3Q 2007, "the most pressing care issues" associated with the Sprint-Nextel integration were not behind Sprint.  In fact, while a substantial portion of the purported merger synergies were premised on consolidating network facilities and collocating the iDEN and CDMA networks, it was later admitted that less than 10% of network sites had actually been collocated, the vast majority of which were newly built sites, and incompatibility issues prevented any progress on consolidating the two networks.  As of 3Q 2007, and throughout the Class Period, Sprint had failed to integrate the primary network infrastructure, including the network switches, base stations, operation maintenance centers, base station controllers, or home location registers. Moreover, Sprint was not benefitting from any improvement in customer retention.  As a result, Sprint was not on course to achieve any material merger synergies;

(k)      Sprint was significantly behind and over budget in the efforts to comply with the FCC's rebanding efforts.  As of 3Q 2007, Sprint had completed less than 30% of the necessary rebanding work and would not be able to complete the process on time or within the original budget; and

(l)      The certifications that Forsee and Saleh signed together with Sprint's 3Q 2007 Form 10-Q (¶70) stating that the Company's financial results were reported in accordance with GAAP were, as described above and in ¶¶95-120, false and misleading when made.

73.      Defendants' statements during November 2007, which were false and misleading when made, had a direct effect on Sprint's stock price preventing greater reductions in the stock price which continued to trade at artificially inflated levels.

### THE TRUTH ABOUT DEFENDANTS' FALSE STATEMENTS AND OMISSIONS EMERGES

74.     On December 17, 2008, Hesse took over as Sprint's CEO and President.  Until May 2006, Hesse had served as CEO of Sprint's local telecommunications division.  Subsequently, and until taking the reins at Sprint, Hesse had served as Chairman and CEO of the Sprint spin-off, Embarq Corporation, which also focused on local telecommunications.  Given his positions at the Company and tenure in the telecommunications industry, Hesse was considered to have a strong working knowledge of Sprint and the Company's operations.

75.     Only one month after replacing Saleh, and three months after Forsee's termination, Hesse and the Company were forced to acknowledge that Sprint had *lost 683,000 post-paid subscribers* in 4Q 2007, churn remained high at 2.3 percent and Sprint was suffering form "continued downward pressure on subscriber trends, revenues, and profitability."  It was also disclosed that the Company was considering "record[ing] a non-cash impairment charge related to goodwill" in 4Q 2007.  Despite his prior tenure with Sprint and knowledge of the industry, Hesse later admitted that, upon taking over the CEO position at Sprint, "[t]he subscriber losses – that surprised even me."  "To be perfectly frank," Hesse admitted to analysts and investors, "*the issues we face are more difficult than what I expected to find*."

76.     Investors and the market were stunned.  *The Associated Press* reported that "[t]he company's struggle dates to the 2005 acquisition of Nextel Communications, Inc., which left it with incompatible networks, technical glitches, a customer base filled with credit-compromised subscribers and a dubious marketing effort."  Dow Jones confirmed that subscriber losses and churn were so high because "*Sprint relied too much in the past on credit-risky consumers to generate growth* and management has been taking steps to limit the company's exposure."

77.     Oppenheimer analyst Timothy Horan issued a report on January 18, 2008 titled "Meltdown: 4Q07 Sub Loss Worse Than Expected; Serious Restructuring Ahead," and reported that Sprint "announced wireless results indicating, in our opinion, a dangerous level of market share loss. . . . We believe these results indicate a virtual meltdown in consumer perception of the company's network, customer care, and reputation which will take years to fix."  Deutsche Bank analyst Greg Miller similarly reported that "it is clear that the business continues to deteriorate rapidly . . . . [T]oday's announcement seriously calls into question just how long a turn-around of this company will take."

78.     The same day, January 18, 2008, Fitch downgraded Sprint's credit ratings to "reflect the ongoing concern over Sprint Nextel's financial and operating results and the lack of visibility as to the company's performance going forward."  The Fitch press release noted that "Sprint has endured difficulties with stabilizing its core operations and improving the company's competitive position as evidenced by the recent postpaid subscriber trends, which were materially worse than expected."  A few days later, Standard & Poor's also downgraded Sprint based on the Company's "***merger integration and network technology implementation challenges, which have led to significant customer losses; declining ARPU; and high churn relative to its peers due to a large percentage of sub-prime customers***."

79.     In response to the disclosures, Sprint's stock price plunged 24.8% on January 18, 2008 alone, losing $2.87 per share on incredibly high volume.  As *Reuters* reported, "Sprint shares closed down $2.87 to $8.70, after trading as low as $8.15 earlier in the session, its steepest drop in a single trading day for nearly three decades."  For the first time since 2002, Sprint's stock price sank below $10 per share and the disclosures reduced Sprint's market capitalization by almost $8 billion as the artificial inflation caused by defendants' fraud was removed from the Company's stock price.

80.     On January 24, 2008, little more than a week after the disclosure that Sprint had suffered massive subscriber losses and elevated churn due to the sub-prime customer base, and that the goodwill associated with the Nextel merger was impaired, the Company's new CEO, Hesse, announced that defendant Saleh would leave the Company, effective immediately.  According to analyst Michael Nelson, "[a]s Sprint's 2005 purchase of Nextel is seen as the root of many of its current problems, Hesse likely ousted Saleh to clean the slate of legacy managers."

81.     One week later, on January 31, 2008, Sprint issued a Form 8-K disclosing that the net book value of the Company's wireless business exceeded its fair value and that Sprint would have to "record a material, non-cash impairment charge that will represent a substantial portion, and potentially all, of the goodwill recorded on its balance sheet" related to the Nextel acquisition.  The following day, *The Kansas City Star* reported, under the headline "Sprint write-off could rank as one of the largest in U.S. corporate history," that "the potential scale of the coming write-off is surprising."  The article continued, "Sprint's statement on Thursday [January 31, 2008] was *its most direct admission so far of just how much it misfired in combining Sprint and Nextel Communications*."

82.     Finally, on February 28, 2008, Sprint issued a press release disclosing the Company's 4Q and FY 2007 results and Hesse hosted a conference call with analysts and investors.  The press release reported that "the company recorded a non-cash *goodwill impairment charge of $29.7 billion*" contributing to a "*net loss for the quarter [of] $29.5 billion or $10.36 diluted loss per share*."  The release confirmed that post-paid churn was 2.3% and that "[w]ireless post-paid ARPU in the quarter was a little more than $58," a 4% decrease from 4Q 2006.  The loss reported on February 28, 2008 was, according to *Bloomberg News*, *the fifth largest loss reported by a Standard & Poors 500 company over the prior 18 year period*.  As a result of Sprint's subprime customer

issues and the failed integration of Nextel, it was reported that the Company's Board of Directors had determined that Sprint would "not declare a dividend for the foreseeable future, in an effort to retain greater financial flexibility," the first time Sprint had failed to pay a dividend in more than 65 years.  Hesse was quoted in the press release, acknowledging that "[t]he fourth quarter financial results reflect the challenges facing our Wireless business."

83.     The next day, February 29, 2008, Sprint filed its 4Q and FY 2007 Form 10-K, further disclosing the scope of the problems resulting from defendants' prior reliance on subprime customers and the failure to integrate the Sprint and Nextel systems and operations.  The Form 10-K confirmed that Sprint lost 683,000 post-paid subscribers in 4Q 2007 and disclosed that 686,000 post-paid subscribers left the iDEN network, while there were *only 3,000 additions to the CDMA network, down more than 99% from the prior year*.  Post-paid churn remained at 2.3%, while post-paid APRU slipped to $58, down from $60 at the end of 2006.

