**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| CORA E. BENNETT, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 2:09-cv-02122-EFM-KMH |
| SPRINT NEXTEL CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF BRIAN O. O'MARA IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, BRIAN O. O'MARA, declare as follows:

1.      I am an attorney duly licensed to practice before all of the courts of the State of California, and am admitted *pro hac vice* to practice in this action.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP, one of the counsel of record for plaintiffs in the above-entitled action.  I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2.      **Weekly Trading Volume**:  The reported trading volume from October 26, 2006 to February 27, 2008 (the "Class Period") for Sprint Nextel Corporation ("Sprint" or the "Company") common stock was 7.44 billion shares, which was almost three times the 2.80 billion average shares outstanding.[1]  The average weekly trading volume was 106.3 and the average weekly trading volume as a percentage of shares outstanding was almost 4% over the Class Period.  The cumulative weekly average trading volume for the Sprint Bonds[2] was in excess of $477 million, and the average weekly trading volume as a percentage of bonds outstanding during the Class Period was 2.76%.  The volume and trading data for the Sprint Bonds is attached hereto as Exhibit 1.

3.      **Market Capitalization of Sprint Bonds**:  During the Class Period, the market capitalization for the Sprint Bonds ranged from approximately $14.2 billion to $18.1 billion.  *See* Exhibit 2.

_____

[1]      According to Sprint's 2007 Form 10-K, the Company had approximately 2.8 billion shares outstanding.

[2]      "Sprint Bonds" refers to the ten Sprint bonds included in this action: (i) 6.0% bonds, due December 1, 2016; (ii) 6.9% bonds, due May 1, 2019; (iii) 8.75% bonds, due March 15, 2032; (iv) 8.375% bonds, due March 15, 2012; (v) 7.625% bonds, due January 30, 2011; (vi) 6.375% bonds, due May 1, 2009; (vii) 6.875% bonds, due November 15, 2028; (viii) 6.875% bonds, due October 31, 2013; (ix) 5.95% bonds, due March 15, 2014; and (x) 7.375% bonds, due August 1, 2015.

4.      **Bid-Ask Spread**:  According to Bloomberg, during the Class Period the average bid-ask spread for the Sprint Bonds was very small, ranging from 0.13% to 0.44%, *see* Exhibit 3, which is indicative of an efficient market.

5.      **Analyst Coverage**:  According to Nelson's Directory of Investment Research ("Nelson's"), analyst coverage on Sprint ranged between 23 and 27 analysts during the Class Period, with an average of 25 analyst firms covering the Company.  In addition, Nelson's identified 24 separate investment banks that provided analyst coverage of Sprint.  Specifically with respect to the Sprint Bonds, there were eight credit analysts that provided coverage of Sprint during the Class Period.  During the Class Period, more than 340 analyst reports regarding Sprint were issued by such firms as: HSBC Global Research, RBC Capital Markets, Credit Suisse, Wells Fargo Securities, LLC, Morgan Stanley and Deutsche Bank Securities, Inc.

6.      **Market Makers/Specialist/Dealers**:  Sprint's common stock traded on the New York Stock Exchange ("NYSE") under the ticker "S."  The NYSE uses specialists to provide liquidity and price stability, which are the functional equivalent of market makers.  *See, e.g.*, http://www.investopedia.com/ask/answers/128.asp.  Unlike Nasdaq where there can be multiple market makers, firms listed on the NYSE are assigned a single specialist.  During the Class Period, Sprint was assigned a specialist: Banc of America Specialist, Inc.

7.      Sprint's common stock was also traded in the over-the-counter market during the Class Period.  There is evidence that numerous financial entities were actively buying and trading Sprint's common stock during the Class Period.  According to Bloomberg, there were 71 registered active market makers for Sprint's common stock between October 2006 and February 2008.[3]

---

[3]      Bloomberg L.P.  According to Bloomberg, there were 71 registered market makers with trading volumes in excess of one million shares between October 2006 and February 2008.  The

Similarly, in 2008 there were on average 141 dealers reporting prices for the Sprint Bonds.  The large number of market makers and dealers facilitating trading in Sprint's common stock and bonds is indicative of a liquid and efficient market.

8.      During the Class Period, an average of 645 large institutional investors reported holding Sprint shares.  These institutions held, on average, 90% of Sprint's outstanding shares.  Similarly, during the Class Period, approximately 224 institutions held the Sprint Bonds.

9.      **Form S-3 Eligibility**:  At the time of *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the filing of a Form S-3 registration statement required firms to file reports under the Securities Exchange Act of 1934 ("Exchange Act") for three years prior to the Form S-3 filing and to have $150 million of stock held by non-affiliates (or $100 million of stock held by non-affiliates coupled with annual trading volume of three million shares per year).  *See id.* at 1271.  The SEC has since modified the requirements for filing a Form S-3. Among the current requirements for filing a Form S-3 registration statement are that a company be organized and operating under the laws of the United States or its territories, has filed reports under the Exchange Act for 12 calendar months, has suffered no default of its obligations and has an aggregate market value of common equity held by non-affiliates of $75 million or more.  *See* SEC Form 1379, "Form S-3 Registration Statement Under the Securities Act of 1933, General Instructions," as revised August 2001.  The value of Sprint's common stock held by non-affiliates during the Class Period ranged between $23.7 billion and $65 billion.  Sprint was organized and operated under Kansas law during the Class Period, satisfying the organizational requirement.  Sprint also filed quarterly and annual SEC reports during the Class

---

complete list of market makers with trading volumes in excess of one million shares includes 140 total entities.  Seventy-one entities are registered market makers, 37 are non-registered market makers, and 32 are NASDAQ participants.

