**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| CORA E. BENNETT, individually and | ) | |
| On Behalf of All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-2122 EFM/KMH |
| | ) | |
| SPRINT NEXTEL CORPORATION, | ) | |
| GARY D. FORSEE, PAUL N. SALEH | ) | |
| and WILLIAM G. ARENDT, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

Defendants Sprint Nextel Corporation ("Sprint" or the "Company"), Gary D.

Forsee, Paul N. Saleh and William G. Arendt (collectively, "Individual Defendants" and,

together with Sprint, "Defendants") submit this memorandum of law in opposition to the Motion

for Class Certification ("Motion") filed by the PACE Industry Union-Management Pension Fund

("PACE"), Skandia Life Insurance Company ("Skandia") and the West Virginia Investment

Management Board ("WVIMB") (collectively, "Lead Plaintiffs" or "Plaintiffs").

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... ii

I.     STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT ............. 1

II.    PROCEDURAL HISTORY .................................................................................. 3

III.   STATEMENT OF FACTS AND GENERAL ALLEGATIONS ...................................... 4

       A.   Sprint. ..................................................................................................... 4

       B.   The Nextel Merger. ................................................................................. 4

       C.   Credit Markets Contract as Sprint Implements Its Long-Term Post-Merger
            Strategy. ................................................................................................. 5

       D.   Sprint Announces Unfavorable Results and a Goodwill Impairment. ..................... 6

       E.   Plaintiffs' Holdings in Sprint Securities. ................................................... 7

       F.   Plaintiffs Move for Class Certification. ..................................................... 8

       G.   Plaintiffs Support Their Class Certification Request With Only An
            Inadequate Attorney Declaration, Not Expert Testimony. ................................ 10

IV.    STATEMENT OF THE QUESTION PRESENTED ...................................................... 10

V.     ARGUMENT ................................................................................................... 10

       A.   Individualized Issues Will Predominate – And Class Treatment Under Fed.
            R. Civ. P. 23(b)(3) Is Inappropriate – Because The Market For The Sprint
            Bonds Is Not Efficient. .......................................................................... 10

       B.   Plaintiffs' Attorney Declaration Does Not Meet Their Burden of Proving
            That The Sprint Bonds Traded in an Efficient Market. ................................. 12

       C.   Sprint Bonds and Sprint Common Stock Differ Significantly In Terms of
            Market Efficiency. ................................................................................. 15

       D.   An Event Study Shows the Sprint Bonds Traded in an Inefficient Market. ......... 16

       E.   The Opportunities For Arbitrage Profits Is Further Evidence of Market
            Inefficiency. ......................................................................................... 22

       F.   The Sprint Bonds Exhibit a Predictable Pricing Pattern Irrespective of
            New Information. ................................................................................... 24

CONCLUSION ...................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*In re America International Group, Inc. Securities Litigation*,
  265 F.R.D.157 (S.D.N.Y. 2010) ........................................................................ *passim*.

*Amida Capital Management II, LLC v. Cerberus Capital Management, L.P.*,
  669 F. Supp. 2d 430 (S.D.N.Y. 2009)............................................................................5

*Basic v. Levinson*,
  485 U.S. 224 (1988)..........................................................................................2, 11, 16

*Bell v. Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) ...................................................................................12, 18

*Bell v. Ascendant Solutions, Inc.*,
  No. Civ. A. 3:01 CV 0166 N, 2004 WL 1490009 (N.D. Tex. July 1, 2004)..............19

*Billhofer v. Flamel Techs., S.A.*,
  No. 07 Civ. 9920, 2012 WL 928147 (S.D.N.Y. Mar. 15, 2012) ................................25

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ..............................................................................16

*In re Countrywide Finance Corp. Securities Litigation*,
  273 F.R.D. 586 (C.D. Cal. 2009) ..........................................................................15, 16

*D.G. ex rel. Stricklin v. Devaughn*,
  594 F.3d 1188 (10th Cir 2010) ...................................................................................13

*In re DVI Inc. Securities Litigation*,
  249 F.R.D. 196 (E.D. Pa. 2008)............................................................................12, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 589 (1993).................................................................................................. 18-19

*Dronsejko v. Thornton*,
  632 F.3d 658 (10th Cir. 2011) ...................................................................................11

*Edgington v. R.G. Dickinson & Co.*,
  139 F.R.D. 183 (D. Kan. 1991).................................................................................11

*In re Enron Corp. Securities Derivative & "ERISA"Litigation*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) .......................................................................15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) .................................................................................11, 13, 19

*In re Federal Home Loan Mortgage Corp. Securities Litigation*,
  Nos. 09 Civ. 832 (MGC), 09 MD 2072, 2012 WL. 1028642
  (S.D.N.Y. Mar. 27, 2012) .............................................................................. *passim*.

*Freeman v. Laventhol & Horwath*,
  915 F.2d 193 (6th Cir. 1990) ..................................................................................11

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ...............................................................................11

*Hatfield v. Wal-Mart Stores, Inc.*,
  335 F. App'x 796 (10th Cir. 2009)...........................................................................19

*In re HealthSouth Corp. Securities Litigation*,
  261 F.R.D. 616 (N.D. Ala. 2009)..............................................................................15

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ...........................................................................2, 11

*Kelley v. Mid-America Racing Stables, Inc.*,
  139 F.R.D. 405 (W.D. Okla. 1990)...................................................................... 16-17

*Lehocky v. Tidel Technologies, Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004)..............................................................................25

*Liebau v. Columbia Casualty Co.*,
  176 F. Supp. 2d 1236 (D. Kan. 2001)....................................................................3, 14

*Marine Bank v. Weaver*,
  455 U.S. 551 (1982)..................................................................................................7

*In re Merrill Lynch Auction Rate Securities Litigation*,
  No. 09 MD 2030 (LAP), 2011 WL 536437 (S.D.N.Y. Feb. 9, 2011) ..........................5

*In re Moody's Corp. Securities Litigation*,
  274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................................12, 21

*In re Nature's Sunshine Products Inc. Securities Litigation*,
  251 F.R.D. 656 (D. Utah 2008) ...............................................................................16

*In re PolyMedica Corp. Securities Litigation*,
  432 F.3d 1 (1st Cir. 2005).................................................................................. *passim*.

*In re PolyMedica Corp. Securities Litigation*,
   453 F. Supp. 2d 260 (D. Mass. 2006) ........................................................22, 23, 24, 25

*Rice v. Charles Schwab*,
   No. SACV 10-003980-CJC (MLGx), 2010 WL 5156654
   (C.D. Cal. Oct. 22, 2010) .................................................................................................6

*In re Safety-Kleen Corp. Bondholders Litigation*,
   No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004) ............................21, 22

*Serfaty v. International Automated System, Inc.*,
   180 F.R.D. 418 (D. Utah 1998) ..................................................................11, 13, 14

*Starkey v. Boulder County Social Services*,
   569 F.3d 1244 (10th Cir. 2009) ...........................................................................3, 14

*Stat-Tech Liquidating Trust v. Fenster*,
   981 F. Supp. 1325 (D. Colo. 1997)............................................................................11

*In re Taco Bell Wage & Hour Actions*,
   No. 1:07-cv-01314-OWW-DLB, 2011 WL 4479730
   (E.D. Cal. Sept. 26, 2011) ...................................................................................3, 14

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*
   (*Bombardier I*),
   No. 05 Civ. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ..........22, 23, 24

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.*
   (*Bombardier II*),
   546 F.3d 196 (2d Cir. 2008)............................................................................... *passim*.

