# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CORA E. BENNETT, Individually and On
Behalf of All Others Similarly Situated,

     *Plaintiff,*

  vs.

SPRINT NEXTEL CORPORATION,
GARY D. FORSEE, PAUL N. SALEH,
and WILLIAM G. ARENDT,

     *Defendant.*

Case No. 09-CV-2122-EFM-KMH

## MEMORANDUM AND ORDER

This is a securities class action against Defendant Sprint Nextel Corporation ("Sprint" or the "Company") and certain former Sprint officers and directors—Defendants Gary D. Forsee, Paul N. Saleh, and William G. Arendt. Lead Plaintiffs PACE Industry Union-Management Pension Fund ("PACE"), Skandia Life Insurance Company ("Skandia"), and the West Virginia Investment Management Board ("WVIMB"), on behalf of themselves and others similarly situated, assert that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 as a result of false and misleading statements and omissions made by Defendants regarding Sprint's business performance and financial results. This matter comes before the Court on Lead Plaintiffs' Motion for Class Certification (Doc. 116). For the reasons set forth below, the Court grants Lead Plaintiffs' motion.

# I.   Factual and Procedural Background[1]

Sprint is a wireless and wireline communications services company with its headquarters in Overland Park, Kansas.   In August 2005, Sprint, the country's then third largest wireless carrier, acquired Nextel, the country's fifth largest carrier, for $37.8 billion.   Sprint allocated $15.6 billion of the purchase price to goodwill.[2]   Defendant Forsee became CEO of the combined Company and Defendant Saleh became the CFO.

According to Plaintiffs, problems arose almost immediately after Sprint's acquisition of Nextel.   Plaintiffs contend that cultural differences divided legacy Sprint and Nextel personnel and technological differences eliminated the possibility of integrating the two companies' wireless networks.   Plaintiffs claim that the combination of these difficulties, among others, led to the deterioration of the Company's customer base.   Plaintiffs allege that to cover up the Company's worsening condition, Defendants made repeated false and misleading statements about the Company's business metrics and financials.   Specifically, Plaintiffs contend that from October 26, 2006, through February 27, 2008, through press releases, conference calls, and SEC filings, Defendants falsely represented that Sprint received billions of dollars in benefits from merger synergies, that Sprint improved its customer mix as a result of tightening credit standards, that the integration of the Sprint and Nextel cellular platforms was progressing as planned, and that the goodwill associated with the Nextel purchase was not impaired.

Plaintiffs claim that Sprint's true condition was not revealed until after Dan Hesse was named CEO of Sprint on December 18, 2007.   This was two months after Sprint's board of

---

[1]   The facts are presented as set forth Lead Plaintiffs' Consolidated Complaint (Doc. 33).

[2]   "Goodwill is an intangible asset that represents the amount paid for a business over and above the value of the actual assets acquired and liabilities assumed."   *See* Statement of Financial Accounting Standards No. 142 ("SFAS 142"), at Appendix F1, *available at* http://www.fasb.org/pdf/fas142.pdf.

directors forced Defendant Forsee to resign as the Company's CEO and Chairman.[3]  On January 18, 2008, Sprint disclosed that it suffered a net loss of 683,000 post-paid subscribers in the fourth quarter of 2007 and that it was evaluating a charge in the fourth quarter related to a goodwill write-down.  That day, the Company's stock price dropped 24.8% or $2.87 per share.  On February 28, 2008, Sprint issued a press release disclosing the Company's fourth quarter and fiscal year 2007 results, which stated that "the company recorded a non-cash goodwill impairment charge of $29.7 billion" contributing to a "net loss for the quarter [of] $29.5 billion or $10.36 diluted loss per share."[4]  The next day, on February 29, 2008, Sprint filed its 4Q and FY 2007 results with the SEC, which Plaintiffs claim further disclosed the scope of problems resulting from Defendants' reliance on subprime customers and the failure to integrate Sprint and Nextel systems and operations.  On February 28 and 29, 2008, the Company's stock price dropped a cumulative 20.5% or $1.84 per share.  Overall, in a little more than six months, Sprint's stock price dropped almost 70% from its class period high of $23.25 per share to less than $7.15 per share.

There are currently three Lead Plaintiffs:  PACE, Skandia, and WVIMB.  PACE is a defined benefit plan based in Nashville, Tennessee, that is jointly administered by labor and management.  PACE alleges that during the class period, it purchased over 180,000 shares of Sprint common stock, expending $3.6 million.  Skandia is a life insurance company headquartered in Stockholm, Sweden, that provides financial and insurance services, with assets under management as of the end of fiscal year 2010 of approximately $44.8 billion.  Skandia

---

[3]     Between the time that Forsee resigned and Hesse was named CEO, Defendant Saleh was the Company's acting CEO.  Saleh left the Company on January 24, 2008.

[4]     Plaintiffs' Memo. in Support of Mtn. for Class Certification, Doc. 117, p. 15.

alleges that during the class period, it purchased over 448,000 shares of Sprint common stock, expending over $5.6 million. WVIMB is an institutional investor based in Charleston, West Virginia, that provides fiscal administration and investment management services to twenty-two participant plans. WVIMB alleges that during the class period, it purchased: (1) over 405,000 shares of Sprint stock, expending $7.5 million, (2) 3.3 million units of Sprint's 6.0% bonds, due December 1, 2016, (3) 120,000 units of Sprint's 6.9% bonds, due May 1, 2019, and (4) 3,070,000 units of Sprint's 8.75% bonds, due March 15, 2032. Lead Plaintiffs now move the Court for an order certifying this action as a class action under Fed. R. Civ. P. 23(a) and 23(b)(3).