84.     In the Form 10-K, the Company conceded, by omission, that the iDEN losses in 2007 were *not* due to any heightened credit standards, but were, in fact, the result of "[c]onsumer sentiment regarding the iDEN network, reduced marketing programs and limited new handset offerings."  The Form 10-K also disclosed, for the first time, that Sprint "*increased credit extended in early 2007 and 2006*" and "*[e]arlier in the year [2007], we adjusted our credit policy in certain markets in an effort to attract new subscribers*.  In late 2007, we adjusted our credit policies and returned to policy standards similar to those in mid 2006, which also contributed to the decline in subscriber additions."

85.     The Form 10-K further disclosed that, during 2006, the company had not resolved any of the significant risks associated with the integration of Nextel, including the integration of the iDEN and CDMA networks, consolidating and integrating the duplicative facilities and operations,

or combining the product and service offerings.  Indeed, the integration risk disclosures in the FY

2007 Form 10-K were *identical* to the risks identified in the Company's FY 2006 Form 10-K.

Moreover, Sprint's efforts at rebanding portions of the iDEN network were only 30-40% completed

and would cost significantly more than previously disclosed.  As of the end of 2007, Sprint had

incurred only $1.1 billion of the costs attributable to the spectrum rebanding process and, as a best

case scenario, estimated total costs for the rebanding would be $3.4 billion, $600 million more than

previously disclosed.

      86.    In the aftermath of the February 28 and February 29 disclosures, investors and

analysts recognized the scope and consequences of defendants' prior misstatements and omissions.

For example, *MarketWatch* reporter Jeffry Bartash noted that Sprint's new CEO at least "gets marks

for honesty."  Bartash reported that the "problems at Sprint – dating to the $35 billion acquisition of

Nextel in 2005 – were at least three years in the making," but "*Hesse is not in denial like the former*

*management team, which never let investors or analysts onto the true depth of the company's*

*problems*."   Under the heading "*10-K disclosures reveal previously unknown fundamental*

*weakness*," Deutsche Bank analyst Greg Miller similarly reported:

> In Sprint's 10-K filing it was disclosed CDMA net adds . . . were a mere 3k in the
> fourth quarter.  ***Throughout the first half of 2007, the previous management team***
> ***had suggested that the CDMA business was performing well despite the poor***
> ***performance on the acquired Nextel business.  However, from disclosures in the***
> ***company's 10-K, it would appear credit standards in the CDMA business were***
> ***loosened in early 2007 which could have allowed investors to perceive that the***
> ***CDMA business was doing better than it might have had the more restrictive***
> ***policies been in place. If so, it would appear that the CDMA business is not nearly***
> ***as healthy as was once thought***.  Without a strong CDMA business to support a
> struggling iDEN business, it is simply going to be that much more difficult for the
> company to show improving fundamentals at any time in the near future.
>
>         *       *       *
>
> A declining base of sub-prime customers will also pressure ARPU as sub-prime
> customers generate higher monthly revenue than prime customers.

\*　　　\*　　　\*

[The] decline in sub-prime customers will be a drag on ARPU. . . .  **With the apparent reversal of the credit policy in early 2007 that likely created the appearance that the CDMA subscriber base was more stable than in reality, we should not be surprised that Sprint's ARPU held in better than some had expected**.  With yet another reversion to a stricter credit policy, investors should not be surprised to see the revised expectations set by management for the first two quarters of 2008.

87.     As *The Washington Post* reported in an article titled "Struggling Sprint Reports Huge Loss; Insolvent Subscribers Partly to Blame for Nearly $30 Billion Hit," during 2007 Sprint "**courted people with poor credit to boost its number of subscribers**" and the Company was now suffering as a result of the short-term – and previously undisclosed – tactics.  As the paper reported, **Hesse admitted that the prior management team loosened credit requirements "to attract customers with poor or little credit histories**" and he acknowledged that, as a result, Sprint has "a lot of subprime customers in our customer base and we were disproportionately hit hard versus other carriers."

88.     Following the conference call and Form 10-K disclosures, *Dow Jones* published an article titled "In the Money:  No Talk of Synergies From Sprint Nextel Now," reporting that "it appears 'synergies' aren't much of a live issue at Sprint Nextel Corp. any more."  In pertinent part, the article continued as follows:

        Not so long ago, Sprint Nextel was boasting that the 2005 merger of the former Sprint Corp. and Nextel Communications Inc. would bring the company $14.5 billion in synergies – the cost savings and other enhancements of value that would come from combining the two companies.  That was a big part of the rationale behind the $35 billion deal.

\*　　　\*　　　\*

        **Sprint Nextel said as recently as early 2007 that it was "on course" for $14.5 billion in synergies from the merger**.  (And that was on a "net present value" basis - the current value of all future savings - suggesting the company expected its total savings to be much greater than $14.5 billion.)  Since then, however, Sprint has

been buffeted by competition, a subscriber mix that has a lot of customers with less-than-perfect credit, and other problems.

*One factor that suggests Sprint is no longer expecting a ton of synergies is the $29.7 billion charge it took Thursday to write off almost all of its goodwill. That is one of the biggest goodwill-impairment charges ever, and it amounts to a tacit acknowledgment that the Nextel deal hasn't worked*.

\*       \*       \*

As recently as a quarter ago, Sprint said that difficulties with integrating its Sprint and Nextel businesses "could prevent or delay our realization of the cost savings and other benefits we expect to achieve as a result of these integration efforts." *In Thursday's statement, however, the company no longer even mentions the savings: Now it says integration difficulties "may limit our ability to fully integrate the operations of these businesses" at all.* Sounds more pessimistic, doesn't it?

If that weren't enough, a look at the company's income statement also suggests that the hoped-for synergies just aren't happening. When the merger was announced, Sprint projected as much as $1 billion in operating-income net synergies in 2007. But operating expenses, where the bulk of those synergies would have come, actually rose about 4% in 2007, excluding one-time items and non-cash depreciation and amortization.

89.     Sprint's Chief Networking Officer, Kathy Walker, later admitted during a conference call with analysts that the purported synergies were premised around collocating the iDEN and CDMA networks, but that, as of 1Q 2008, only "about 10% of our sites have both iDEN and CDMA on them." Walker's admission prompted an incredulous analyst to ask: "In talking about the number of cell sites you had, I heard you say that about 10% of your sites have both CDMA and iDEN. Was that correct or did I mishear you?" Walker could only concede that it was "[s]lightly less than that, but yes."

90.     On rebanding, Pali Research analyst Walter Piecyk reported that "the recently filed 10-K revealed that not only has the re-banding dispute not been resolved with the government, Sprint now believes *it could cost $600 million more than expected despite repeated statements by former management over the past two years that the project was on budget*." Deutsche Bank

analyst Greg Miller concurred, reporting that Sprint's "*re-banding process agreed to with the FCC has become a nightmare*. . . . [W]e did not anticipate the company would suggest incremental costs could be $600 million or significantly more [] after *the prior management team suggested that spending was on track*."

91.     As *The New York Times* columnist Joe Nocera commented immediately after the Class Period, "you don't lose $30 billion by accident.  But what this writedown really is, it's really an accounting number that acknowledges that the Sprint Nextel merger of about three years ago has been a giant, colossal, total fiasco, a $30 billion fiasco . . . *then they went out and got customers, basically, who couldn't pay their bills*."