Period, meeting the filing requirement.  Indeed, Sprint filed Form S-3s on March 27, 2006 and October 10, 2006, and thereafter filed several amended Form S-3s.

10.       **Price Reaction to Unexpected New Information**:  During the Class Period, the price of Sprint's common stock reacted to Company-related disclosures in a manner demonstrating market efficiency.  For example, on October 26, 2006, defendants issued a press release announcing Sprint's 3Q 2006 financial results and stating "our margins benefited from merger synergies and the scale provided by acquisitions."  ¶23.[4]   In response to this positive information and defendants' subsequent conference call, Sprint's stock price gained $1.18, or 6.7% on very heavy volume of 71.3 million shares.  On the same day, the Dow Jones Industrial Average was up only slightly by about 0.2%.  On February 28, 2007, defendants issued a press release in which they reported the Company's financial results for 4Q and FY 2006, announcing "[w]ireless customer additions of 742,000 raises year-end total to 53.1 million; wireless service revenues and profits increase at double-digit rate."  *See* ¶37.  In response to the positive press release, defendants' subsequent conference call, and several news articles reporting on defendants' statements, Sprint's stock price increased 4.6%, or $0.85 per share on heavy volume of 55.3 million shares.  On the same day, the Dow Jones Industrial Average was up slightly by about 0.4%.  The next day, on March 1, 2007, in response to defendants' filing of Sprint's Form 10-K in which defendants stated that they "tightened [Sprint's] credit policies for new subscribers of both CDMA and iDEN services," Sprint's stock price continued to increase gaining 3.4%, or $0.65 on heavy volume of 49.79 million shares.  *See* ¶¶42-43.  On the same day, the Dow Jones Industrial Average was down 0.3%.  On May 2, 2007, defendants issued a press release touting "[n]et subscriber additions of nearly 600,000 increase base

---

[4]       All "¶_" or "¶¶__" references are to the Consolidated Complaint for Violations of the Federal Securities Laws, filed July 16, 2009.

- 4 -

to more than 53.6 million." ¶48.  In response to this press release and defendants' subsequent conference call, Sprint's stock price gained 3.3% to close at $20.59.  On the same day, the Dow Jones Industrial Average was up only 0.6%.  On January 18, 2008, a Sprint analyst issued a research report titled "Meltdown: 4Q07 Sub Loss Worse Than Expected; Serious Restructuring Ahead." ¶77.  That same day rating agency Fitch downgraded Sprint's credit rating to "reflect the ongoing concern over Sprint Nextel's financial and operating results and the lack of visibility as to the company's performance going forward." ¶78.  In response to these disclosures, Sprint's stock plunged 24.8%, losing $2.87 per share on incredibly heavy volume of 229.9 million shares.  On the same day, the Dow Jones Industrial Average was down 0.5%.  On February 28, 2008, Sprint issued a press release disclosing the Company's 4Q and FY 2007 results and announcing a "goodwill impairment charge of $29.7 billion." ¶82.  In response to this disclosure and defendants' subsequent conference call, Sprint's stock price lost 9.6% to close at $8.09.  On the same day, the Dow Jones Industrial Average was down only 0.9%.  The next day, February 29, 2008, Sprint filed its 4Q and FY 2007 Form 10-K, further disclosing the scope of the Company's problems. ¶¶83-85.  In response to this disclosure, Sprint's stock price lost an additional 12.1% to close at $7.11.  On the same day, the Dow Jones Industrial Average was down only 2.51%.

11.     During the Class Period, the price of the Sprint Bonds reacted to Company-related disclosures and credit-related events in a manner demonstrating market efficiency.  For example, on January 18, 2008, a Sprint analyst issued a research report titled "Meltdown: 4Q07 Sub Loss Worse Than Expected; Serious Restructuring Ahead." ¶77.  That same day rating agency Fitch downgraded Sprint's credit rating to "reflect the ongoing concern over Sprint Nextel's financial and operating results and the lack of visibility as to the company's performance going forward." ¶78.  In response to these disclosures and the decline in Sprint's rating, eight of the ten Sprint Bonds declined, dropping between 0.50% and 6.57%.  *See* Exhibit 4.  Additionally, on February 28, 2008, when

- 5 -

Sprint issued a press release disclosing the Company's 4Q and FY 2007 results and announcing a "goodwill impairment charge of $29.7 billion" and the extent of defendants' misstatements and omissions was revealed, Fitch slashed Sprint's rating to a "junk" rating of BB+ with "Rating Watch Negative." *See* ¶¶82, 139  In response to these disclosures and the decline in Sprint's rating, nine of the ten Sprint Bonds declined precipitously, dropping between 9.44% and 12.5%.  *See* Exhibit 5.

12.     Attached hereto as Exhibit 6 is a true and correct copy of Robbins Geller Rudman & Dowd LLP's firm resume.

13.     Attached hereto as Exhibit 7 is a true and correct copy of Motley Rice LLC's firm resume.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 17th day of November, 2011, at San Diego, California.

s/ Brian O. O'Mara
BRIAN O. O'MARA