*Trevizo v. Adams*,
   455 F.3d 1155 (10th Cir. 2006) ................................................................................11

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ........................................................................12, 13, 16

*United States v. Kumar*,
   617 F.3d 612 (2d Cir. 2010)......................................................................................19

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ..........................................................................................3, 11

*In re Williams Securities Litigation*,
   496 F. Supp. 2d 1195 (N.D. Okla. 2007)........................................................17, 18, 19

## STATUTES

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) .........................................................1

## RULES

Fed. R. Civ. P. 23(b)(3) …………………………………………………………...1, 10, 24

## MISCELLANEOUS

Edward Chancellor, *Look Out. This Crunch Is Serious*,
    WASHINGTON POST, Aug. 19, 2007, at B1 ..............................................................6

Alan Greenspan, *The Roots of the Mortgage Crisis*,
    WALL STREET JOURNAL, Dec. 12, 2007, at A19 ...................................................5

Jane J. Kim, *Credit Crunch Moves Beyond Mortgages*,
    WALL STREET JOURNAL, Aug. 22, 2007, at D1 ....................................................5

Ted Pincus, *It's crunch time for the economy; If politicians make the wrong moves,
    be prepared to begin worrying in earnest*,
    CHICAGO SUN-TIMES, Sept. 4, 2007, at 47………………………………………..5

**I.      STATEMENT OF THE NATURE OF THE MATTER BEFORE THE COURT**

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs move this Court to certify a class consisting of purchasers of Sprint common stock and ten different Sprint bonds during the proposed class period of October 26, 2006, through February 27, 2008 (the "Class Period").  For the reasons articulated below, Defendants oppose the inclusion of any purchasers of these ten Sprint bonds (the "Sprint Bonds") within the proposed class.

As a preliminary matter, Plaintiffs' Motion – filed over two years after this litigation commenced – is the first indication that Plaintiffs ever intended to include Sprint bondholders as part of the proposed class.  Plaintiffs failed to include any Sprint Bonds in their motion for Lead Plaintiff appointment.  Likewise, neither the original nor consolidated complaint mentions the Sprint Bonds, and Plaintiffs did not produce documents relating to the purchase of any of the Sprint Bonds until after they filed their Motion.  Those same documents demonstrate that only one Lead Plaintiff – WVIMB – purchased any of the Sprint Bonds.  But WVIMB did not buy all ten bonds that Plaintiffs seek to include in the proposed class.  To the contrary, WVIMB owned only three of these bonds at any one time and only owned two through the end of the proposed Class Period.

Plaintiffs, as the moving party, bear the burden of establishing that all the requirements for class certification have been met.  Because reliance is an element under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), in order to satisfy Rule 23(b)'s predominance requirement, *see* Fed. R. Civ. P. 23(b)(3), Plaintiffs must rely on what is known as the fraud-on-the-market theory.  Otherwise, it is well-settled that individual issues of reliance will predominate.  The fraud-on-the-market theory is that

> in an open, efficient, and developed market, where millions of shares are traded daily, the investor must rely on the market to perform a valuation process which incorporates all publicly available information, including misinformation.

*Joseph v. Wiles*, 223 F.3d 1155, 1164 n.2 (10th Cir. 2000) (citing *Basic v. Levinson*, 485 U.S. 224, 241-47 (1988)).

But to take advantage of the presumption of reliance under a fraud-on-the-market theory, Plaintiffs must first prove that the Sprint Bonds trade in an efficient market. For all the reasons discussed below, Plaintiffs fail to do so.

Stocks and bonds are very different securities that trade in very different markets. Courts have recognized the fraud-on-the-market theory in the context of highly liquid, well-established, efficient markets. Conversely, courts have been more skeptical of efforts to apply the fraud-on-the-market presumption to bonds and other thinly-traded (as compared to common stock) securities, such as the Sprint Bonds. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.* (*Bombardier II*), 546 F.3d 196, 210-211 (2d Cir. 2008) (common issues did not predominate where plaintiff failed to show that debt certificates traded efficiently); *In re Am. Int'l Group (AIG), Inc. Sec. Litig.*, 265 F.R.D. 157, 181 (S.D.N.Y. 2010) (common issues did not predominate where bonds did not trade in an efficient market). Because the Sprint Bonds did not trade in an efficient market, this Court should view Plaintiffs' Motion with the same skepticism.

Notwithstanding the critical differences between stock and bond markets, and Plaintiffs' burden to establish market efficiency for the Sprint Bonds separate from Sprint common stock, Plaintiffs chose not to submit an expert report or event study in support of their Motion. It is widely recognized that expert testimony through an event study is critical in determining whether a security, and a bond in particular, trades in an efficient market. Instead, Plaintiffs submitted an attorney declaration claiming that the market for the Sprint Bonds is efficient. In large part, this "conclusion" is based on a blurring of the distinctions between Sprint

common stock and the Sprint Bonds.[1]  But Plaintiffs ignore that (1) they must establish market efficiency for each security separately and (2), Sprint common stock and the Sprint Bonds differ in significant respects, including that the Sprint Bonds do not trade in an efficient market, as explained in the Report of Dr. Mukesh Bajaj (the "Bajaj Report" or "Bajaj Rep."), submitted in connection with this Opposition and attached hereto as Exhibit A.[2]

For these reasons and those discussed below, Plaintiffs cannot rely upon the fraud-on-the-market presumption and common issues do not predominate as to the Sprint Bonds. Therefore, this Court should not certify any class that includes purchasers of the Sprint Bonds.

## II.    PROCEDURAL HISTORY

Plaintiff Cora E. Bennett ("Ms. Bennett") filed her claim against Defendants on March 10, 2009 (the "Original Complaint").  (Dkt. 1.)  On June 5, 2009, this Court appointed PACE, Skandia, and WVIMB Lead Plaintiffs.  (Dkt. 23.)  Plaintiffs filed a consolidated complaint on August 11, 2009 (the "Consolidated Complaint" or "CC")).  (Dkt. 33.)  Defendants' motion to dismiss the Consolidated Complaint was denied on January 6, 2011.  On November 17,

---

[1]      Although Plaintiffs have the burden of proof on class certification, *see, e.g., Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011), Defendants assume, solely for the purposes of opposing Plaintiffs' Motion, that Sprint common stock traded in an efficient market, and thus do not oppose certification of the proposed class of Sprint common stock holders.  Defendants reserve their rights to challenge the claims of Sprint common stock holders because, among other infirmities, their purported losses were not caused by any decline in the price of Sprint common stock as a result of any disclosures purportedly correcting any misstatements.

[2]      Plaintiffs should not be permitted to submit additional evidence in support of their Motion – ostensibly in a reply brief – including but not limited to evidence as to whether the Sprint Bonds trade in an efficient market.  A reply brief is not a proper forum for introducing new evidence.  *See Starkey v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259 (10th Cir. 2009) ("This court does not ordinarily review issues raised for the first time in a reply brief.") (internal quotation marks omitted) (citation omitted); *Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244-45 (D. Kan. 2001) (same); *see also In re Taco Bell Wage & Hour Actions*, No. 1:07-cv-01314-OWW-DLB, 2011 WL 4479730, at *7 (E.D. Cal. Sept. 26, 2011) (expert's supplemental declaration was inadmissible because "[n]ew evidence or analysis presented for the first time in a reply [to a class certification motion] will not be considered").

2011, Plaintiffs filed their Motion.  Before the Court is Defendants' opposition to Plaintiffs' Motion.