### III.     Analysis

**A.     Class Certification Under Rule 23**

**1.     General Standards Governing Class Certification**

Whether to certify a class is committed to the broad discretion of the trial court.[5] In exercising this discretion, the Court should err on the side of class certification because it has the authority to later redefine or even decertify the class if necessary.[6] In deciding whether to certify, the Court must perform a "rigorous analysis" as to whether the proposed class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.[7] Rule 23 does not provide the Court with the authority to conduct a preliminary inquiry into the merits of the lawsuit to

---

[5]     *Shook v. El Paso County*, 386 F.3d 963, 967 (10th Cir. 2004).

[6]     *Sibley v. Sprint Nextel Corp., et al.*, 254 F.R.D. 662, 670 (D. Kan. 2008) (citing *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968)); *Heartland Commc'ns, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 115 (D. Kan. 1995)); *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

[7]     *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982); *see Nat'l Union Fire Ins. Co. v. Midland Bancor, Inc.*, 158 F.R.D. 681, 685 (D. Kan. 1994).

determine whether it may be maintained as a class action.[8]  The Tenth Circuit, however, has emphasized that the question of class certification involves considerations that are "enmeshed in the factual and legal issues comprising the plaintiff's cause of action."[9]  Although the Court may not evaluate the strength of a cause of action at the class certification stage, it must consider, "without passing judgment on whether plaintiffs will prevail on the merits," whether the requirements of Rule 23 are met.[10]

As the parties seeking class certification, Plaintiffs have the burden to demonstrate under a strict burden of proof that the requirements of Rule 23 are clearly satisfied.[11]  In doing so, Plaintiffs must establish that the prerequisites of Rule 23(a) are satisfied and that the proposed class falls under one of the categories described in Rule 23(b).

### 2.     Class Definition

In determining whether to certify a class, the Court first addresses the proposed class definition.[12]  "Defining the class is of critical importance because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action."[13]  Therefore, the definition must be "precise,

---

[8]     *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974); *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988); *Anderson v. City Of Albuquerque*, 690 F.2d 796, 799 (10th Cir.1982).

[9]     *Shook*, 543 F.3d at 612 (quoting *Falcon*, 457 U.S. at 160); *see also J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999); *Reed v. Bowen*, 849 F.2d 1307, 1309 (10th Cir. 1988).

[10]     *Shook*, 543 F.3d at 612; *see Eisen*, 417 U.S. at 178 (stating that in determining propriety of a class action, the question is not whether plaintiffs state a cause of action or will prevail on merits, but whether the requirements of Rule 23 are met).

[11]     *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

[12]     *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 257-58 (D. Kan. 2010).

[13]     *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 444 (D. Kan. 2006) (citing Manual for Complex Litigation § 21.222, at 270 (4th ed. 2005)).

objective, and presently ascertainable."[14]    Here, Lead Plaintiffs seek certification of the following class:

> All persons and entities who purchased or otherwise acquired the publicly-traded common stock of Sprint Nextel Corporation . . . from October 26, 2006, through February 27, 2008, inclusive . . . and who were damaged thereby.  Included in the Class are purchasers of Sprint common stock ["Sprint Stock"] and the following Sprint debt securities ["Sprint Bonds"]:  (i) 6.0% bonds, due December 1, 2016; (ii) 6.9% bonds, due May 1, 2019; (iii) 8.75% bonds, due March 15, 2032; (iv) 8.375% bonds, due March 15, 2012; (v) 7.625% bonds, due January 30, 2011; (vi) 6.375% bonds, due May 1, 2009; (vii) 6.875% bonds, due November 15, 2028; (viii) 6.875% bonds, due October 31, 2013; (ix) 5.95% bonds, due March 15, 2014; and (x) 7.375% bonds, due August 1, 2015.  Excluded from the Class are Defendants herein, members of each Defendant's immediate family, any entity in which any Defendant has or had a controlling interest, officers and directors of Sprint, and Defendants' legal representatives, heirs, successors, or assigns of any such excluded party.

Defendants do not object to Lead Plaintiffs' proposed class definition.  Furthermore, the Court finds that the proposed class is sufficiently defined to allow potential class members to be identified.

### 3.    Rule 23(a) Requirements

Rule 23(a) provides the following prerequisites for class certification: "(1) Numerosity: the class is so numerous that joinder of all members is impracticable; (2) Commonality: there are questions of law or fact that are common to the class; (3) Typicality: the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) Adequacy of Representation: the representative parties will fairly and adequately represent the interests of the class."[15]    Of the four requirements listed above, Defendants only contend that Lead Plaintiffs

---

[14]    *Id.*

[15]    *Trevizo*, 455 F.3d at 1161-62 (citing Fed. R. Civ. P. 23(a)).

have not met the requirement of typicality.[16] Nonetheless, the Court will briefly analyze whether Plaintiffs have met all of the Rule 23(a) requirements for class certification.