92.     In response to the disclosures in Sprint's Form 10-K, Fitch downgraded Sprint's debt to junk status and Standard & Poor's put the Company on CreditWatch with negative implications, suggesting that it might also label Sprint's debt as junk.  According to Fitch, it was "[p]articularly concerning [that] *Sprint will now begin to experience erosion to its CDMA subscriber base absent transfers from the iDEN network*."

93.     Investors, again, acted swiftly and negatively to the Sprint disclosures.  As *The Kansas City Star* reported, "[i]nvestors hammered Sprint shares on the news."  On February 28, 2008, the Company's stock price dropped 9.6%, losing $0.86 a share to close at $8.09, on volume of over 126 million shares.  *The New York Times* reported on February 29, 2008, "Sprint's stock slid more than 9 percent after the company announced a $29.45 billion fourth-quarter loss because of a huge write-down related in part to its merger with Nextel Communications."  That day, February 29, 2008, Sprint's stock price continued dropping another 12.1%, to $7.11 per share, on high volume as the artificial inflation came out of the stock price.

94.     All told, in little more than six months Sprint's stock price dropped 70% from its Class Period high of $23.25 per share, losing tens of billions of dollars in market capitalization. Sprint has never recovered from the revelations of defendants' fraud and currently trades below $4.00 per share.

## SPRINT'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

95.     In order to inflate the price of Sprint's stock, defendants caused the Company to falsely report its results for 4Q and FY 2006 and 1Q, 2Q and 3Q FY 2007 by failing to timely write-off its impaired goodwill which overstated the Company's assets and net income.

96.     Sprint's Class Period financial results were included in Form 10-K and Form 10-Qs filed with the SEC.  *See* ¶¶27, 42, 52, 61, 69.  The results were also included in press releases disseminated to the public.  *See* ¶¶23, 37, 48, 59, 67.  Defendants' SEC filings claimed that the financial information presented therein was a fair statement of Sprint's financial results and that the results were prepared in accordance with GAAP.

97.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Sprint's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

98.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need

not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

**Sprint's Improper Goodwill Accounting**

99.      Sprint's acquisition of Nextel and Nextel Partners dramatically increased the size and importance of Sprint's reported goodwill.  Nonetheless, in order to avoid causing Sprint to post disappointing earnings and acknowledge that the purported benefits of the Nextel acquisitions were not coming to fruition, defendants' failed to timely record and report the impairment to Sprint's goodwill.

100.     Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Companies account for their business combinations using the purchase method of accounting as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are recorded at their respective fair market value as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.

101.     An asset is an item which provides economic value to an entity.  FASB Statement of Concepts (FASCON) No. 2, ¶25.  Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition.  Goodwill is intended to reflect the going concern value of the business acquired and its expected contribution to future earnings growth.  SFAS No. 141, ¶¶B101-114.

102.     Following an acquisition, companies are required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangibles*.  SFAS No. 142 requires that a company review its goodwill to determine if the asset is impaired.  Goodwill must be tested at least

annually for impairment, and more often when events or circumstances arise that indicate the goodwill could be impaired.  SFAS No. 142, ¶¶18-29.

> Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.  Examples of such events or circumstances include:

> (a)    A significant adverse change in legal factors or in the business climate

> (b)    An adverse action or assessment by a regulator

> (c)    Unanticipated competition

> (d)    A loss of key personnel

> (e)    A more-likely-than-not that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of

> (f)    The testing for recoverability under Statement 144 of a significant asset group within a reporting unit

> (g)    Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.  SFAS No. 142, ¶28.

103.    Testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment.  A company performs goodwill testing at a reporting unit level.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing is required.  However, if the carrying value of the unit exceeds its fair value, then a second step is performed to measure the amount of the impairment.  SFAS No. 142, ¶¶17-22.

104.    Sprint operates in two business segments: Wireless and Wireline (also called the Long Distance segment).  It considers its reporting units for goodwill impairment purposes to be its

operating segments.  All of the Company's goodwill during the relevant period was allocated to its Wireless segment.

105.    As of year end 2006 and throughout the Class Period, Sprint's goodwill balance was the Company's largest asset.  Nearly one third of Sprint's total assets belonged to its goodwill – $30.9 billion out of total assets of $97.2 billion.  The majority of the goodwill was related to acquisitions the Company made in the two years prior to the Class Period, including its acquisition of Nextel and Nextel Partners.  These acquisitions caused a sharp increase in the Company's goodwill.  The Company's overall goodwill balance jumped from $4.4 billion at year end 2004 to $30.9 billion by year end 2006.

106.    In December 2004, Sprint entered into a merger agreement with Nextel.  At the time, the merger was deemed as a "merger of equals" with each company having a market capitalization of approximately $33 billion.  The merger was completed on August 12, 2005, with Sprint Corporation buying Nextel for $37.8 billion.  Sprint paid a premium for Nextel over the fair value of its assets and liabilities and recorded $15.6 billion as goodwill.  As a result of the Nextel acquisition, by year end 2005, Sprint's goodwill had grown to $21.3 billion.[2]

107.    According to Sprint, the goodwill associated with the Nextel acquisitions was due to certain potential strategic benefits and financial synergies that it expected to realize as a result of the merger, including the following:

---

[2]    In 2005, Sprint also acquired three PCS Affiliates (US Unwired, Inc., Gulf Coast Wireless Limited Partners and IWO Holdings Inc.) increasing its reported goodwill balance by $1.3 billion due to these acquisitions.

(a)     the strategic combination of Nextel's extensive iDEN network and spectrum of assets with Sprint's CDMA network and spectrum of assets;

(b)     the strategic combination of Nextel's strength in business and government wireless services with Sprint's position in consumer wireless and data services;

(c)     the size and scale of the combined company would allow Sprint to more effectively compete with Verizon and AT&T; and

(d)     the ability for Sprint to position itself strategically in the fastest growing areas of the communications industry.

108.    Nextel Partners was the only American affiliate of Nextel.  Nextel formed Nextel Partners in 1999 along with Motorola (the sole supplier of the iDEN infrastructure and the supplier of substantially all of Nextel's handsets) in order to accelerate the build-out of the iDEN network outside of the large metropolitan areas.  Nextel Partners provided Nextel branded services in midsized cities and rural areas allowing Nextel to continue its focus on the metropolitan areas. Nextel Partners went public in February 2000 with Nextel retaining a 32% interested in the outstanding common stock of Nextel Partners.

109.    In connection with the Nextel merger, Sprint acquired a 28% interest in Nextel Partners.  In June 2006, Sprint acquired the remaining 72% interest Nextel Partners as the merger triggered certain rights held by Nextel Partners shareholders which the shareholders opted to exercise.  As of June 30, 2006, Nextel Partners book value was approximately $1.1 billion with total assets of $2.4 billion and total liabilities of $1.3 billion.  Sprint paid a substantial premium for Nextel Partners as the Company purchased the remaining interest for $6.4 billion, allocating $6 billion of the purchase price as goodwill.  Due in considerable part to the Nextel Partners acquisition, by year

end 2006, Sprint's goodwill had grown to $30.9 billion.[3]  The goodwill associated with the Nextel

Partners acquisition was due to the same potential strategic benefits and financial synergies that

Sprint expected to realize from its acquisition of Nextel, as the Nextel Partners' customer base

utilized the iDEN network.

110.    Sprint tested for goodwill each year, beginning on or after the first day of October.

From 2002 through 2004, Sprint's goodwill testing was done internally.  In 2005, given the growth

in its goodwill balance, the Company retained an independent third party valuation firm to assist it in

testing for goodwill impairment.  Nonetheless, in 2006, despite the continued growth and critical

nature of its goodwill balance, the Company reversed course, did not retain an independent third

party valuation firm, and elected to test its goodwill internally.  By conducting the test internally, the

Company was able to ignore the extensive negative evidence indicating that a good portion of

Sprint's goodwill associated with its acquisition of Nextel was impaired by the end of 2006.