### III.   STATEMENT OF FACTS AND GENERAL ALLEGATIONS

#### A.   Sprint.

Sprint is a telecommunications company based in Overland Park, Kansas.  (CC ¶¶ 4, 7.)  Sprint was founded in 1898 in Abilene, Kansas, as the Brown Telephone Company; its original business was linking homes to the local town hall or Western Union.  (*Id*. ¶ 12.)  More recently, its business has been divided into two segments, wireline and wireless.  (*Id*. ¶ 7.)  By 2004, Sprint generated the majority of its revenues through wireless communications services.  (*Id*. ¶ 12.)  Gary Forsee was the Chairman and Chief Executive Officer of Sprint from the beginning of the proposed Class Period until October 8, 2007.  (*Id*. ¶ 8.)  Paul Saleh was Sprint's Chief Financial Officer from the beginning of the proposed Class Period until January 25, 2008.  (*Id*. ¶ 9.)  William Arendt was Sprint's Controller during the proposed Class Period.  (*Id*. ¶ 10.)

#### B.   The Nextel Merger.

In August 2005, Sprint merged with Virginia-based Nextel Communications, Inc. ("Nextel"), the country's then-fifth largest cellular company.  Nextel had garnered a substantial niche market with its push-to-talk, walkie talkie features.  (CC ¶¶ 14-16.)  Sprint operated on what was known as a CDMA network, while NEXTEL's push-to-talk system operated on what was called the iDEN network.[3]

---

[3]  "CDMA" stands for "code division multiple access" network, which is the operating network for Sprint brand cellphones. "iDEN" is short for "integrated digital enhanced network," which was the operating system for Nextel's walkie-talkie feature phones.  (CC ¶ 8(a).)

### C.   Credit Markets Contract as Sprint Implements Its Long-Term Post-Merger Strategy.

In addition to purchasers of Sprint common stock, Plaintiffs seek to certify a class of Sprint bond purchasers who purportedly bought Sprint bonds during a time of global economic upheaval. (*See generally* Bajaj Rep. ¶¶ 27-34.) Just over halfway through the Class Period, the global credit markets began to contract, and an absence of liquidity led to wide discrepancies in asset valuation. *See Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 433 (S.D.N.Y. 2009) ("July 2007 marked the beginning of what was then called the 'credit crunch,' the first phase of the financial crisis that culminated in the fall of 2008"); *see also* Alan Greenspan, *The Roots of the Mortgage Crisis*, Wall St. J., Dec. 12, 2007, at A19 (identifying August 9, 2007, as the beginning of the credit crisis) (attached hereto as Exhibit B); (Bajaj Rep. ¶ 29.)

As the credit crisis unfolded, it spread beyond the subprime mortgage market where it originated. *See* Ted Pincus, *It's crunch time for the economy*; *If politicians make the wrong moves, be prepared to begin worrying in earnest*, Chi. Sun-Times, Sept. 4, 2007, at 47 (Dkt. 36, Ex. I.) (developments in housing market "are creating a tightening in commercial and consumer credit"); *see also* Jane J. Kim, *Credit Crunch Moves Beyond Mortgages*, Wall St. J., Aug. 22, 2007, at D1 (Dkt. 36, Ex. J.  This upheaval had a pronounced impact on corporate bond markets. (Bajaj Rep. ¶ 33 ("aggregate illiquidity in the corporate bond markets doubled after the credit crisis broke out.").)  Bond pricing also depends on credit ratings from one or more of the recognized credit agencies such as Standard and Poors. (Bajaj Rep. n.23.)  As courts have recently recognized, the credit ratings of various companies were under intense scrutiny during the credit crisis, with the evaporation of liquidity making it difficult to value assets despite their credit rating. *See In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09 MD 2030 (LAP), 2011

WL 536437, at *13 (S.D.N.Y. Feb. 9, 2011) (a strong credit rating is not a representation about liquidity); *Rice v. Charles Schwab*, No. SACV 10-00398-CJC (MLGx), 2010 WL 5156654, at *3 (C.D. Cal. Oct. 22, 2010) ("[C]redit ratings are opinions or predictions of the future creditworthiness or value of companies").

        Neither Sprint nor the broader cellphone industry was immune from these general economic woes.  (*See* Sprint Third Quarter 2007 Earnings Release at 2 (Dkt. 36, Ex. K) ("our third quarter results reflect mixed performance as we . . . manage through credit market impacts on a portion of our customer base"); Sprint Third Quarter 2007 Earnings Call at 4 (Dkt. 36, Ex. G) ("the macro-economic environment we're experiencing this summer created incremental pressure on our subprime subscribers."); Edward Chancellor, *Look Out.  This Crunch Is Serious*, Wash. Post, Aug. 19, 2007 at B1 (*Id.*, Ex. L) ("An increasing number of businesses, from motorcycle retailers to cellphone operators, are finding their sales affected by the subprime debacle. . . .").)

      **D.**    **Sprint Announces Unfavorable Results and a Goodwill Impairment.**

        On January 18, 2008, Sprint announced results for its 2007 financial year, which included a loss of 683,000 post-paid subscribers.  (CC ¶ 75.)  On that same day, Sprint's common stock declined 24.8%.  (*Id.* ¶ 79.)  Despite this negative news and the decline in the value of Sprint common stock, certain Plaintiffs continued to purchase Sprint securities.  On January 23, 2008, and February 13, 2008, Skandia purchased over 280,000 shares of Sprint common stock. (*See* Skandia Cert. Ex. A (Dkt. 12, Ex. A).)  On February 28, 2008, Sprint disclosed the amount of a previously announced goodwill impairment, reflecting a decrease in the carrying value of

certain assets it acquired in the Nextel merger.  (CC ¶ 82.)  On that same day, Sprint common stock declined 9.6%.  (*Id.* ¶ 93.)[4]

      **E.**      **Plaintiffs' Holdings in Sprint Securities.**

      In the Original Complaint, Ms. Bennett purported to be an investor in Sprint common stock – not Sprint bonds.  Likewise, when Plaintiffs moved for Lead Plaintiff appointment, neither PACE, Skandia, nor WVIMB submitted evidence of investments in Sprint's bonds, but rather solely in Sprint common stock.  (*See* Declaration in Support of WVIMB Lead Plaintiff Motion Ex. A (Dkt. 15, Ex. A).)  Similarly, the Consolidated Complaint alleged that there were over 2.7 billion shares of Sprint common stock outstanding during the Class Period (CC ¶ 158), but included no allegations as to outstanding bonds.  Nor did Plaintiffs allege any false statements by Sprint in any bond offerings, registration statements or prospectuses.

      In discovery, prior to the filing of the Motion, none of the Plaintiffs produced documents or information indicating that they held any Sprint bonds, despite Defendants' requests for information and documents about Plaintiffs' investments in Sprint "securities."[5]  (*See, e.g.*, Defendants' First Request for Production of Documents, Request 1 (requesting documents relevant to purchases or sales of Sprint securities) (attached hereto as Exhibit C).)  Instead, Plaintiffs responded to these discovery requests by identifying information and producing documents only as to the purchase or sale of Sprint common stock, including the identification of investment advisors only involved in common stock investments.  (*See, e.g.*, Plaintiffs' Response

---

[4]      Underscoring the inappropriateness of including the Sprint Bonds as part of a class, two of the Sprint Bonds *increased* in price on January 18, 2008.  *See* Declaration of Brian O'Mara in Support of Plaintiffs' Motion for Class Certification ("O'Mara Decl.") Ex. 4.  One of the Sprint Bonds increased in price on February 28.  (*See* O'Mara Decl. Ex. 5.)

[5]      It is widely recognized that "security" is broadly defined under the Securities Exchange Act to include bonds.  *See Marine Bank v. Weaver*, 455 U.S. 551, 555-56 (1982).

to Defendants First Set of Interrogatories, Response to Interrogatory 3 (attached hereto as Exhibit D).)  Plaintiffs each held Sprint common stock through investments managed by third party investment advisors, investments over which the investment advisors had total discretion, and pursuant to which Sprint equities were held as part of a basket of stocks.  (*See* Skandia Dep. 74:24-75:10 (discussing discretion of Skandia investment advisors), 93:5-14 (discussing investment strategy) (attached hereto as Exhibit E); PACE Dep. 64:22-65:11 (discussing investment strategy), 76:3-7 (discussing discretion of PACE investment advisors) (attached hereto as Exhibit F); WVIMB Dep. 63:3-64:4 (discussing stock investment strategy), 51:15-23 (discussing discretion of WVIMB investment advisors) (attached hereto as Exhibit G).)