### a. Numerosity

To satisfy the numerosity requirement of Rule 23(a)(1), Plaintiffs must establish that the class is so numerous so as to make joinder impracticable.[17] Plaintiffs must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved.[18] Courts have found that classes as small as twenty members can satisfy the numerosity requirement, and a "good faith estimate of at least 50 members is a sufficient size to maintain a class action."[19] Here, there were, on average, 645 institutional investors holding Sprint common stock and 224 holding Sprint bonds during the class period. The Court therefore finds that Plaintiffs have established the numerosity required to maintain a class action.

### b. Commonality

Rule 23(a)(2) requires Plaintiffs to show that questions of law or fact are common to the class, that is, members of the putative class "possess the same interest and suffer the same injury."[20] This inquiry requires the Court to find only whether common questions of law or fact

---

[16] In their response to Plaintiffs' Motion for Class Certification, Defendants assert that Plaintiffs' motion was the first time Plaintiffs revealed that they sought to certify a class containing purchasers of Sprint Bonds. Defendants, however, do not cite any authority as to how this affects the Court's certification analysis. Further, the Court notes that Plaintiffs' Amended Complaint states that Plaintiffs bring this action "on behalf of a class consisting of purchasers and acquirers of Sprint *securities*." Consolidated Complaint, Doc. 33, p. 91. The term "securities" typically includes stocks and bonds. *See Collins English Dictionary-Complete & Unabridged 10th Edition*, *available at* http://dictionary.reference.com/browse/security. Therefore, the Court does not see this as a basis to deny Plaintiffs' motion.

[17] *Id.* at 1162; Fed. R. Civ. P. 23(a)(1).

[18] *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).

[19] *Id.*; *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 613 (D. Kan. 1995).

[20] *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

exist. Unlike the Court's analysis under Rule 23(b)(3), this inquiry does not require a finding that such questions predominate.[21]

Plaintiffs have identified the following three questions of law and fact that they claim are common to all class members: (1) whether Defendants' alleged acts violated federal securities laws; (2) whether Defendants' statements during the class period were materially false and misleading when issued or whether Defendants' statements omitted material facts necessary to make the statements not misleading; and (3) the extent and measure of damages sustained by class members. Plaintiffs assert that common questions of law and fact are present where "the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls."[22] The Court agrees. The alleged misrepresentations and omissions leading to inflated securities prices relate to all investors of Sprint securities and the materiality of these statements and omissions are important common issues.[23] Thus, the Court finds that the commonality requirement is satisfied.

---

[21] *Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672, 679 (D. Kan. 1991).

[22] Plaintiffs' Memo. in Support of Motion for Class Certification, Doc. 117, p. 23.

[23] *See, e.g., Lane v. Page*, 272 F.R.D. 558, 570 (D.N.M. 2011) ("Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met."); *see also id*. ("Securities cases often involve allegations of common courses of fraudulent conduct, which can be sufficient to satisfy the commonality requirement."); *Darquea v. Jarden Corp*., 2008 WL 622811, at *2 (S.D.N.Y. Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all investors and the existence and materiality of such misstatements or omissions present important common issues.").

### c. Typicality

Rule 23(a)(3) requires that the representative plaintiff possess the same interests and suffer the same injuries as the proposed class members.[24] "It is well established that differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative[s] and class members are based on the same legal or remedial theory."[25] The representative plaintiffs' interests need not be identical to those of the class members,[26] but they must not be "significantly antagonistic" to the claims of the proposed class.[27] Here, the class members' claims rise and fall on the same facts and legal theories as alleged by the representatives. Both Plaintiffs and proposed class members purchased Sprint securities. Furthermore, both Plaintiffs and class members seek to prove that Defendants made materially false and misleading statements during the class period and failed to disclose material adverse facts about Sprint's financial results. And, both Plaintiffs and the class members suffered a loss when the price of Sprint's securities fell.

Defendants generally argue that class certification is not appropriate as to the Sprint Bonds because Lead Plaintiff WVIMB is the only proposed representative that purchased the Sprint Bonds, and WVIMB only purchased three of the ten bonds at issue. Defendants, however, do not cite any authority as to how or why this affects the Court's certification analysis. Nor do

---

[24] Fed. R. Civ. P. 23(a)(3); *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010).

[25] *Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678, 689 (D. Kan. 2009) (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir. 1988)).

[26] *Stricklin*, 594 F.3d at 1198 (citing *Anderson v. City of Albuquerque*, 690 F.2d 796, 800 (10th Cir. 1982)).

[27] *Olenhouse*, 136 F.R.D. at 680; *see also Stricklin*, 594 F.3d at 1198–99 ("Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality.").

Defendants provide any evidence as to how the bonds differ from each other such that the claims of two potential plaintiffs, each holding different bonds, would not be similar. Accordingly, the Court finds that the typicality requirement has been met.

### d. Adequacy of Representation

Pursuant to Rule 23(a)(4), a representative plaintiff must show that he or she will fairly and adequately protect the interests of the class.[28] To satisfy this requirement, the representative plaintiff must be a member of the class he or she seeks to represent and must show that (1) the plaintiff's interests do not conflict with those of the class members and (2) that the plaintiff will be able to prosecute the action vigorously through qualified counsel.[29] To defeat class certification, a conflict must be fundamental and go to specific issues in controversy.[30] A fundamental conflict exists where some members of the class claim harm through a representative plaintiff's conduct that resulted in benefit to other class members.[31] Minor conflicts will not defeat class certification.[32] Here, there is no evidence that Lead Plaintiffs have any potential conflict with other members of the class. Therefore, the Court finds that this requirement has been satisfied.