111.    During October 2006, the Company performed a goodwill test under defendants'

supervision, but utilized assumptions so unreasonable that it resulted in no impairment charge related

to its Wireless operations.  According to Sprint, the Company's impairment evaluation for year end

2006 purportedly indicated that *none* of its goodwill was impaired.  The failure to write-down its

impaired goodwill gave the false impression that the purported benefits and synergies of the Nextel

acquisitions were on track and would meaningfully contribute to the Company's future earnings

growth.

_____

[3]      In 2006, Sprint also acquired three PCS Affiliates (Enterprise Communications Partnership,
Alamosa Holdings, Inc. and UbuquiTel Inc.) increasing its goodwill balance by $3.6 billion due to
these acquisitions – $2.8 billion of the increase was derived from its acquisition of Alamosa
Holdings.  Sprint further acquired Velocita Wireless Holding Corp in 2006, increasing its goodwill
by another $59 million.

112.     As described herein, however, by the end of 2006 defendants had not resolved any of the most critical risks associated with the Nextel acquisitions and two years after the acquisitions had been unable to integrate the CDMA and iDEN networks.  None of the strategic or financial benefits or synergies that defendants had identified as the reasons for paying a substantial premium for the Nextel acquisitions had come, or was likely to come, to fruition.  Sprint made the determination that absolutely no impairment charge was necessary in the face of the following negative evidence that was available to the company by 4Q 2006:

- Sprint had not experienced any merger synergies related to the integration of the Sprint and Nextel systems and, in fact, operating costs were increasing as the Company had to run two separate networks.

- Sprint had failed to integrate the Sprint and Nextel networks.  By year end 2006, Sprint had made minimal headways in integrating the two systems.  Indeed even a full year later, less than 10% of cell sites were collocated.

- Two years after the merger, Sprint had failed to fully integrate back office systems including its billing systems and its customer service functions.

- Sprint remained unable to compete with Verizon and AT&T.  By the end of 2006, Sprint had all but destroyed subscriber growth on the iDEN network and CDMA growth was driven by poaching iDEN customers and lowering credit standards, whereas both Verizon and AT&T continued to enjoy strong subscriber additions and low rates of churn throughout 2006 and into 2007.

- The iDEN network suffered from overcapacity in key large markets eliminating growth opportunity.  The overcapacity issues resulted in subscriber losses as iDEN customers' experienced poor coverage and a high number of dropped calls.

- The iDEN system had experienced network issues prior to the merger between Sprint and Nextel.  Thereafter, iDEN's issues not only continued, but worsened as Sprint stopped investing money to properly maintain the network let alone to expand or enhance the iDEN network.

- Sprint was not benefitting from improved customer retention.  In fact, by 2Q 2006, iDEN was actually losing post-paid subscribers.  In 3Q 2006, iDEN lost 387,000 post-paid subscribers.  This was the quarter immediately prior to the goodwill impairment testing.  The iDEN network continued to lose millions of subscribers through the first three quarters of 2007.

- Despite the reduction of credit standards and resulting influx of subprime customers, Sprint's ARPU continued to remain under pressure due to intense competition and the erosion in its iDEN network.

- Nextel Partners had added significant numbers of fake or non-paying customers to its base and failed to drop customers that had left the iDEN network in the months before being acquired by Sprint, which later had to be removed after the acquisition.

- Sprint had failed to timely comply with rebanding requirements on the 800 MHz spectrum of the iDEN network, resulting in considerable additional costs and further limiting any growth potential of the iDEN customer base.

113.   This evidence demonstrated that Sprint would be unable to recognize the synergies that it expected to realize as a result of the mergers.  Sprint was not able to integrate Sprint's and Nextel's differing networks, spectrum assets, customer bases or services in any meaningful way which could provide the Company with any strategic or financial benefits.  The size and scale of the combined Company did not allow Sprint to compete with Verizon and AT&T nor did it provide Sprint with the ability to positively position itself within the fastest growing areas of the communications industry.  In fact, all of the negative evidence available to Sprint by the end of 2006 went to the very heart of defendants' reasons for recording $21.6 billion in goodwill from its Nextel acquisitions, yet defendants failed to recognize any impairment on Sprint's Nextel related goodwill.

114.   If Sprint had appropriately written off the impaired goodwill associated with the Nextel acquisitions by year end 2006 or during the first three quarters of 2007, even conservatively assuming that only half of the Nextel Partners goodwill was impaired, then it would have dramatically decreased the Company's reported net income and diluted EPS.  For FY 2006, defendants would have had to report a net loss of $11.2 billion versus net income of $1.3 billion – a $12.5 billion reduction in reported earnings.  Sprint further would have reported a diluted EPS loss

of $3.75 per share for FY 2006 versus diluted earnings of $0.45 per share.[4]  For 4Q 2006, defendants would have had to report a net loss of $12.2 billion versus net income of $261 million and report a diluted loss of $4.11 per share versus diluted earnings of $0.09 per share.

115.    The significant market disruption in the credit markets not only persisted but worsened throughout 2007.  In addition, the erosion in Sprint's iDEN and CDMA customer base and the deterioration of the iDEN network continued into 2007.  This turmoil constituted events or changes in circumstances which required Sprint to test for goodwill impairment more frequently. Despite indications that impairment testing was necessary, Sprint failed to conduct impairment tests as of the end of 1Q, 2Q or 3Q 2007 and failed to properly record impairment charges in those quarters.

116.    If Sprint had written off the impaired goodwill associated with its Nextel acquisitions on an interim basis throughout 2007, it would have dramatically decreased the Company's reported net income and diluted EPS as follows[5]:

---

[4]     The net effect of the impairment charges have been calculated on an after tax basis using Sprint's effective tax rate for 2006 of 32.6%.  Hence, the write-off of $15.6 billion of the Nextel goodwill would have reduced the Company's net income by $10.5 billion while the write-off of the $3 billion of the Nextel Partners goodwill (conservatively assuming only half of the Nextel Partners goodwill was impaired) would have reduced Sprint's net income by $2 billion.

[5]     The net effect of the impairment charges for 1Q, 2Q and 3Q 2007 have also been calculated on an after tax basis using Sprint's effective tax rate for 2006 of 32.6%.

| (In Millions of $ Except EPS) | 1Q 2007 | 2Q 2007 | 3Q 2007 |
|---|---|---|---|
| Net Income as Reported | ($211) | $19 | $64 |
| Diluted EPS as Reported | ($0.07) | $0.01 | $0.02 |
| Goodwill Write-Off Defendants Should Have Taken to Reflect Impairments | ($12,481) | ($12,481) | ($12,481) |
| **Net Income Reflecting Goodwill Write-Off** | **($12,692)** | **($12,462)** | **($12,417)** |
| **Actual Diluted EPS Reflecting Goodwill Write-Off** | **($4.38)** | **($4.29)** | **($4.36)** |

117.    Ultimately, at the end of the Class Period and after defendants Forsee and Saleh had been forced out of the Company, Sprint reported an astonishing $29.5 billion loss – one of the largest quarterly losses ever reported by an American company.  The loss was due, in substantial part, to the delayed $29.7 billion goodwill charge, $21.6 billion of which was tied to the Company's Nextel operations.[6]

118.    According to Sprint, the write-off of its goodwill was due to a reduction in the Company's market capitalization and in its expected cash flows related to its Wireless segment.  The factors cited by Sprint as reasons for the reductions included, among other items: Sprint's difficulty attracting and retaining subscribers in a highly competitive environment, particularly subscribers on its troubled iDEN network; expected reductions in average voice revenue per subscriber; and, the extensive costs associated with acquiring subscribers and with operating its wireless network.  All of these factors however were in existence and clearly evident by year end 2006 and throughout the first three quarters of 2007.