Only WVIMB purchased any of the Sprint Bonds.  (Ex. G at 69:13-72:16 (discussing bond investment strategy).)[6]  But no Lead Plaintiff made any direct investments in Sprint securities and only after Plaintiffs filed their Motion would Defendants learn that neither of the advisors previously identified by WVIMB had investment management responsibility over WVIMB bond purchases.

### F.    Plaintiffs Move for Class Certification.

When Plaintiffs filed their Motion, more than two years after the commencement of this litigation, Plaintiffs revealed, for the first time, that they sought to certify a class containing purchasers of the Sprint Bonds.  (Dkt. 117.)  Specifically, Plaintiffs seek to certify a class consisting of:

> All persons and entities who purchased or otherwise acquired the publicly-traded common stock of Sprint . . . [for the Class Period], and who were damaged thereby.  Included in the Class are purchasers of Sprint common stock and the following Sprint debt securities: (i) 6.0% bonds, due December 1, 2016; (ii) 6.9%

---

[6]    These depositions were taken after Plaintiffs moved for class certification and after documents were produced regarding Plaintiffs' bond purchases.

bonds, due May 1, 2019; (iii) 8.75% bonds, due March 15, 2032; (iv) 8.375% bonds, due March 15, 2012; (v) 7.625% bonds, due January 30, 2011; (vi) 6.375% bonds, due May 1, 2009; (vii) 6.875% bonds, due November 15, 2028; (viii) 6.875% bonds, due October 31, 2013; (ix) 5.95% bonds, due March 15, 2014; and (x) 7.375% bonds, due August 1, 2015.  Excluded from the Class are Defendants herein, members of each Defendant's immediate family, any entity in which any Defendant has or had a controlling interest, officers and directors of Sprint, and Defendant's legal representatives, heirs, successors, or assigns of any such excluded party.

(*Id.*)  Even from their face, it is evident that the Sprint Bonds all have different characteristics. They each have different maturities and different coupons (interest rate paid).  They were also issued by different entities.  Six were issued before the Nextel merger by Sprint Capital Corporation, three were issued before the merger by Nextel Communications, Inc. and only one bond was issued by the merged Sprint-Nextel entity.  (*See* Bajaj Rep. ¶ 15.)  Yet, Plaintiffs fail to recognize that the Sprint Bonds will react differently to the same information and instead lump the Sprint Bonds together, along with Sprint common stock, as part of a putative class.

On November 17, 2011 – the *same* day they filed the Motion – Plaintiffs for the first time produced documents illustrating their purchases and sales of the Sprint Bonds. WVIMB is the only Plaintiff that purports to be a purchaser or seller of any of the Sprint Bonds. (*See* Dkt. 15, Ex. A.)  But WVIMB purchased only three of the ten bonds included in the class Plaintiffs seek to certify.  (*Id.* (purchasing 6.0% bonds, due December 1, 2016, 6.9% bonds, due May 1, 2019 and 8.75% bonds, due March 15, 2032).)  And as to one of these bonds, WVIMB sold out of its position before the end of the Class Period.  (*Id.* (selling out of position in 6.0% bond due December 1, 2016 by August 15, 2007).)  Thus, at the end of the Class Period, one Plaintiff held only two of the ten bonds that Plaintiffs seek to include in the proposed class.

**G.** **Plaintiffs Support Their Class Certification Request With Only An Inadequate Attorney Declaration, Not Expert Testimony.**

Despite the fact that Plaintiffs bear the burden on certifying a class, Plaintiffs chose not to submit any expert evidence in support of their Motion.  Instead, the only evidence Plaintiffs present to this Court is the O'Mara Declaration attesting to the efficiency of the market for the Sprint Bonds.  Mr. O'Mara does not purport to be an economist or to have any finance expertise.  Yet, he concludes that the market for the Sprint Bonds was efficient.

But as discussed herein, Mr. O'Mara's "conclusion" that the market for the Sprint Bonds is efficient fails to elicit the type of evidence routinely used in determining market efficiency and whether the fraud-on-the-market presumption should apply.  Most strikingly, he fails to indicate any reaction in the price of the Sprint Bonds to any information prior to the purported corrective disclosures on January 18, 2008 and February 28, 2008.

## IV.   STATEMENT OF THE QUESTION PRESENTED

Whether, pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, this Court should certify a class that includes purchasers of ten Sprint bonds where Plaintiffs have failed to meet their burden of proving those bonds traded in an efficient market and, consequently, that common issues of law predominate.

## V.   ARGUMENT

**A.** **Individualized Issues Will Predominate – And Class Treatment Under Fed. R. Civ. P. 23(b)(3) Is Inappropriate – Because The Market For The Sprint Bonds Is Not Efficient.**

Plaintiffs seek certification pursuant to Rule 23(b)(3), claiming "questions of law or fact common to class members predominate over any questions affecting only individual members" (Fed. R. Civ. P. 23(b)(3)).  (Mem. in Support of Plaintiffs' Motion for Class Certification ("Mem."), pp. 23-24.)  As the moving party, Plaintiffs bear the burden of

establishing that all the prerequisites for class certification have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011); *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

To succeed in their claims under Section 10(b) of the Securities Exchange Act of 1934, Plaintiffs must prove reliance.  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988); *Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997); *Edgington v. R.G. Dickinson & Co.*, 139 F.R.D. 183, 192-93 (D. Kan. 1991) (applying *Basic*).  Reliance "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000) (quotation marks omitted) (quoting *Basic*, 485 U.S. at 243).  Each investor must prove that he reasonably relied on material misstatements to his detriment.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184-85 (2011); *Joseph*, 223 F.3d at 1164.  Here, Plaintiffs seek to establish reliance on a class-wide basis through the fraud-on-the-market theory.

"Defendants are not required to demonstrate that the market is inefficient."  *In re Fed. Home Loan Mortgage Corp. ("Freddie Mac") Sec. Litig.*, Nos. 09 Civ. 832 (MGC), 09 MD 2072 (MGC), 2012 WL 1028642, at *7 (S.D.N.Y. Mar. 27, 2012).  Rather, to take advantage of the fraud-on-the-market presumption, a plaintiff must first establish that the security traded in an *efficient* market.  *See Basic*, 485 U.S. at 248 n.27; *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421 (D. Utah 1998) ("[t]he fraud-on-the-market theory cannot be applied logically to securities that are not traded in efficient markets") (quotation marks omitted) (citation omitted).[7] Plaintiffs bear the burden "of making a preliminary showing of market efficiency at the class

---

[7]    "An efficient market is one which rapidly reflects new information in the price of the stock. It is almost always 'developed,' in the sense that the market is characterized by a relatively high level of activity and frequency, and for which trading information is widely available." *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1346 (D. Colo. 1997) (citing *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990)).

certification stage." *Bell v. Ascendant Solutions, Inc*., 422 F.3d 307, 313 (5th Cir. 2005); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 489 (S.D.N.Y. 2011); *see also Bombardier II*, 546 F.3d at 210 ("preponderance of the evidence" standard applies to showing of market efficiency). To meet their burden, Plaintiffs must do more than allege in conclusory fashion that a security traded in an efficient market. *Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th Cir. 2005) ("Courts cannot make an informed decision [about class certification] based on bare allegations. . . . ").