### 4. Requirements under Rule 23(b)(3)

After satisfying the prerequisites under Rule 23(a), Plaintiffs must demonstrate that the proposed class action fits within one of the three categories described in Rule 23(b). In this case,

---

[28] Fed. R. Civ. P. 23(a)(4).

[29] *E. Tex. Motor Freight Sys., Inc., v. Rodriguez*, 431 U.S. 395, 403 (1977); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).

[30] *Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 260 (D. Kan. 2010).

[31] *Id.*

[32] *Id.*

Plaintiffs seek to proceed under Rule 23(b)(3), which addresses situations where "class action treatment is not as clearly called for as it is in Rule 23(b)(1) and (b)(2) situation, [but] may nevertheless be convenient and desirable."[33]  Accordingly, Rule 23(b)(3) "invites a close look at the case before it is accepted as a class action."[34]

Rule 23(b)(3) provides that a class action may be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting individual members" and a class action "is superior to other available methods for the fair and efficient adjudication of the controversy."[35]  This requirement is often "readily met in certain cases alleging consumer or securities fraud."[36]

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action."[37]  One of the elements Plaintiffs must prove to succeed on their § 10(b) claim, is reliance.  Reliance "provides the requisite causal connection between defendant's misrepresentation and a plaintiff's injury."[38]  Here, Plaintiffs seek to establish reliance on a class-wide basis through the fraud-on-the-market theory.  This theory allows plaintiffs to invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public.[39]  The theory rests on the notion that "certain well

---

[33]  *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 615 (1997).

[34]  *Id.*

[35]  Fed. R. Civ. P. 23(b)(3).

[36]  *Amchem,* 521 U.S. at 625.

[37]  *Erica P. John Fund, Inc. v. Halliburton Co*., 131 S. Ct. 2179, 2184 (2011).

[38]  *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir. 2000) (quotation omitted).

[39]  *Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, -- U.S. --, 133 S. Ct. 1184, 1192 (2013) (citation omitted).

developed markets are efficient processors of public information," and that the market price of shares reflects all publicly available information.[40]

To trigger the rebuttable presumption under the fraud-on-the-market theory, Plaintiffs must first show that the security traded in an efficient market.[41] Plaintiffs bear the burden "of making a preliminary showing of market efficiency at the class certification stage."[42] Here, Defendants concede that Sprint stock traded in an efficient market during the class period. Their only contention with regard to this Rule 23(b) requirement is that Plaintiffs have failed to show that the Sprint Bonds traded in an efficient market during the class period. Therefore, if Plaintiffs cannot demonstrate that the Sprint bond market was efficient by a preponderance of the evidence, then Plaintiffs cannot avail themselves of the fraud-on-the-market presumption, and certification of a class that includes bondholders would be inappropriate.[43]

### a.     The Sprint Bonds Traded in an Efficient Market.

"An efficient market is one which rapidly reflects new information in the price of the stock. It is almost always 'developed,' in the sense that the market is characterized by a relatively high level of activity and frequency, and for which trading information is widely

---

[40]     *Id.*

[41]     *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 n.27 (1988).

[42]     *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 (5th Cir. 2005); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 210 (2nd Cir. 2008) (applying a "preponderance of the evidence" standard to the determination of market efficiency).

[43]     *See In re Winstar Commnc'ns Sec. Litig.*, 290 F.R.D. 437, 445 (S.D.N.Y. 2013) (stating that the plaintiffs must demonstrate that the bond market was efficient by a preponderance of the evidence).

available."[44]  Courts generally consider the following factors, known as the "*Cammer* factors," in evaluating an efficiently traded security:

> (1) whether the security has a large weekly trading volume; (2) whether a significant number of securities analysts followed and reported on the company's stock during the applicable period; (3) whether the stock had numerous market makers; (4) whether the company was entitled to file an S-3 Registration Statement in connection with public offerings; and (5) whether the security experienced an historical showing of immediate price response to unexpected corporate events or financial releases. [45]

Courts have also considered the following additional factors when evaluating market efficiency: "(6) the company's market capitalization; (7) the bid-ask spread and (8) the float, or issue amount outstanding excluding insider-owned securities; and (9) the percentage of institutional ownership."[46]

The *Cammer* factors were created in the context of evaluating the efficiency of stock markets, not bond markets.  Although these factors " 'are admittedly not well-suited for the analysis of debt securities,' " courts generally apply these factors to the efficiency question for bonds.[47]  The Tenth Circuit has yet to adopt a standard to determine whether the fraud-on-the-market applies to stocks or bonds, but some district courts in the Circuit have applied the *Cammer* factors in the context of stocks.[48]  In the absence of any guidance from the Circuit, the

---

[44]  *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325, 1346 (D. Colo. 1997) (citing *Freeman v. Laventhol & Horvath*, 915 F.2d 193, 198 (6th Cir. 1990)).

[45]  *In re Healthsouth Corp. Sec. Litig.*, 261 F.R.D. 616, 635 (N.D. Ala. 2009); *Unger v. Amedisys, Inc.*, 401. F.3d 316, 323 (5th Cir. 2005) (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D. N.J. 1989)); *see also In re Nature's Sunshine Prod.'s Inc.*, Sec. Litig., 251 F.R.D. 656, 662-64 (D. Utah 2008) (applying *Cammer* factors).