---

[6]    Sprint wrote off of the remaining $963 million of goodwill associated with its Wireless operations at year end 2008.

**Sprint's Financial Statements Violated**
**Fundamental Concepts of GAAP**

119.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although

investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

120.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## INDICIA OF DEFENDANTS' SCIENTER

**Defendants' Admitted Knowledge and Reckless**
**Disregard of the Truth**

121.    Throughout the Class Period, defendants knew, or recklessly disregarded, the true facts about Sprint's credit standards, subscriber base, and financial reporting, including the impact of the failed integration of the iDEN and CDMA networks.  The Company's wireless subscriber

additions and total subscribers, churn, and ARPU were the most closely monitored business metrics by investors and analysts – accounting for a majority of the Company's revenue and earnings – and the integration of the Sprint and Nextel networks was seminal to Sprint's future wireless earnings and growth, as well as billions of dollars in booked goodwill.

122.    Given the critical nature of Sprint's wireless business, and, in particular, the Company's ability to grow subscriber additions and derive benefits from the $33 billion merger with Nextel, investor attention was focused on the Company's subscriber base and integration efforts prior to and during the Class Period.  In turn, defendants Forsee and Saleh held themselves out to investors as the persons most knowledgeable at Sprint regarding Sprint's customer base, including the credit standards applied to the wireless subscribers, as well as the iDEN-CDMA integration and related issues, including the rebanding of the iDEN 800 MHz spectrum.  As detailed herein, these defendants personally communicated with investors and analysts during the Class Period and represented that they were informed of and knowledgeable about, *inter alia*, changes to Sprint's credit standards and credit extended, Sprint's financial results, including the Company's goodwill assets and the review of those assets, the integration of the iDEN and CDMA networks and the rebanding of the 800 MHz spectrum.

123.    Defendants did not merely hold themselves out as knowledgeable, but specifically described their personal involvement in and knowledge of critical aspects of the Company's wireless business.  For instance, on the iDEN-CDMA integration, Forsee boasted that "[w]e have accomplished a lot" and we are "on track, if not ahead of plans."  Similarly, when speaking with Saleh, Forsee repeatedly asserted that "[w]e tightened credit" and "[we] bit the bullet on tightening credit to bring a better quality of customer on."  Saleh reiterated, in speaking with Forsee about the supposedly tightened credit standards, that "we are, again, very clearly focused and resolved on

improving our customer mix."  Saleh also personally confirmed, in response to investor questions about the integration of Nextel, that Sprint was "on track, if not ahead, on realizing the $14.5 billion in merger cost savings" and "[w]e have all the infrastructure in place today."  These personal claims were consistent with defendant's assertions that they closely monitored and ran Sprint's wireless business.  Indeed, after firing Sprint's COO in August 2006, Forsee publicly took over day-to-day operations of the Company and asserted "*I'm where the buck stops*."

124.    Further corroborating defendants' claims of personal knowledge, former officers and employees of Sprint have confirmed that defendants were directly involved in and kept apprised of the Company's wireless subscriber base and credit standards and the iDEN-CDMA integration.  For example, on a quarterly basis, and prior to the filing of Sprint's Form 10-K and Form 10-Qs, Saleh, with defendant Arendt, participated in "Issue Calls" with pertinent staff from Sprint's Technical Accounting Team, Accounting Operations, Corporate Accounting, and External Reporting departments, and senior representatives from the Finance Department.  The purpose of the calls was to discuss matters related to SEC reporting and Sprint's financial reports, including the goodwill associated with the Nextel acquisitions.  The Technical Accounting Team at Sprint was responsible for performing the Company's goodwill evaluation under the supervision of defendants Arendt and Saleh.  According to a participant in the "Issue Calls" during the Class Period, a member of the Technical Accounting Team took meeting minutes during the "Issue Calls" which were distributed to all participants and would have been available to defendants.

125.    In May 2005, defendants formed a Merger Committee that eventually reported directly to defendant Saleh, who chaired the committee, and Forsee, regarding potential synergies and issues related to the Sprint-Nextel integration.  The Merger Committee met throughout the Class Period and addressed issues related to Sprint's failure to derive synergies from the Sprint-Nextel

integration, including the inability to collocate iDEN and CDMA cellular sites or even utilize the same cellular towers and the technological incompatibility of the iDEN and CDMA networks. According to former Sprint employees who were with the Company during the Class Period, Sprint's technical staff were constantly bemoaning the incompatibility of the iDEN and CDMA networks and defendants' decision not to support or prevent the deterioration of the iDEN network.

126.    In addition, both Sprint's legacy P2K billing systems and the Ensemble billing system that Sprint was attempting to install during the Class Period allowed defendants real time access to Sprint's "data warehouse," including the Company's subscriber additions or losses on both the iDEN and CDMA networks, churn rate, ARPU, and the credit composition of Sprint's subscriber base. The data warehouse also reflected any changes to the Company's subscriber credit standards and included Sprint's sales and financial forecasts and allowed defendants to monitor, day-by-day, the Company's progress on making (or missing) forecasted subscriber additions and churn rates. Defendants could also monitor the increasing "intercompany churn" during the Class Period caused by legacy Nextel iDEN customers being switched to Sprint's CDMA to create the appearance of organic growth on the CDMA network.  Moreover, on a monthly, quarterly and annual basis, defendants received formal "Strategic and Financial Balanced Scorecard" reports that alerted defendants to changes in Sprint's subscriber composition, which would include the increased reliance on subprime customers to generate new additions and stabilize churn and ARPU, and the Company's financial results, including the growing bad debt associated with subprime subscribers during the Class Period.

127.    Concurrent with their claims of personal knowledge and involvement in Sprint's wireless business, and the subscriber and integration information available to defendants throughout the Class Period, Forsee and Saleh publicly certified with each of the Company's SEC filings that

they had personally "evaluated [Sprint's] disclosure controls and procedures" and "concluded that such procedures are effective."  Forsee and Saleh further certified that Sprint's internal controls were designed to, and did, keep them apprised of all material facts about the financial condition and results of operations of Sprint, including material facts about the Company's wireless subscriber base and the integration of the wireless networks.

**Defendants' Fraudulent Conduct Allowed Forsee and Saleh to Collect More than $25.5 Million in Performance-Based Bonuses**

128.    Defendants Forsee and Saleh's employment contracts and Sprint's executive compensation plans tied the majority of their compensation to the Company's reported wireless business and financial performance.  Sprint's executive incentive plan was extremely short-term focused as the Company set quarterly performance targets instead of annual targets.  Under the defendants' watch, the Company would wait until the end of the first quarter of the fiscal year before it would set performance targets for the year.  Moreover, Sprint's plan provided flexibility for the Company to establish performance targets lower than the actual results of the previous period and even below the Company's guidance to investors.  For example, for 2007, defendants provided adjusted OIBDA guidance to investors and analysts of $11 billion to $11.5 billion whereas for purposes of the Company's Short-Term Incentive Compensation Plan ("STIC") the minimum threshold adjusted OIBDA amount established for bonuses for Forsee and Saleh in March 2007 was only $10.7 billion.