**B.**     **Plaintiffs' Attorney Declaration Does Not Meet Their Burden of Proving That The Sprint Bonds Traded in an Efficient Market.**

Plaintiffs' conclusory factual assertions – in the form of an attorney declaration – do not meet their burden for establishing the market efficiency of the Sprint Bonds. *See id.* at 323 n.6 (noting that courts tasked with assessing market efficiency "may often benefit from statistical, economic, and mathematical analysis" from experts); *see also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209 n.19 (E.D. Pa. 2008) ("In determining if there is an efficient market for DVI's common stock, the Court must make a legal determination based on the arguments of counsel and supported by expert witness reports."), *aff'd*, 639 F.3d 623 (3d Cir. 2011). Rather, the O'Mara Declaration sets forth conclusory and unsupported statements that the market for the Sprint Bonds was purportedly efficient because, among other reasons, "the price of the Sprint Bonds reacted to Company-related disclosures and credit-related events in a manner demonstrating market efficiency." (O'Mara Decl. ¶ 11.)  In support of this conclusion, Mr. O'Mara asserts that eight of the ten bonds declined in price on January 18, 2008, and nine of the ten bonds declined in price on February 28. (*Id.*)[8]  No additional price reaction throughout the

---

[8]     Plaintiffs use January 18, 2008 and February 28, 2008 to support the assertion that "there is a cause-and-effect relationship between certain unexpected corporate events or financial releases and an immediate response in

*(cont'd)*

Class Period is offered as to the Sprint Bonds.  Such a conclusory showing is insufficient to meet Plaintiffs' burden.  *See D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir 2010); *Unger*, 401 F.3d at 325, *Serfaty*, 180 F.R.D. at 419.

Conversely, as the Bajaj Report demonstrates and as discussed in more detail herein, the Sprint Bonds did not react efficiently to news about the Company.  (Bajaj Rep. ¶¶ 90-110.)  None of the O'Mara Declaration's additional "evidence" of market efficiency, (*see generally* O'Mara Decl. ¶¶ 2-11), can carry Plaintiffs' burden on the market efficiency of the Sprint Bonds.

- Weekly trading volume (O'Mara Decl. ¶ 2): Mr. O'Mara admits that less than 3% of outstanding bonds traded during any given week during the Class Period, and provides no evidence of daily trading.

- Market capitalization (O'Mara Decl. ¶ 3): Mr. O'Mara declares that there were tens of billions of dollars of the Sprint Bonds held by the market, but presents no evidence of how regularly those bonds traded or the dollar volume of trades.

- Bid-Ask Spread (O'Mara Decl. ¶ 4): Mr. O'Mara concludes that the bid-ask spread on the Sprint Bonds was "small" based on data from Bloomberg.  As discussed herein, Bloomberg does not measure spreads on intraday transactions and therefore has no bearing on arbitrage profits, a key factor in determining market efficiency.

- "Analyst Coverage" (O'Mara Decl. ¶ 5): Mr. O'Mara asserts that the Sprint Bonds were covered by eight "credit analysts" during the putative Class Period, with no discussion of which Sprint Bonds they covered, who these analysts were or whether they covered Sprint Bonds for the entirety of the Class Period or just a portion of it.

---

*(cont'd from previous page)*

the price of Sprint's securities" as to the Sprint Bonds.  (*See* Mem. at 24; O'Mara Decl. ¶ 11.)  These are days on which Sprint allegedly made disclosures correcting supposed misstatements that allegedly caused the price of Sprint's stock to decline.  (CC ¶¶ 79, 93.)  By relying on corrective disclosures for determining whether there was a price reaction on the Sprint Bonds, Mr. O'Mara conflates loss causation and reliance.  "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock . . . Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory."  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011).  But even in Mr. O'Mara's conclusory and admittedly non-expert analysis, three of the Sprint Bonds increased in price on the days of supposed corrective disclosures.  (*See* O'Mara Decl. Exs. 4, 5.)  Regardless, Mr. O'Mara's conclusions cannot establish an efficient market and cannot satisfy Plaintiffs' burden on its Motion.

- "Market Makers/Specialists/Dealers" (O'Mara Decl. ¶¶ 6-8): Mr. O'Mara claims that 141 dealers reported prices for Sprint bonds in 2008.  This covers, at most, the last two months of the Class Period.  As the Bajaj Report concludes, the number of market makers is largely irrelevant when they were largely inactive.  (Bajaj Rep. ¶¶ 119-120.)[9]  Indeed, more than half of the dealers in the Bonds were unable to provide quotes when requested.  (*Id.* ¶ 120.)  Likewise, while Mr. O'Mara claims there were approximately 224 institutions that held the Sprint Bonds (O'Mara Decl. ¶ 8), he does not indicate whether these institutional investors were actively trading these holdings.

- Form S-3 filing (O'Mara Decl. ¶ 9): Mr. O'Mara does not indicate how this factor has any bearing on the Sprint Bonds.

- "Price reaction to unexpected new information" (O'Mara Decl. ¶¶ 10-11.)  Mr. O'Mara only measures price reaction for the Sprint Bonds on the two supposedly corrective disclosure days (January 18, 2008 and February 28, 2008), not any days during the Class Period where Sprint supposedly made a misstatement or other disclosure, and does so without use of a statistically valid event study.  (O'Mara Decl. ¶ 11.)

Plaintiffs' attempt to prospectively provide for "supplemental evidence" of market efficiency, *see* Mem. at 22 n.10 – presumably in a new expert report to be submitted with their reply brief – is insufficient as well.  To permit Plaintiffs to first introduce evidence of market efficiency in reply would effectively shift the burden on class certification from Plaintiffs to Defendants.  Such tactics – introducing new evidence of market efficiency on reply – are impermissible.  *See Starkey v. Boulder Cnty. Soc. Servs.*, 569 F.3d 1244, 1259 (10th Cir. 2009); *Liebau v. Columbia Cas. Co.*, 176 F. Supp. 2d 1236, 1244-45 (D. Kan. 2001); *see also In re Taco Bell Wage & Hour Actions*, No. 1:07-cv-01314-OWW-DLB, 2011 WL 4479730, at *7 (E.D. Cal. Sept. 26, 2011) (expert's supplemental declaration on reply in support of class certification was inadmissible.)

---

[9]       "Market makers are those who announce their willingness to trade a specific number of shares at a specific price."  *Serfaty*, 180 F.R.D. at 422.  The Bajaj Report provides a glossary of relevant terms.  (*See* Bajaj Rep. App. 1.)

C.   **Sprint Bonds and Sprint Common Stock Differ Significantly In Terms of Market Efficiency.**

Plaintiffs also ignore that they must establish the efficiency of the market for each security separately and that significant differences exist between the markets for Sprint common stock and the Sprint Bonds.  *See Bombardier II*, 546 F.3d at 210 (reliance on price movement in defendant's stock as indicative of bond-market efficiency was misplaced); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 631 (N.D. Ala. 2009) ("the market for HealthSouth stock trade[s] in an efficient market . . . [t]hat finding, however, does not mean that the market for HealthSouth bonds was equally efficient" (citation omitted)); *see also In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 755 (S.D. Tex. 2006) ("[A] comparison between equity and bond markets is a comparison between the proverbial apple and orange."), *rev'd sub nom. on other grounds*, *Regents v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 552 U.S. 1170 (2008).

Quite simply, the market for Sprint Bonds is not like the market for Sprint common stock.  While Sprint common stock regularly trades on the New York Stock Exchange, the Sprint Bonds did not regularly trade on a major exchange.  Rather, when the Sprint Bonds were traded, they were usually traded in  "decentralized, dealer intermediated, over-the-counter markets."  (Bajaj Rep. ¶ 22(i).)  Thus, even assuming for the sake of argument that Sprint's common stock trades efficiently, that assumption does not mean that the Sprint Bonds also trade in an efficient market.  As a result, the economic evidence as to the efficiency with which each type of security trades – whether a price reflects all publicly available information – is different as well.  *See In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 615 (C.D. Cal. 2009) (describing modifications to traditional efficiency analysis applied to proposed debt securities class); (*see also* Bajaj Rep. ¶¶ 27, 34.)