[46]  *Healthsouth*, 261 F.R.D. at 632; *see Unger*, 401 F.3d at 323; *Bell*, 422 F.3d at 313; *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001).

[47]  *Healthsouth*, 261 F.R.D. at 632.

[48]  *See Nature's Sunshine*, 251 F.R.D. at 662; *see also Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421-23 (D. Utah 1998) (examining *Cammer* factors).

Court will apply the *Cammer* factors to the Sprint Bonds at issue in this case and will address each factor below.

### i. Weekly Trading Volume

The first *Cammer* factor concerns whether " 'there existed an average weekly trading volume during the class period in excess of a certain number of shares.' "[49] "The higher the trading volume, the stronger the showing of significant investor interest in the company and, therefore, likelihood that many investors are executing trades on the basis of newly available or disseminated corporation information."[50] In evaluating weekly trading volume, "average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[51]

Lead Plaintiffs rely on the Declaration of their attorney, Brian O'Mara (the "O'Mara Declaration") in support of their contention that the Sprint Bonds traded in an efficient market. With regard to the first *Cammer* factor, the O'Mara Declaration provides that during the class period, Sprint had $17 billion debt securities outstanding and the aggregate weekly trading volume for the Sprint Bonds was in excess of $477 million. Further, the average weekly trading volume during the class period as a percentage of Sprint Bonds outstanding was 2.76%. Because this percentage is greater than two percent, it warrants a strong presumption of efficiency under *Cammer*. Thus, this factor weighs toward a finding that the market for the Sprint Bonds was efficient.

---

[49] *Nature's Sunshine*, 251 F.R.D. at 662 (quoting *Cammer*, 711 F. Supp. at 1286).

[50] *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613 (C.D. Cal. 2009).

[51] *In re DVI Secs. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008) (citing *Cammer*, 711 F. Supp. at 1286).

### ii.    Analyst Coverage

The second *Cammer* factor that courts look to is the number of securities analysts that follow the company or the security.[52] "The existence of a number of analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market."[53]

The O'Mara Declaration states that, on average, twenty-five analyst firms provided coverage of Sprint during the class period. Additionally, Nelson's Directory of Investment Research identified twenty-four separate investment banks that provided analyst coverage of Sprint, issuing more than 340 analyst reports. With respect to the Sprint Bonds, the O'Mara Declaration states that there were eight credit analysts who provided coverage of Sprint Bonds during the class period.[54] Accordingly, the Court finds that this factor militates toward a finding of market efficiency.

### iii.    Market Makers and Arbitrageurs

The third factor addresses the number of market makers that deal in the security at issue. "The presence of Market Makers supports the efficiency of a market because they 'react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.' "[55] The SEC defines a "market maker" as

---

[52]   *Winstar*, 290 F.R.D. at 446 (citing *Cammer*, 711 F. Supp. at 1286).

[53]   *Id*. (citing *Bombardier*, 546 F.3d at 205).

[54]   *See Nature's Sunshine*, 251 F.R.D. at 662 (noting that "[c]ourts have . . . applied the fraud on the market theory where at least six securities analysts issued reports . . . during the class period").

[55]   *Healthsouth*, 261 F.R.D. at 635 (quoting *Cammer*, 711 F. Supp. at 1287).

a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers.[56]

The O'Mara Declaration states that, on average, 141 dealers reported prices for the Sprint Bonds in 2008. It also states that at least 224 large institutional investors reported purchases and holdings of Sprint Bonds during the class period. The Declaration does not state, however, whether these dealers and institutional investors were "ready, willing and able" to trade the Sprint Bonds. Accordingly, this factor does not support a finding of market efficiency.

### iv.　　S-3 Registration Statement

The fourth *Cammer* factor is the ability of a company to file a Form S-3 registration statement. The ability to file a Form S-3 "creates a presumption that the securities trade in an efficient market."[57] To file a Form S-3, a company must have filed SEC reports for twelve consecutive months and possess a $75 million market capitalization level.[58] Here, it is undisputed that Sprint was eligible to and did file a Form S-3 during the class period. Thus, this factors weighs in favor of a finding of market efficiency.

### v.　　Reaction to New Information

The fifth *Cammer* factor is whether there is a cause and effect relationship between unexpected corporate events or disclosures and an immediate response in the security's price.[59]

---

[56]　17 C.F.R. § 240.15c3-1[c][8] (2006).

[57]　*Healthsouth*, 261 F.R.D. at 635; *see also Nature's Sunshine*, 251 F.R.D. at 663 ("the SEC permits [Form S-3] registration only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.").

[58]　*See* 17 C.F.R. § 239.13.

[59]　*Cammer*, 711 F. Supp. at 1287

Some courts have considered this "the most important *Cammer* factor" because without a causal relationship, it is "difficult to presume that the market will integrate the release of material information about a security into its price."[60]   When applying this factor in the context of analyzing the market efficiency of debt securities, court have recognized that "[t]he price of bonds reacts differently to unexpected new information than does the price of stocks."[61] "Information that may be material to a stock price, such as the announcement of a dividend, may not be material for a bond investor whose fixed return would not be affected."[62]   Accordingly, when examining this factor in the context of debt securities, the Court should recognize that "material new unexpected information concerning the creditworthiness of the issuer or the prospect of default on bond obligations would be of interest to bondholders and affect the price."[63]

The O'Mara Declaration states that eight of the ten Sprint bonds dropped in price on January 18, 2008, when a Sprint analyst issued a research report titled "Meltdown:  4Q07 Sub Loss Worse Than Expected; Serious Restructuring Ahead."[64]   Additionally, on February 28, 2008, when Sprint issued a press release announcing the Company's 4Q and FY 2007 results and a goodwill impairment charge of $29.7 billion, nine of ten Sprint bonds dropped in price, losing 9.44% to 12.5%.  Plaintiffs assert that this is evidence of a cause and effect relationship between new Sprint news and Sprint Bond prices.