129.    Under the STIC, Forsee and Saleh were entitled to bonus payouts worth over 100% of their salary if the Company met specified financial and operational goals for the year.  The Human Capital and Compensation Committee ("HC&CC") of the Board would establish the targeted objectives for the year in March of each year.  For the 2006 fiscal year, the HC&CC established

three financial and operational objectives under the 2006 STIC: net subscriber additions, post-paid wireless churn, and adjusted OIBDA.

130.    Sprint's Enhanced Near-Term Equity Plan and Long Term Equity Incentive Plan, from which the executives would receive stock or options awards, were similarly premised on reported subscriber and churn results and based on same performance targets as used in determining the STIC awards.

131.    The incentive compensation at Sprint played an unusually large part of the defendants' total compensation.  Collectively, performance-based compensation comprised more than 92% of the value of defendants Forsee and Saleh's total compensation for 2006.  Based on the manipulations discussed herein that inflated subscriber additions and reported earnings and stabilized churn, Forsee and Saleh pocketed tens of millions of dollars under the performance-based plans for FY 2006.  For 2006, Forsee's salary was $1.4 million, but he received performance-based stock and option awards and other compensation totaling ***$19.9 million*** according to Sprint's April 9, 2007 proxy statement.  Defendant Saleh's salary was $750,000, but he received performance-based stock, option and cash awards and other compensation totaling ***$5.6 million***.  Collectively, for 2006 alone, defendants took home $25.5 million in performance-based compensation based on their manipulation of Sprint's reported business and financial results.

**Defendants' Fraudulent Conduct Artificially Preserved
Sprint's Investment Grade Credit and Debt Ratings and
Prevented Triggering Sprint's Loan Covenants**

132.    Defendants also disguised the problems with Sprint's worsening wireless subscriber trends in order to maintain the Company's investment grade credit and debt ratings.  As disclosed in Sprint's SEC filings, including its FY 2006 Form 10-K, if its credit ratings were downgraded or otherwise adversely affected, it "would likely increase [Sprint's] future borrowing costs and could affect [the Company's] ability to access capital."  For example, Sprint's $6 billion revolving credit

facility carried an interest rate equal to the London Interbank Offered Rate ("LIBOR") or Prime Rate plus "a spread that varies depending on our parent company's credit ratings."  As such, an alteration or downgrade of Sprint's credit rating would increase this spread, and thus increase the Company's borrowing costs, as well as Sprint's "ability to place the paper with investors, as well as the duration and interest rates of commercial paper."

133.   Defendants further concealed the erosion of Sprint's balance sheet to inflate reported earnings because the Company's credit facilities required that the Company maintain a ratio of total indebtedness to trailing four quarters earnings of no more than 3.5 to 1.  If defendants had reported results which caused Sprint to exceed this ratio during the Class Period, the Company would have immediately been in default under the credit facilities.

134.   At the beginning of the Class Period, Sprint maintained an investment grade credit profile with all three major rating agencies. Moody's, Standard & Poor's, and Fitch assigned the Company Baa3, BBB+ and BBB+ ratings, respectively.  Defendants Forsee and Saleh emphasized the importance of maintaining these ratings, acknowledging that "it's in our interest as a company of our size to maintain an investment-grade reading" and "we believe that our credit statistics will continue to support an investment-grade profile."

135.   Although defendants were able to maintain Sprint's investment-grade rating throughout the Class Period, on January 10, 2007 Fitch slightly downgraded Sprint one notch to BBB with a negative outlook. According to Fitch's press release, the downgrade was the result of concerns about Sprint's "materially reduced cash flow prospects." Of particular concern was the erosion of the Nextel iDEN network and iDEN subscriber losses. Based on defendants' false and misleading statements, however, Fitch reported that it expected that these operational issues would be substantially addressed in 2007, and could lead Fitch to revise Sprint's outlook to "Stable."

136.     From January 2007 through the end of the Class Period, defendants continued to make false and misleading statements and inflate Sprint's financial results, such that they were able to maintain the Company's investment-grade credit ratings from all three major rating agencies. Defendant Saleh repeatedly acknowledged the importance of maintaining these ratings during the Class Period:

(a)     On the 1Q 2007 conference call, Saleh reassured investors that "[w]e're maintaining a solid investment grade profile and ample financial flexibility with a net debt to annualized adjusted OIBDA ratio of 1.9 times."

(b)     Similarly, on the 2Q 2007 conference call, Saleh again assured "[w]e're maintaining a solid investment grade profile and financial flexibility with a net debt to annualized adjusted OIBDA ratio of 1.8 times. . . .  We continue to forecast that our full-year performance will fall within the range of guidance that was previously provided."

137.     On January 18, 2008, however, after Sprint's worsening subscriber trends and imminent goodwill charge were disclosed, Fitch immediately downgraded Sprint's rating to BBB-/F3 with a negative outlook.  According to Fitch's press release, the downgrade was the result of Sprint's "lack of visibility" for future performance and postpaid subscriber trends that were "materially worse than expected."

138.     On January 23, 2008, Standard & Poor's followed suit, lowering its rating to BBB-with a negative outlook.  According to Standard and Poor's, "[t]he downgrade is based on our assessment that Sprint Nextel's business risk profile is no longer supportive of a 'BBB' rating given the ongoing operational issues, which have plagued the company since the August 2005 merger and have resulted in continued erosion of its subscriber base and elevated churn."

139.     On February 28, 2008, when the extent of defendants' misstatements and omissions was revealed, Fitch slashed Sprint's rating to a "junk" rating of BB+ with "Rating Watch Negative." Fitch explained that Sprint's operating results were "significantly worse than expected," and noted that Sprint's CDMA subscriber base would now begin to erode absent transfers from the iDEN network.  Sprint reported a net loss from continuing operations of $29.5 billion and acknowledged that the downgrade could cause "higher interest costs on our borrowings and our access to the public capital markets could be negatively impacted.  Our access to the commercial paper market may not be available on terms attractive to us, or at all."  Indeed, on February 27, 2008, Sprint was forced to draw down $2.5 billion on its credit facility to reduce its refinancing risk and to enhance its financial flexibility.

140.     On the same day that Sprint disclosed its dismal results, *Reuters* reported that the cost to insure Sprint's $22 billion in debt shot up on the fear that further downgrades to junk status would force some ratings-constrained investors to sell their bonds, with credit protection costs surging 64% according to *Markit Intraday*.  And, in March 2008, *Barron's* reported that the premium to insure Sprint's debt jumped to almost twice the premium asked in early February.  In fact, a March 10, 2008 *Daily Deal* article discussed Sprint's debt covenants problems, quoting several analysts who felt Sprint could end up "dangerously close to trouble:"

> "We think it is unlikely that the deterioration at Sprint will trigger a credit event – but *a bear case scenario comes too close for comfort*," Jason Armstrong of Goldman, Sachs & Co. wrote in a recent report.

> In that bearish scenario, Armstrong projects, the company would end 2008 with a level of 3.45 times gross debt to Ebitda, and a multiple of 3.43 in 2009.  The analyst described these figures as *"dangerously close" to trouble*.

> Romeo Reyes of Jefferies & Co. notes that the company will have to produce $7.6 billion in Ebitda to meet the covenant.

> *"If the company does not take immediate steps to renegotiate its bank covenant, it may find itself having billions of debt being put to them as cross de-*

***faults are triggered on the rest of its debt instruments***," Reyes said.  "In this case, the company would have to file for Chapter 11 protection.  We believe management can avoid having to file if it negotiates with the bank debtholders early enough."