15

In determining whether securities trade on an efficient market, courts often consider the so-called *Cammer* factors as indicia of market efficiency:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger*, 401 F.3d at 323 (footnote omitted) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)); *see also In re Nature's Sunshine Prod.'s Inc. Sec. Litig.*, 251 F.R.D. 656, 662-64 (D. Utah 2008) (applying *Cammer* factors). The *Cammer* factors are meant as a guide, not a strict test, and other factors are often considered. *See Unger*, 401 F.3d at 325; *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 18 (1st Cir. 2005) ("Many factors bearing on the structure of the market may be relevant to the efficiency analysis, and courts have wide latitude in deciding what factors to apply in a given case. . . ."); *see also AIG*, 265 F.R.D. at 175-76; *Countrywide*, 273 F.R.D. at 610.

**D.    An Event Study Shows the Sprint Bonds Traded in an Inefficient Market.**

In light of Mr. O'Mara's cursory assertions, Plaintiffs have not met their burden of showing that the Sprint Bonds traded in an efficient market. In contrast, the Bajaj Report, by way of an event study, demonstrates that the market for the Sprint Bonds was inefficient, thereby rebutting the fraud-on-the-market presumption. *See Basic*, 485 U.S. at 248 n.27. Therefore, neither Plaintiffs nor any other class member investing in the Sprint Bonds may presume reliance under the fraud-on-the-market theory. *Id*. Instead, individual issues predominate, and this Court should decline to certify any class including purchasers of the Sprint Bonds. *See Bombardier II*, 546 F.3d at 210-11; *AIG*, 265 F.R.D. at 181; *Kelley v. Mid-America Racing Stables, Inc.*, 139

F.R.D. 405, 409 (W.D. Okla. 1990) (denying class certification for failure to prove that secondary bond market was efficient); *see also Freddie Mac*, 2012 WL 1028642, at *9 (holding that common issues did not predominate where plaintiff failed to show that preferred shares traded efficiently).

1.      An event study is critical to the determination of an efficient market.

"Evidence of a cause-and-effect relationship between unexpected news and market price," the fifth *Cammer* factor, is "the *sine qua non* of efficiency" in a market.  *Id.*, at *8-9.  Numerous courts have recognized that the primary way to demonstrate a cause and effect relationship is through testimony of an expert who conducted an event study of the critical days in question.[10]  *See, e.g.*, *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1272-73 (N.D. Okla. 2007) (without an event study, there would be no way to "'distinguish between the fraud-related and non-fraud-related influences of [sic] the stock's price behavior.'") (alternation in original) (citation omitted), *aff'd*, 558 F.3d 1130 (10th Cir. 2009).

Event studies are accepted as a standard technique for determining whether a security's reaction to a news announcement or other event has statistical significance.  *See AIG*, 265 F.R.D. at 182.  An "'[e]vent study' is thus 'a term of art in the relevant economic literature that refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price.'" *Williams*, 496 F. Supp. 2d at 1273 (citation omitted).  Indeed, "[a]n event study that correlates the disclosures of unanticipated, material

---

[10]      An event study by Dr. Bajaj was recently cited as persuasive evidence of inefficiency.  In *Freddie Mac*, the court denied certification to a class of Freddie Mac preferred shares.  In so doing, the court relied on Dr. Bajaj's testimony to conclude that plaintiffs had not met their burden of showing market efficiency and as such were not entitled to the fraud-on-the-market presumption.  *Freddie Mac*, 2012 WL 1028642, at *8-9.  The court emphasized that, although plaintiffs might have met some of the *Cammer* factors, they had not demonstrated a cause-and-effect relationship between market news and statistically-significant abnormal returns in the right direction, *id.* at 9, meaning an increase on positive news and a decrease on negative news.  *Id.* at 6.

information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of . . . a causal relationship." *Bombardier II*, 546 F.3d at 207-08.[11]

Without an event study, it is impossible to calculate price reaction to information with any acceptable degree of precision.  In particular, it is impossible to eliminate the possibility that fluctuations in price were a result of random events.  *See AIG*, 265 F.R.D. at 178 (denying class certification where plaintiffs failed to present evidence of price reaction through an event study).  Conversely, event studies showing an *absence* of price movements on the dates of alleged misrepresentations have been accepted as rebutting the presumption of reliance afforded by the fraud-on-the-market theory.  *Id.* at 181-88.

An event study must be presented through reliable expert testimony.  *See Bell*, 422 F.3d at 311 (affirming exclusion of plaintiff's event study as unreliable "and purposefully designed to support its market-efficiency conclusion."); *Freddie Mac*, 2012 WL 1028642, at *8 (refusing to credit plaintiffs' experts' event study because it was "unreliable", "unpersuasive" "internally inconsistent" and "poorly supported.")[12]  Accordingly, the techniques supporting a finding of market efficiency have to be tested, subject to peer review and publication, and enjoy general acceptance within a relevant scientific community.  *See Williams*, 496 F. Supp. 2d at 1272-73 (excluding plaintiffs' expert testimony as to price reactivity as unreliable under *Daubert*

---

[11]     As Dr. Bajaj explains, an event study assumes the existence of at least a weak form efficient market.  *See* Bajaj Rep. ¶ 51.  As discussed herein, because of significant negative serial correlation, meaning that the Sprint Bonds exhibit a predictable pricing pattern, the Sprint Bonds do not even trade in a weak form efficient market, let alone a semi-strong efficient market, the level of market efficiency courts require for the fraud-on-the-market presumption to even apply.  *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, n.16 (1st Cir. 2005) (recognizing that the Supreme Court in *Basic* adopted the semi-strong form of market efficiency as a prerequisite for the fraud-on-the-market presumption).  Dr. Bajaj explains the difference between "weak form" and "semi-strong" efficient markets in his report.  (*See* Bajaj Rep. ¶¶ 37-39.)

[12]     In contrast, in *Freddie Mac*, Judge Cedarbaum found Dr. Bajaj's testimony "credible, reliable and persuasive" *Freddie Mac*, 2012 WL 1028462, at *8.

18

*v. Merrell Dow Pharm., Inc.*, 509 U.S. 589 (1993)); *Bell v. Ascendant Solutions, Inc.*, No. Civ. A. 3:01 CV 0166 N, 2004 WL 1490009, at *4-5 (N.D. Tex. July 1, 2004), *aff'd* 422 F.3d 307 (5th Cir. 2005); *see generally Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x. 796, 799-800 (10th Cir. 2009) (affirming exclusion of expert testimony based upon finding that testimony was unreliable).  The proponent of expert testimony bears the burden of showing that the expert is qualified based on "knowledge, skill, experience, training or education," and that the expert's opinions are "reliable."  *Williams*, 496 F. Supp. 2d at 1230 n.10, 1231 (citations omitted).[13]

The O'Mara Declaration does not meet the standard for a reliable event study. Critically, the O'Mara Declaration does not demonstrate a reaction in the price of the Sprint Bonds to new information about Sprint during the Class Period, namely, that any of the supposed misstatements about Sprint caused the price of the Sprint Bonds to artificially inflate.  Bajaj Rep. ¶ 94.  Instead, Plaintiffs present information as to supposed price declines for the Sprint Bonds on days that Sprint made supposedly corrective disclosures – of 2007 losses (January 18, 2008) and the amount of a goodwill impairment (February 28, 2008).  This is a cursory, non-expert demonstration of loss causation, not market efficiency.  *See Halliburton*, 131 S. Ct. at 2186.