---

[60]   *Winstar*, 290 F.R.D. at 448.

[61]   *Healthsouth*, 261 F.R.D. at 635.

[62]   *Id.*

[63]   *Id.* at 635-36.

[64]   Declaration of Brian O'Mara, Doc. 117-5, p. 6.

Defendants contend that Lead Plaintiffs have not met their burden to show that the Sprint Bonds traded in an efficient market because Plaintiffs did not present an event study through expert testimony showing that the price of the Sprint Bonds reacted to new information. An event study is "a term of art in the relevant economic literature that refers to a regression analysis that examines the effect of an event on some dependent variable, such as a corporation's stock price."[65] An event study has been considered prima facie evidence of the existence of a causal relationship.[66] However, it may be rejected if it is methodologically unsound or unreliable.[67] Defendants argue that the O'Mara Declaration does not qualify as an event study and does not show that the price of the Sprint Bonds reacted to any of the alleged misstatements about Sprint.

The Court finds this argument unpersuasive. Lead Plaintiffs are not required to provide an event study or expert testimony to show market efficiency.[68] Nowhere in *Cammer* did the court require an event study or expert opinion to prove the existence of an efficient market.[69] The Supreme Court has even acknowledged that "there is more than one way to demonstrate the causal connection."[70] Furthermore, at least one district court has found indicia of market efficiency based on a showing that a company's bonds reacted to news about the company on two days during the class period, despite the lack of a formal event study.[71] In *Winstar*, the

---

[65] *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1272-73 (N.D. Okla. 2007) (citation omitted).

[66] *Winstar*, 290 F.R.D. at 448 (citing *Bombardier*, 546 F.3d at 207).

[67] *Id.* (citing *Bell*, 422 F.3d at 316).

[68] *Countrywide*, 273 F.R.D. at 609 n. 74; *accord Unger*, 401 F.3d at 323 n. 6 ("There is no requirement for expert testimony on the issue of market efficiency . . . .").

[69] *Cammer*, 711 F. Supp. at 1287 ("[I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship").

[70] *Basic Inc.v. Levinson*, 485 U.S. 224, 243 (1988).

[71] *Winstar*, 290 F.R.D. at 448-49.

plaintiffs' expert was not able to conduct a formal event study for Winstar's bonds because she did not have trading data for each day of the class period.[72] Despite this, the court found that the expert's evidence showed that the price of the bonds reacted on two days during the class period and thus was indicative of market efficiency.[73]

Here, the Court finds that Plaintiffs have submitted probative evidence of a cause and effect relationship between the price of Sprint Bonds and the release of unexpected information. Indeed, "the relationship between market price for bonds and public information may best be demonstrated by the cause and effect relationship of disclosure of *unexpected* information."[74] The bond prices for the Sprint Bonds dropped dramatically to the unexpected disclosure of adverse financial information on January 18, 2008, and February 28, 2008. The Court notes, however, that Plaintiffs presented no expert testimony on this factor, as is typically done. Although expert testimony is not strictly required, in its absence the Court must conclude that Plaintiff's evidence is not a conclusive indicator of market efficiency and weighs only slightly toward a finding of market efficiency. The Court will consider it for its contribution to the overall weighing of the nine relevant factors in assessing market efficiency.

### vi.     Market Capitalization

In addition to the *Cammer* factors, some courts have also looked at market capitalization when examining market efficiency.[75] Here, Lead Plaintiffs have produced evidence showing that the market value of the Sprint Bonds during the class period ranged from approximately $14.2

---

[72]     *Id*. at 448.

[73]     *Id*.

[74]     *HealthSouth*, 261 F.R.D. at 636.

[75]     *Unger*, 401 F.3d at 323.

billion to $18.1 billion. Defendants argue that this information is insufficient because Plaintiffs have not provided information on how regularly these bonds traded. This information, however, does not change the total value of the bonds. Furthermore, Plaintiffs have provided information regarding the weekly trading volume of the Sprint Bonds.[76] Given the large market value of the Sprint Bonds, this factor indicates that the Sprint Bonds trade in an efficient market.[77]

### vii.    Bid-Ask Spread

"The bid-ask spread is the difference between the price at which investors are willing to buy stock and the price at which current stockholders are willing to sell their shares. A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[78]

The O'Mara Declaration states that the bid-ask spread for the Sprint Bonds ranged from 0.13% to 0.44%, which is very small. Defendants claim that Plaintiffs' data is inaccurate because it relies on price quotes from Bloomberg, L.P., which are end of day quotes and not transaction prices.[79] In response, Plaintiffs assert that the Bloomberg price quotes are "matrix pricing" which courts have approved the use of "as long as they are shown to be consistent and reliable proxies for transaction prices."[80] Plaintiffs have not, however, provided any information regarding whether the Bloomberg price quotes they used in calculating the bid-ask spreads are

---

[76]    *See* above in Section 4.a.i., titled "Weekly Trading Volume."