141.    By 1Q 2008, in the wake of the disclosures regarding defendants' false statements and omissions, Sprint reported that the Company's debt ratio had risen precipitously to 2.9 to 1, prompting a warning that if the Company tripped the credit facility covenants the loan maturity dates would accelerate.  As a result, Sprint was forced to implement cost reduction initiatives and explored "de-levering, disposition of non-core assets and other measures to assist us in maintaining compliance with financial covenants . . . and may consider entering into discussions with our lenders to obtain appropriate waivers."  Sprint, however, could not provide assurance that they would remain in compliance, noting that a default under their credit facilities could "trigger defaults under our other debt obligations, including senior notes, which in turn could result in the maturities of certain debt obligations being accelerated."

142.    On May 1, 2008, Standard & Poor's downgraded Sprint two full ratings levels to BB, citing subscriber losses on the iDEN network, and stating that "Sprint Nextel's business risk profile is no longer supportive of an investment-grade rating given its deteriorating operating performance and lack of visibility . . . along with increased financial leverage due largely to declining EBITDA."  ***The downgrade made Sprint the largest company to drop from investment-grade to junk status since 2005***.

## Defendants' GAAP Violations and Misleading Statements Allowed Them to Fend Off a Hostile Takeover

143.    Defendants' GAAP violations and artificial inflation of Sprint's stock price allowed them to fend off takeover bids and preserve their executive positions.  By the summer of 2006, as Sprint's stock price sunk below $17 per share on disappointing wireless subscriber results and news of integration problems, rumors circulated on Wall Street that Comcast, Time Warner Cable, or Cox

Communications were considering a takeover of Sprint.  Thrivent Asset Management analyst John

Krause reported in October 2006: "There's been speculation that Sprint Nextel with its issues could

be an acquisition candidate."  The primary barrier to a takeover was Sprint's stock price and market

capitalization.  If the stock price continued to drop, however, that barrier would fall.  As *Reuters*

reported on October 23, 2006, if Sprint "does not improve, it may see its valuation fall to a level

where its assets are attractive for acquisition."

144.    Entering the Class Period, defendants were desperate to inflate Sprint's stock price as

takeover and buyout rumors persisted.  According to *The Kansas City Star*, in a November 11, 2006

article titled "Is Sprint a takeover target?":

> In a 44-page report titled "Deal or No Deal?" released Friday, Citigroup
> analysts speculated that Comcast Corp., the nations largest cable company, was
> likely to go shopping soon for a wireless business.  Moreover, Citigroup considers
> Sprint a  prime target.

145.    Defendants' fraudulent scheme succeeded in boosting Sprint's stock price and

keeping other companies at bay.  *CNNMoney.com* editor at large Paul R. La Monica reported in

February 2007 that ***as long as Sprint's share price stayed around $20 per share, Sprint was likely***

***too expensive for a buyout target***:

> [E]ven though Sprint Nextel's stock has fallen about 20 percent in the past year,
> [Patrick] Comack [an analyst with Zachary Investment Research] argues that shares,
> which currently trade at about $19.50, are not yet cheap enough to tempt Comcast or
> Time Warner to make a bid.
>
> "Certainly there's a price where a cable company might want to buy them.  ***If***
> ***the stock goes to $14 maybe they would think about doing it***."

146.    Most worrisome to defendant Forsee were the rumors that former Nextel CEO Tim

Donahue, who believed that Forsee was mismanaging Sprint's assets and particularly the iDEN

network, and another former Nextel executive, Daniel Akerson, were both interested in taking over

Sprint.  As Akerson said in October 2007, "I think Sprint is a very interesting company with great

assets that have yet to be fully utilized and could be of interest to a potential buyer, strategic or otherwise." By maintaining Sprint's artificially inflated stock price, and keeping tens of billions of dollars in impaired good will assets on the books, defendants were able to prevent a takeover battle during the Class Period.

**Defendants' Fraudulent Scheme Allowed Them to Keep Paying Sprint's Dividends Through the Class Period**

147.   Until 1Q 2008, and the disclosure of defendants' false statements and omissions, Sprint had paid a dividend to the holders of the Company's common stock for approximately 250 consecutive quarters dating back to 1939. By failing to disclose the truth about Sprint's goodwill assets, customer credit mix, and failed merger integration, defendants were able to continue paying dividends in each quarter during the Class Period.

148.   Had defendants timely disclosed and properly accounted for the impairment to the goodwill assets and been truthful about the true nature of Sprint's customer base and failed integration, by the start of the Class Period the Company would have had to preserve capital and cease paying a dividend. Of course, the failure to pay dividends on Sprint's common stock would have turned a spotlight on defendants' failure to improve Sprint's wireless business and customer base and the disastrous Nextel acquisition. Cancelling the dividend also would have had an immediate and negative impact on Sprint's stock price.

149.   At the end of the Class Period, after Forsee and Saleh were terminated, the Company could no longer conceal the truth. As a result, and to preserve capital in light of the problems facing Sprint, the Company was forced to cancel its dividend payment, and has not paid a dividend since.[7]

---

[7]   Upon the disclosures of the fraud, and after defendant Forsee's successor was forced to cancel Sprint's dividend "for the foreseeable future," which had amounted to $0.10 per share annually, Sprint's shares plunged over 9% to close at $8.09 on extremely heavy volume of 126 million shares.

## LOSS CAUSATION/ECONOMIC LOSS

150.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive investors and the market and a course of conduct that artificially inflated and maintained Sprint's stock price and operated as a fraud or deceit on Class Period purchasers of the Company's publicly traded securities by misrepresenting and omitting material information about the Company's wireless subscriber levels and credit standards, the integration of Sprint and Nextel, including the iDEN and CDMA networks, and Sprint's financial results.   When defendants' misrepresentations and omissions were revealed, as detailed in ¶¶74-94, Sprint's stock price fell precipitously as the prior artificial inflation came out of the price.   As a result of their purchases of Sprint stock during the Class Period, Plaintiffs and other members of the Class suffered significant economic loss, *i.e.*, damages, under the federal securities laws.

151.    Defendants' false statements and omissions, identified herein at ¶¶23-28, 30-31, 34-45, 48-49, 52-56, 59-63, 67-70, had the intended effect and caused Sprint's stock to trade at artificially inflated levels up to and above $23 per share during the Class Period.   As a direct result of the disclosures on January 18 and February 28-29, 2008, however, Sprint's stock price suffered material, statistically significant declines.

152.    On January 18, 2008, when it was disclosed that Sprint had suffered a net loss of 683,000 post-paid subscribers in 4Q 2007 on high churn and that the Company was evaluating a charge in the fourth quarter related to a goodwill writedown, the Company's stock price dropped 24.8%, $2.87 per share, on unusually high trading volume of nearly 230 million shares. *See* ¶79.  As *Reuters* reported, "Sprint shares closed down $2.87 to $8.70, after trading as low as $8.15 earlier in the session, its ***steepest drop in a single trading day for nearly three decades***."

153.    On February 28 and February 29, 2008 – following Sprint's issuance of its press release and Form 10-K for 4Q and FY 2007, which disclosed, *inter alia*, that the Company had

previously lowered credit standards and temporarily boosted subscription rates through subprime customers, would now have to reduce assets and take a $29.7 billion goodwill impairment charge to the wireless reporting unit, wiping out all of the goodwill associated with Nextel acquisition, and was far from integrating Sprint and Nextel or completing the iDEN rebanding effort – the Company's stock price plummeted again by a cumulative 20.5%, $1.84 per share, on unusually high volume. *See* ¶93. As *The Kansas City Star* reported, "[i]nvestors hammered Sprint shares on the news." Individually and collectively, these drops removed the inflation from Sprint's stock price, causing real economic loss of at least $4.71 per share to investors who had purchased the stock during the Class Period.