## 2.    The Bajaj Report's event study shows that the price of the Sprint Bonds did not react efficiently to new information.

Plaintiffs avoided presenting an event study for good reason: as Dr. Bajaj demonstrates, an event study shows that the Sprint Bonds did not react efficiently to new information about Sprint, and thereby rebuts any presumption of reliance afforded by the fraud-on-the-market theory.  (Bajaj Rep. ¶ 96 ("There was no Event Date on which all Sprint Bonds

---

[13]      Dr. Bajaj is well recognized and held in high regard for his expertise in economics and the reliability of his findings.  *See United States v. Kumar*, 617 F.3d 612, 633-34 (2d Cir. 2010) (accepting findings of the District Court that Dr. Bajaj's conclusions were sound, and that his event study "conforms to the most widely accepted practices of economists") (quotation marks omitted) (citation omitted) , *cert. denied*, 131 S. Ct. 2931 (2011); *Freddie Mac*, 2012 WL 1028462, at *8.

exhibited a statistically significant price reaction in the right direction"), ¶¶ 97-99.)  Overall, Dr. Bajaj found that the Sprint Bonds exhibited statistically significant price reactions to new information on, at most, 22% of the 27 "Alleged Event Dates" – dates during the Class Period where Plaintiffs allege Sprint-specific information – which is insufficient to meet the fifth, and most important, *Cammer* factor.  *Compare* (Bajaj Rep. ¶ 99) *with Freddie Mac*, 2012 WL 1028462, at *8 (denying class certification where plaintiffs' event study demonstrated at most a 28% rate of abnormal return to market news.).  Indeed, Bonds 1 and 7 *never* responded in the correct direction on an Alleged Event Date.[14]  (*Id.*)

As demonstrated by the Bajaj Report, for the 20 "Alleged Misstatement Dates" (days where Plaintiffs allege a misstatement) and the seven "Alleged Disclosure Days" (days during the putative Class Period where Plaintiffs allege an additional disclosure) that together make up the Alleged Event Dates, the price of the Sprint Bonds was not affected in the manner one would expect if the market was efficient – inflating on positive news and decreasing on negative news.  (*See* Bajaj Rep. ¶¶ 96-99 (expected price movements are not in the "right" direction).)  For example, on the 20 Alleged Misstatement Dates: (i) no Bonds traded in the right direction on more than two dates; (ii) Bonds 1, 2, 5, 6 and 7 never traded significantly in the right direction; and (iii) Bonds 4 and 9 traded in the wrong direction as often as traded in the right direction on those dates.  (*See* Bajaj Rep. Table 7.)  On Alleged Event Dates, (i) Bonds 1 and 7 did not trade significantly in the right direction; and (ii) Bond 2 traded in the wrong direction as often as it traded in the right direction.  (*See* Bajaj Rep. Table 8.)

Dr. Bajaj also compared movements in the price of Sprint common stock to the Sprint Bonds.  Assuming solely for the purpose of his analysis that Sprint common stock traded

---

[14]        WVIMB held Sprint Bonds 7, 8 and 10.

in an efficient market (and irrespective of Plaintiffs' burden of proof), Dr. Bajaj found that 21

"significant information days" show statistically significant returns in the price of Sprint stock,

with no corresponding returns for the Sprint Bonds that would indicate an efficient price reaction.

(*Id.* ¶¶ 108-110.)[15]  Indeed, Bonds 2, 4 and 9 moved in the *opposite* direction on as many or more

days when Sprint common stock exhibited a statistically significant reaction in the right direction.

(*See* Bajaj Rep. Table 9.)  Bond 5 did not even trade on two significant information days.  *Id.*

*See AIG*, 265 F.R.D. at 180 (finding it "problematic that on two of the days when significant

AIG-related news was announced, the 0.5% bonds were not traded at all" in determining that

bonds did not trade efficiently).

Finally, Dr. Bajaj concludes that pairs of Bonds moved in opposite directions in

reaction to the same information.  (Bajaj Rep. ¶ 101 ("The Bond prices did not move in the same

direction in response to <u>any</u> of these 21 material news days."), ¶ 103.)  Plaintiffs fail to explain

why different Sprint Bonds, trading in an efficient market, would react differently to the same

information.  If their claim of market efficiency was correct, the Sprint Bonds should exhibit

similar reactions to the same information.  But this is not the case.  Indeed, the Sprint Bonds

moved in the same direction on only <u>five</u> of the 209 days on which Sprint-specific information

was released to the market.  (Bajaj Rep. ¶ 101.)  Only 53% of all possible Sprint Bond pairings

moved in the same direction in response to the same Sprint-specific information during the Class

Period.  (*Id.* ¶ 103.)  This is indicative of inefficiency.  *See In re Safety-Kleen Corp. Bondholders*

*Litig.*, No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004).  In *Safety-Kleen*, the court

---

[15]     The Bajaj Report defines "significant information days" as days when some Sprint-related information was
released to the markets and Sprint stock reacted significantly at the 95% confidence level.  (Bajaj Rep. ¶ 107.)  This
is a standard measure of statistical significance.  *See Moody's*, 274 F.R.D. at 493 n.11.  In determining statistical
significance, Dr. Bajaj utilized a test statistic, or t-stat, of 1.97, a well-recognized standard deviation in measuring
error.  (Bajaj Rep. n.98, 99.)  Mr. O'Mara does not present the statistical significance or error rate for any of his
conclusions.

found that an absence of a cause and effect relationship between bond prices and company-specific news was highly indicative of an inefficient market where, among other factors, the bonds moved in opposite directions from each other.  *Id.* at *27 (denying class certification when plaintiffs' event study "had one issue of bonds moving up while the other moved down").  Plaintiffs cannot rebut this evidence and cannot establish that the Sprint Bonds traded in an efficient market.

  **E.**  **The Opportunities For Arbitrage Profits Is Further Evidence of Market Inefficiency.**

    Arbitrage is the ability to take advantage of information inequalities to exact a profit from the ability to buy low and sell high.  *See PolyMedica*, 453 F. Supp. 2d at 273 n.14.  In an efficient market, arbitrageurs' ability to exploit price discrepancies would quickly lead to market participants settling on a price that reflects all available information.  *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.* (*Bombardier I*), No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006) (citing *PolyMedica*, 432 F.3d at 9) (noting that arbitrageurs help stabilize price by quickly eliminating the possibility for arbitrage profits), *aff'd*, 546 F.3d 196 (2d Cir. 2008).  This is called the "Law of One Price."  (*See* Bajaj Rep. ¶ 41.)  Conversely, the inability to eliminate arbitrage opportunities is evidence of an inefficient market.  *PolyMedica*, 453 F. Supp. 2d at 273-276; *see also In re Safety-Kleen*, 2004 WL 3115870, at *6 (decertifying bond class where "bid-offer spreads were very wide").  For example, in *PolyMedica*, the court examined a species of arbitrage known as put-call parity, which means that in an information-efficient market, there should be an identity, or near identity, of prices between put options (the option to sell a stock at a specific price) and call options (the option to buy a stock at a specific price).  The discrepancy between the put and call prices – or spread – is arbitrage.  Accepting the defendants' expert's view, the *PolyMedica* court held that

investors can exploit information discrepancies to engage in arbitrage, locking in guaranteed

profits by structuring a transaction that includes buying one of the options, selling the other, and

either buying or selling short the Company's underlying stock. 453 F. Supp. 2d at 274-75. The

*PolyMedica* court concluded that the ability to do this – and the inability to eliminate these

arbitrage opportunities – meant that the stock did not trade in an efficient market. *Id.*

Here, Plaintiffs do not proffer any data as to the potential for arbitrage profits in

the Sprint Bonds. Instead, the O'Mara Declaration merely asserts that the "bid ask spreads" in

the Sprint Bonds were supposedly narrow, relying upon generic quote data from Bloomberg, L.P.