[77]    *See Healthsouth*, 261 F.R.D. at 636 (finding that the market value of bonds ranging from $870 million to $3.5 billion reflected an efficient market).

[78]    *Krogman*, 202 F.R.D. at 478.

[79]    *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *11 (S.D.N.Y. Aug. 1, 2006) (noting that Bloomberg prices are not transaction prices) [hereafter "*Bombardier II*"].

[80]    *In re Dynex Capital, Inc. Secs. Litig.*, 2011 WL 781215, at *5 (S.D.N.Y. Mar. 7, 2011).

consistent and reliable proxies for transaction prices. Therefore, the Court finds that this factor does not support a finding of market efficiency.

<strong>viii.    Float</strong>

This factor looks at the percentage of shares held by the public as opposed to corporate insiders. Neither party has addressed this factor, as debt is not generally held by corporate insiders.[81]  Thus, this factor is not relevant to the determination of the market efficiency of the Sprint Bonds.

<strong>ix.    Institutional Ownership</strong>

During the class period, approximately 224 institutions purchased and held Sprint bonds. Included in this number are insurance companies, investment banks, pension funds, and other sophisticated traders. The fact that a large number of institutions actively traded Sprint Bonds demonstrates an efficient market through the class period.

**b.    Defendants' Expert's Report Does Not Undermine the Market Efficiency of Sprint Bonds.**

Defendants challenge Plaintiffs' evidence that the Sprint Bonds traded in an efficient market through the findings of their expert, Dr. Bajaj. Dr. Bajaj's expert report concludes that the Sprint Bonds traded in an inefficient market because (1) event studies show that the Sprint Bonds did not react efficiently to new information about Sprint; (2) there is a potential for arbitrage profits on the Sprint Bonds; and (3) the Sprint Bonds exhibit a predictable pricing pattern irrespective of new information. In response to Dr. Bajaj's expert report, Plaintiffs submitted the expert report of Dr. Preston, which the Court finds adequately refutes Dr. Bajaj's conclusion that the Spring Bonds traded in an inefficient market.

---

[81]    *HealthSouth*, 261 F.R.D. at 637.

First, Dr. Bajaj performed three event studies on the Sprint Bonds to determine whether there is "a cause and effect relationship" between unexpected corporate events or financial releases and a response in the security's price. According to Dr. Bajaj's expert report, these studies show that the market for the Sprint Bonds is inefficient because (1) for the twenty-seven days in the Complaint that Plaintiffs allege a misstatement or additional disclosure by Defendants regarding Sprint, the prices of the Sprint Bonds did not, as expected, inflate on positive news and decrease on negative news; (2) the prices of the Sprint Bonds and the Sprint stocks reacted inconsistently to the same information; and (3) pairs of Sprint Bonds moved in opposite directions in reaction to the same information. However, as Plaintiffs assert, these event studies confuse the equity and debt markets and fail to properly assess the reaction of the Sprint Bonds to new information about Sprint.

In his first and third event study, Dr. Bajaj examined the price of Sprint Bonds on certain "news" days.[82] Dr. Bajaj, however, did not look at the substance the information released on these "news" days. This is important because, unless the statement disclosed information that altered Sprint's likelihood of default, the price of the Sprint Bonds would not be expected to change in any meaningful way. "The changes in market price of corporate bonds most frequently reflect changes in risk-free interest rates (Treasury Bonds) and changes in the company's likelihood of default on its obligations, i.e., a company' credit risk."[83] Furthermore, neither stock nor bond prices would be expected to move in response to the omission of material information. Because Dr. Bajaj failed to evaluate whether or not the substance of the news

---

[82] For the first study, Dr. Bajaj looked at the twenty-seven days in the Complaint that Plaintiffs allege a misstatement or other additional disclosure. For the third study, Dr. Bajaj evaluated 209 news days on which Sprint-specific information was released to the market.

[83] *HealthSouth*, 261 F.R.D. at 631-32.

released would cause a Sprint bond to increase or decrease in price, his event studies are not reliable evidence to evaluate the significance of a bond's price movements against the alleged misstatements.

In his second event study, Dr. Bajaj tried to prove inefficiency by pointing to the different reactions to the Sprint stocks and bonds on certain news days. This analysis ignores the differences between stocks and bonds and assumes that bonds respond in the same manner to events that would affect stock prices. "There seems to be little, if any, dispute that the nature of news that would affect the markets for stock can be quite different [from] what would affect the markets for bonds."[84] Even when equity and debt securities react to similar news, courts have recognized that "their responses may diverge in degree."[85] Thus, Dr. Bajaj's conclusion that the market for Sprint Bonds is inefficient because the bonds did not exhibit similar statistically significant price movement as the Sprint stocks on the same dates does not undermine Plaintiff's evidence of market efficiency of the Sprint Bonds.

Second, Dr. Bajaj's expert report concludes that the market for the Sprint Bonds is inefficient because there was the potential for arbitrage profits on the bonds due to information discrepancies. "Arbitrageurs are 'professional investors who exploit price differences in different markets by buying and selling identical securities in those markets.' "[86] "Market makers and arbitrageurs contribute to market efficiency by 'reacting swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price

---

[84]   *Newby v. Enron Corp.*, 539 F. Supp. 2d 644, 747 (S.D. Tex. 2006).