154. The decline in Sprint's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' prior false statements and omissions being revealed to investors and the market. The timing and magnitude of Sprint's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. Indeed, on each of the days on which Sprint's stock price suffered material price declines, both the Dow Jones Industrial Average and the S&P 500 indices were down less than 1%. The economic loss – damages – suffered by Plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate Sprint's stock price and maintain the price at artificially inflated levels and the subsequent significant decline in the value of Sprint's stock when defendants' prior misrepresentations and omissions were revealed.

## CLASS ACTION ALLEGATIONS

155. Before, during and after the Class Period, defendants regularly communicated with the public and investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-

ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

156.    As a result, the market for Sprint securities digested current information with respect to Sprint from publicly available sources and reflected such information in the price of Sprint's securities.  Under these circumstances, all purchasers or acquirers of Sprint securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

157.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers and acquirers of Sprint securities during the October 26, 2006 through February 27, 2008 Class Period who were damaged by defendants' fraud.  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

158.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Sprint's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, as of February 21, 2008, there were over 2.7 billion shares of Sprint's common stock outstanding.   Accordingly, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sprint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

159.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

160.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business and operations of Sprint; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

162.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

163.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  This presumption provides, *inter alia*:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      The omissions and misrepresentations were material;

(c)      The Company's stock traded in an open efficient and well-developed market;

(d)      The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)      Plaintiffs and other members of the Class purchased Sprint securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

164.     At all relevant times, the market for Sprint securities was efficient for the following reasons, among others:

(a)      Sprint's common stock met the requirements for listing, and was listed and actively traded, on the NYSE;

(b)      Sprint's common stock was regularly followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms; and

(c)      Sprint regularly communicated with the public and investors via established market communication mechanisms, including via regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

165.     As a consequence, the market for Sprint securities digested current information with respect to the Company from publicly available sources and reflected such information in the price of Sprint's securities.  Under these circumstances, all purchasers or acquirers of Sprint  securities

during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and, thus, a presumption of reliance applies.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

166.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or the forward-looking statement was authorized or approved by an executive officer of Sprint who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against Defendants Sprint, Forsee and Saleh

167.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

168.   During the Class Period, Sprint and defendants Forsee and Saleh carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiffs and other members of the Class, regarding Sprint's business, operations, financial prospects and the intrinsic value of Sprint's publicly traded securities; (b) artificially inflate and maintain the market price of Sprint's securities; and (c) cause Plaintiffs and

other members of the Class to purchase Sprint's securities at artificially inflated prices and, as a result, suffer economic losses when the truth and impact about defendants' fraud was revealed. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

169.   Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers or acquirors of the Company's publicly traded securities in an effort to maintain artificially high market prices for Sprint's publicly traded securities in violation of §10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

170.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and its operations as specified herein.

171.   These defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Sprint's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material fact and omitting to state material facts necessary in order to make the statements made about Sprint in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course

of business which operated as a fraud and deceit upon the purchasers or acquirors of Sprint's publicly traded securities during the Class Period.

172.    Each of defendants Forsee and Saleh's primary liability, and controlling person liability, arises from the following facts: (a) these defendants were high level executives and, in certain circumstances, directors at the Company during the Class Period and members of the Company's senior management team; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and director of the Company, was privy to and participated in the analysis of the Company's integration efforts, accounting and goodwill assessments, subscriber trends and credit standards and reporting regarding Sprint's financial performance and condition; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's business and operations, at all relevant times; and (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading and omitted material information.

173.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §210.01 *et seq*., and Regulation S-K, 17 C.F.R. §229.10 *et seq*., and other SEC regulations, including accurate and truthful information about the status of the Company's business and operations so that the market price of the Company's securities would be based on truthful, complete and accurate information.

174.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  As such, defendants' material misrepresentations and/or omissions were made knowingly or with a reckless disregard for the truth and for the purpose and effect of material information about Sprint's business and operations, thus supporting the artificially inflated prices of the Company's publicly traded securities.

175.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sprint's publicly traded securities were artificially inflated during the Class Period.  In ignorance of the fact that the market price of Sprint's publicly traded securities was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the markets in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiffs and the other members of the Class acquired Sprint publicly traded securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation came out of the securities.

176.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true and complete.  Had Plaintiffs, the other members of the Class and the marketplace known the truth regarding the integration of the acquired businesses and the true condition of Sprint's business operations and prospects, which were not disclosed by defendants, they would not have purchased or otherwise acquired their Sprint

publicly traded securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

177.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

179.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

180.    Defendants Forsee, Saleh and Arendt acted as controlling persons of Sprint within the meaning of §20(a) of the Exchange Act as alleged herein.  Sprint controlled all of its employees and each of the individual defendants.  By virtue of their high level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, defendants Forsee, Saleh and Arendt had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  These defendants participated in conference calls with investors and/or were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements, alleged by Plaintiffs to be misleading, prior to and/or shortly after these statements

were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

181.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

182.    As set forth above, Sprint and defendants Forsee and Saleh each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, each of the defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as class representative under Federal Rule of Civil Procedure 23;

B.    Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such equitable, injunctive or other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

      Plaintiffs demand a trial by jury.

DATED:  August 11, 2009          STUEVE SIEGEL HANSON LLP

                                  */s/ Norman E. Siegel*
                                  Norman E. Siegel – KS #44378
                                  460 Nichols Road, Suite 200
                                  Kansas City, MO  64112
                                  Telephone:  816/714-7112
                                  816/714-7101 (fax)
                                  siegel@stuevesiegel.com

                                  Liaison Counsel

                                  COUGHLIN STOIA GELLER
                                    RUDMAN & ROBBINS LLP
                                  DARREN J. ROBBINS
                                  TOR GRONBORG
                                  BRIAN O. O'MARA
                                  655 West Broadway, Suite 1900
                                  San Diego, CA  92101-3301
                                  Telephone:  619/231-1058
                                  619/231-7423 (fax)
                                  darrenr@csgrr.com
                                  torg@csgrr.com
                                  bomara@csgrr.com

                                  MOTLEY RICE LLC
                                  JAMES M. HUGHES
                                  J. BRANDON WALKER
                                  28 Bridgeside Blvd.
                                  Mount Pleasant, SC  29464
                                  Telephone:  843/216-9000
                                  843/216-9450 (fax)
                                  jhughes@motleyrice.com
                                  bwalker@motleyrice.com

                                  MOTLEY RICE LLC
                                  WILLIAM H. NARWOLD
                                  20 Church Street, 17th Floor
                                  Hartford, CT  06103
                                  Telephone:  860/882-1676
                                  860/882-1682 (fax)
                                  bnarwold@motleyrice.com

                                  Co-Lead Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies on August 11, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record, including the following:

Lynn R. Johnson ljohnson@sjblaw.com, dmorantz@sjblaw.com, lisad@sjblaw.com, lisaw@sjblaw.com

Mark W. McGrory markm@rhgm.com

Randall E. Hendricks randyh@rhgm.com, myrat@rhgm.com

John J. Miller millerlaw@prodigy.net

Jay B. Kasner jay.kasner@skadden.com

Scott D. Musoff scott.musoff@skadden.com

James M. Hughes jhughes@motleyrice.com

William H. Narwold bnarwold@motleyrice.com

_____/s/ _Norman E. Siegel_____
Plaintiffs' Liaison Counsel