(*See* O'Mara Decl. Ex. 3.) But Bloomberg discloses end of day quotes. (*See* Bajaj Rep. n.172;

*see also Bombardier I*, 2006 WL 2161887, at *11 (noting that Bloomberg prices are not

transaction prices.)) An examination of transactions during the day (as information is being

absorbed into the price of the Sprint Bonds) reveals that investors faced much higher spreads

because market makers made arbitrage profits in excess of bid-ask spreads. (*Id.* ¶ 125.) An

efficient market relies on eliminating arbitrage profits rapidly during the day. *See PolyMedica*,

432 F.3d at 9 ("arbitrageurs *immediately* attempt to profit from [new] information . . . thereby

causing the stock to move to a price which reflects the latest public information concerning the

stock") (emphasis added). For a market to be efficient,

> the response of a stock's price to news must be made completely (*i.e.*, have
> reached a new equilibrium) before an 'ordinary investor' can earn a trading
> profit based upon it. The speed with which stock prices incorporate new
> information depends in large part on the ability of arbitrageurs quickly to
> integrate new information and move prices **within hours or even minutes**.

*PolyMedica*, 453 F. Supp. 2d at 271 (emphasis added).

In contrast, Dr. Bajaj shows the potential for arbitrage profits on the Sprint Bonds

due to information discrepancies, including on all three of the Sprint Bonds held by WVIMB.

(Bajaj Rep.¶ 83; *Id.* Table 4.) Indeed, there was *no* Sprint Bond for which an arbitrage

opportunity did not exist (*id.* Table 5), and three Sprint Bonds that had an arbitrage opportunity on more than 90% of the days in the Class Period – that is on almost every day of the Class Period there was a pricing discrepancy for three Sprint Bonds.  (*Id.* Table 6.)  This is representative of a market where all participants are not operating on the same information as they would in an efficient market.  *Bombardier I*, 2006 WL 2161887, at *7 (holding that in an efficient market, traders cannot attain such profits "because the market will have already incorporated the information"); *PolyMedica*, 453 F. Supp. 2d at 275 ("In an information efficient market, disparities do correct, and there are no longer any opportunities for arbitrage profits").  Thus, because the Sprint Bonds trade on an inefficient market, Plaintiffs cannot meet the requirements of Rule 23(b)(3).

>   **F.**    **The Sprint Bonds Exhibit a Predictable Pricing Pattern Irrespective of New Information.**

Dr. Bajaj's event study and arbitrage analysis provide conclusive evidence that the Sprint Bonds do not trade in an efficient market.  Additional economic evidence demonstrates that the Sprint Bonds do not trade in a "weak form" efficient market, much less the "semi-strong" efficient market that courts require for the fraud-on-the-market presumption to even apply.  *See PolyMedica*, 432 F.3d at 10 n.16.

Dr. Bajaj found that the Sprint Bonds do not trade in a weak-form efficient market because the Sprint Bond prices are determined, at least in part, by the price on previous days, not the incorporation of new information.  (*See generally* Bajaj Rep. ¶¶ 53-79.)  This phenomenon manifested in two ways, price reversals and negative serial correlation.

Price reversal is a pattern of the market overreacting to information on one day, then retreating from that overreaction on a subsequent day.  The Sprint Bonds went through a number of price reversals during the Class Period.  (Bajaj Rep. ¶ 56.)  Dr. Bajaj demonstrates

overreaction here by reference to a graph of the Sprint Bond prices that exhibit a "saw-toothed" trading pattern.  (*See* Bajaj Rep. ¶ 57, Figure 3.)  This pattern is even more pronounced in the second half of the Class Period, coinciding with the global credit crisis and the corresponding difficulty in valuing assets.  (*See id*. Figure 4.)  Each Sprint Bond had price reversals on more than 50% of the dates following significant price movements during the Class Period, with some Sprint Bonds consistently demonstrating price reversals on more than 75% of those dates.  (*See* Bajaj Rep. Table 1.)  And the magnitude of these reversals is striking, with some Sprint Bonds showing a price reversal of more than 75%.  (*See id* Table 2.)  This is additional evidence that the market for Sprint Bonds was not efficient.

The Sprint Bonds also exhibited a marked predictability in their prices, which also indicates an inefficient market.  (Bajaj Rep. ¶¶ 64, 65.)  This predictability, known as serial correlation, is the ability to use the direction of price movement of a security today to predict the price of the security tomorrow.  *See Billhofer v. Flamel Techs., S.A.*, No. 07 Civ. 9920, 2012 WL 928147, at *12 (S.D.N.Y. Mar. 15, 2012); *see also PolyMedica*, 453 F. Supp. 2d at 276-77; *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-507 (S.D. Tex. 2004).  Significantly negative serial correlation is evidence of an inefficient market because the returns on any given day are not a reaction to new information, but instead a function of how the bond traded on previous days.  (Bajaj Rep. ¶ 63.)  Indeed, negative serial correlation is anathema to a market efficiently incorporating new information.  *See Billhofer*, 2012 WL 928147, at *12 n.3.  A security that exhibits significant serial correlation cannot be even weak-form efficient, let alone exhibit the semi-strong efficiency courts require.  *See In re DVI Inc. Sec. Litig.*, 249 F.R.D. at 213 (if new information about a company is incorporated slowly into the price of a security, then the security will exhibit autocorrelation (also known as serial correlation), suggesting an inefficient market).

Dr. Bajaj demonstrates that the Sprint Bonds exhibited significant negative serial correlation.  For example, if Bond 1 increased in price by 1%, it would likely fall the next day by almost 0.6%.  (*See* Bajaj Rep. ¶ 66.)  Indeed, the negative serial correlation present in the Sprint Bonds is so significant that the profits associated with a trading strategy consistent with observed serial correlation exceeds the profits obtained from passively investing in Sprint each quarter during the Class Period.  (*Id.* ¶¶ 68-78.)  For example, if an investor bought a Sprint Bond when it declined by 2% and short-sold the Sprint Bond when it increased by 2%, the investor would make over $4,500 over the Class Period on an investment of $1,000.  (*Id.* ¶ 76.)  Conversely, an investor would lose money over the Class Period if it simply bought the bond low and held the position through the end of each quarter during the Class Period, or short-sold the bond high and held the position through the end of each quarter during the Class Period.  (*Id.*)  Again, the lesson is that the Sprint Bonds traded inefficiently, which allows these "beat the market" profits to be made.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to certify a class containing

purchasers the Sprint Bonds from October 26, 2006 through February 27, 2008 should be denied.

Dated: May 1, 2012

Respectfully submitted,

_____/s/ Mark McGrory_____
Randall E. Hendricks – KS # 16959
Mark W. McGrory – KS # 12316
ROUSE HENDRICKS GERMAN MAY PC
1010 Walnut, Suite 400
Kansas City, MO 64106
(816) 471-7700 (tel)
(816) 471-2221 (fax)
randyh@rhgm.com
markm@rhgm.com

Of Counsel:

Jay B. Kasner (admitted *pro hac vice*)
Scott D. Musoff (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000 (tel)
(212) 735-2000 (fax)
Jay.Kasner@skadden.com
Scott.Musoff@skadden.com

Charles F. Smith (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700 (tel)
(312) 407-0411 (fax)
Charles.Smith@skadden.com

*Attorneys for Defendants*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2012, the foregoing document was filed with the  Clerk of the Court by using the CM/ECF system, which will serve a notice of electronic filing upon all counsel of record.

<u>/s/ Mark W. McGrory</u>
*Attorney for Defendants*

28