[85]   *Countrywide*, 273 F.R.D. at 615; *see also HealthSouth*, 261 F.R.D. at 632 ("[I]n efficient capital markets, the price of the investment-grade bonds is not very sensitive to day-to-day stock price fluctuations, nor will it always react to corporate announcements.").

[86]   *Bombardier II*, 2006 WL 2161887, at *7 (quoting *Stuebler v. Xcelera.com.*, 430 F.3d 503, 515 n. 13 (1st Cir. 2005)).

level.' "[87]  According to Dr. Bajaj's expert report, arbitrage profits arise when the "Law of One Price" is violated, and an investor can buy from a market maker at a low ask price, simultaneously sell to another market maker at a high bid price and make a profit in excess of trading costs.  Dr. Bajaj asserts that the three Sprint Bonds held by Plaintiff WVIMB violated the Law of One Price because of price discrepancies between certain dealer's bid quotes and other dealer's ask quotes at the end of certain trading days.  Plaintiffs assert, and the Court agrees, that this analysis is flawed.  Bond prices are not the same as bond quotes.  Indeed, dealer quotes are not executable prices and may be stale.  Furthermore, Dr. Bajaj admitted in his deposition that he was not aware of any highly sophisticated investors and banks that generated profits from the Sprint Bonds in this manner.  Accordingly, the Court finds that Dr. Bajaj's conclusions regarding the "Law of One Price" and the Sprint Bonds do not support a finding of market inefficiency.

Finally, Dr. Bajaj concludes that economic evidence shows price reversals and negative serial correlations such that the Sprint Bonds did not trade in an efficient market.  However, the Court is not persuaded that this is sufficient evidence of market inefficiency.  "The presence of serial correlation is not itself determinative of inefficiency."[88]  Additionally, Dr. Preston's expert report states that "serial correlation in bonds is a well-documented phenomemon."[89]  Her expert report also shows that the benchmark bond index Dr. Bajaj measured, as a whole, "exhibited significant serial correlation during the Class Period."[90]  Therefore, the serial correlation in the

---

[87]  *Id.* (quoting *Cammer*, 711 F. Supp. at 1287).

[88]  *Countrywide*, 273 F.R.D. at 615.

[89]  Preston Expert Report, Doc. 171-6, p. 15.

[90]  *Id.*

Sprint Bonds was not unusual in the bond markets generally, and Dr. Bajaj's conclusion that such correlation demonstrates market inefficiency fails.

In considering the evidence before it and the totality of the *Cammer* factors, the Court finds that Plaintiff has established by a preponderance of the evidence that the Sprint Bonds traded in an efficient market during the class period. Therefore, Plaintiffs' proposed class is entitled to the presumption of reliance afforded by the fraud-on-the market theory. Plaintiffs have thus satisfied the Rule 23(b) requirement of predominance.

Plaintiffs have also satisfied the Rule 23(b) requirement of superiority. Where individual claims are similar, a class action may be superior to discrete actions that could be "grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation."[91] As discussed above, Plaintiffs' claims are substantially similar, rely upon much of the same evidence, and will require many of the same witnesses. Therefore, the Court finds that a single class action is a preferable and superior method to duplicative litigation by individual parties.

### 5.    Conclusion

Based on the foregoing, the Court concludes that Plaintiffs' proposed class satisfies the requirements of Rule 23. Accordingly, the class will be certified with respect to Plaintiffs' claims, and Lead Plaintiffs are appointed as class representatives.

---

[91]    *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 679 (D. Kan. 2004).

## B.    Appointment of Class Counsel Under Rule 23(g)

"An order certifying a class must also appoint class counsel that will adequately represent the interests of the class."[92]   In appointing class counsel, the court must consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.[93]

Plaintiffs move to appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and Motley Rice LLC ("Motley Rice") as class counsel for the class.   Defendants do not oppose Robbins Geller or Motley Rice as class counsel for this action.   After reviewing the record, the Court is satisfied that Plaintiffs' attorneys meet the criteria of Rule 23(g) and will adequately represent the interests of the class as counsel.   Both firms have been substantially involved in this litigation, and Robbins Geller has participated in the action since its inception.   Therefore, the Court appoints Robbins Geller and Motley Rice as co-lead class counsel for this action.

## C.    Notice Pursuant to Rule 23(c)(2)(B)

Under Rule 23(c)(2)(B), when a court certifies a class under Rule 23(b)(3), the Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."[94] The Court believes that the majority, if not all, of the class members can be identified through

---

[92]    *Amchem Prod.*, 521 U.S. at 615.

[93]    Fed. R. Civ. P. 23(g)(1)(A).

[94]    Fed. R. Civ. P. 23(c)(2)(B).

reasonable efforts. Record owners of the Sprint securities may be identified from records maintained by Sprint or its transfer agent. Therefore, Sprint is directed to provide Plaintiffs' counsel with names, addresses, and if possible, telephone numbers for all owners of the Sprint securities falling within the defined class on or before May 1, 2014. Also on or before May 1, 2014, Plaintiffs shall prepare and provide to the Court for approval an order regarding notice that complies with the requirements of Rule 23(c) of the Federal Rules of Civil Procedure.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Class Certification (Doc. 116) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 27th day of March, 2014.

Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE